**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____x
**FARI MURRAY,**
**DANIEL MOYLE,**
**ROY WELSH,**
**CARLOS PALAGOACHI,**
**and**
**WARREN PAYNE,**
*individually and on behalf of others similarly*                                     **Case Number 20-1427**
*situated,*

                                                                    **DEMAND FOR JURY TRIAL**
                                                 **Plaintiffs**   **COLLECTIVE ACTION**
                                                                    **UNDER 29 U.S.C. § 216(b)**

**-against-**

**UNITED PARCELS SERVICE, INC.,**
**WILLIE GRAY,**
**CHANCE STEWART, and**
**LLOYD HALL**

                                                 **Defendants.**
_____ x

    Plaintiff Fari Murray ("Plaintiff Murray" or "Mr. Murray"), Plaintiff Daniel Moyle ("Plaintiff Moyle" or "Mr. Moyle"), Plaintiff Roy Welsh ("Plaintiff Welsh" or "Mr. Welsh"), Plaintiff Carlos Palagoachi ("Plaintiff Palagoachi" or "Mr. Palagoachi"), and Plaintiff Warren Payne ("Plaintiff Payne" or "Mr. Payne") (Collectively, "Plaintiff's") individually and on behalf of others similarly situated, by and through their attorney, Tyrone Blackburn Esq, upon their knowledge and belief, and as against United Parcels Service, Inc. d/b/a UPS ("Defendant Corporation"), Willie Gray, Chance Stewart, and Lloyd Hall or ("Defendants") alleges as follows:

<u>**NATURE OF ACTION**</u>

1. This is an action for monetary and declaratory relief to redress Defendants' violation of Plaintiffs' workplace rights. Plaintiffs' seek relief for employment discrimination in violation of Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. ("FLSA"), for violations of the N.Y. Labor Law § § 190 et seq. and 650 et seq. (The "NYLL"), overtime wage orders of the New York Commissioner of Labor codified at N. Y. Comp. Codes R. & Regs. tit. 12, § 146-

1.6 (herein the "Spread of Hours Wage Order"), for violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), CPLR 214 (4), the New York Equal Pay Act, (NYSHRL) N.Y. Exec. Law § 290 et seq., (NYSHRL) N.Y. Exec. Law § 296, ("NYCHRL") Administrative Code of City of New York § 8-107 (7), Administrative Code of City of New York § 8-107 (6), and Administrative Code of City of New York § 8-107 (13).

2.  At all times relevant to this Complaint, Defendants maintained a policy and practice of knowingly and willfully compensating black On the Road Supervisors ("Supervisors"), less than their Caucasian colleagues in violation of Title VII of the Civil Rights Act of 1964 and New York City and State equal pay laws.

3.  At all times relevant to this Complaint, Defendants maintained a policy and practice of requiring Plaintiff's, and other similarly situated employees, to work an excess of forty (40) hours per week without providing the overtime compensation required by federal and state laws and regulations.

4.  Plaintiff's now bring this action on behalf of themselves, and other similarly situated employees, for unpaid minimum and overtime wages pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. ("FLSA"), and for violations of the N.Y. Labor Law § § 190 et seq. and 650 et seq. (The "NYLL"), and overtime wage orders of the New York Commissioner of Labor codified at N. Y. Comp. Codes R. & Regs. tit. 12, § 146-1.6 (herein the "Spread of Hours Wage Order"), including applicable liquidated damages, interest, attorneys' fees and costs.

5.  Plaintiffs seek certification of this action as a collective action on behalf of themselves individually, former employees, and all other similarly situated employees who elect to opt-in to this action pursuant to FLSA, 29 U.S.C. §§ 201 *et seq*., and specifically, the collective action provision of 29 U.S.C. § 216(b).

## ADMINISTRATIVE PROCEDURES

6.  Plaintiff Murray filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for his Title VII race wage discrimination claim. On December 18, 2019, Plaintiff Murray was provided a Notice of Right to Sue by the EEOC. All conditions precedent to the filing of suit have been performed or have occurred.

7.  Plaintiff Moyle filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for his Title VII disability discrimination claim. Plaintiff Moyle has requested a Right to Sue Letter from the EEOC.

8.  Plaintiff Welsh filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for his Title VII Disability, and Religious Observance Discrimination claims. Plaintiff Welsh has requested a Right to Sue Letter from the EEOC.

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction under 28 U.S.C § 1331 (federal question) and the FLSA, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

10. Venue is proper in this district under 28 U.S.C § 1391(b) and (c) because all, or a substantial portion of, the events or omissions giving rise to the claims occurred in this district, Defendant's maintain several branches and offices within this district, and Defendant's operate a package delivery business located in this district. Further, Plaintiffs are or were employed by Defendants in this district.

## PARTIES

*Plaintiffs*

11. Plaintiff Fari Murray is an adult individual residing in Westchester County, New York.

12. Plaintiff Daniel Moyle is an adult individual residing in Bronx County, New York.

13. Plaintiff Roy Welsh is an adult individual residing in New Orleans, Louisiana.

14. Plaintiff Carlos Palagoachi is an adult individual residing in Bronx County, New York.

15. Plaintiff Warren Payne is an adult individual residing in Kings County, New York.

16. Plaintiff Murray was employed by Defendant United Parcels Service from approximately January 4, 2003 to October 8, 2018.

17. Plaintiff Moyle was employed by Defendant United Parcels Service from approximately July 9, 2012 to August 21, 2019.

18. Plaintiff Welsh was employed by Defendant United Parcels Service from approximately June 26, 2016 until July 20, 2019.

19. Plaintiff Palagoachi was employed by Defendant United Parcels Service from approximately October 2017 until May 2018.

3

20. Plaintiff Payne was employed by Defendant United Parcels Service from approximately August 2017 until June 2018.

21. Plaintiff Payne consents to be a party plaintiff pursuant to 29 U.S.C. § 216(b), and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under 29 U.S.C. § 216(b).

*Defendants*

22. At all relevant times, Defendant Corporation own, operate, or control a package delivery service business, located at 10401 Foster Avenue, Brooklyn, NY 11236 under the name "United Parcel Service, Inc."

23. Defendant Willie Gray is a Business Manager at Defendant Corporation. He is also the former supervisor of Plaintiff Murray.

24. Defendant Chance Stewart is a District Manager of Defendant Corporation. He is also the former supervisor of Plaintiff Moyle.

25. Defendant Lloyd Hall is a Business Manager at Defendant Corporation. He is also the former supervisor of Plaintiff Welsh.

## COLLECTIVE ACTION ALLEGATIONS

26. Plaintiff Payne and Plaintiff Palagoachi bring the First Cause of Action, an FLSA claim, on behalf of themselves and all similarly situated persons who work or have worked as Delivery Driver's for Defendant Corporation who elect to opt-in to this action (the "FLSA Collective").

27. Defendants are liable under the FLSA for, inter alia, failing to properly compensate Plaintiff Payne and Plaintiff Palagoachi and the FLSA Collective.

28. Consistent with Defendants' policies and patterns or practices, Plaintiff Payne and Plaintiff Palagoachi and the FLSA Collective were not paid the proper premium overtime compensation of one and a half times their regular rates of pay for all hours worked beyond 40 hours per workweek.

29. All of the work Plaintiff Payne and Plaintiff Palagoachi and the FLSA Collective have performed has been assigned by Defendant, and/or Defendant have been aware of all of the work that Plaintiff and the FLSA Collective have performed.

30. As part of their regular business practice Defendant has intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiff Payne and Plaintiff Palagoachi and the FLSA Collective. This policy and pattern or practice includes, but is not limited to, willfully failing to pay their employees, including Plaintiff Payne and Plaintiff Palagoachi and the FLSA Collective, proper premium overtime wages for all hours worked in excess of 40 hours per workweek.

## CLASS ACTION ALLEGATIONS

31. Plaintiff Payne and Plaintiff Palagoachi bring the NYLL claims, under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a class of persons consisting of:

> All persons who work or have worked as delivery drivers for Defendant Corporation in New York State between 2014 and the date of final judgment in this matter (the "Rule 23 Class").

32. The Rule 23 Class Members are so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

33. Plaintiff's claims are typical of those claims that could be alleged by any Rule 23 Class Member, and the relief sought is typical of the relief which would be sought by each Rule 23 Class Member in separate actions.

34. Plaintiff's and the Rule 23 Class Members have all been injured in that they have been uncompensated or under-compensated due to Defendants' common policies, practices, and patterns of conduct. Defendants' corporate-wide policies and practices affected all Rule 23 Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each of the Rule 23 Class Members.

35. Plaintiff's are able to fairly and adequately protect the interests of the Rule 23 Class Members and has no interests antagonistic to the Rule 23 Class Members.

36. Plaintiffs are represented by attorneys who are experienced and competent.

37. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to

prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

38. Common questions of law and fact exist as to the Rule 23 Class that predominate over any questions only affecting Plaintiff's and the Rule 23 Class Members individually and include, but are not limited to, the following:

    a. Whether Defendants failed to compensate Plaintiff Payne and Plaintiff Palagoachi and the Rule 23 Class for all hours worked at their regular rate(s) of pay;

    b. Whether Defendants failed to compensate Plaintiff Payne and Plaintiff Palagoachi and the Rule 23 Class for hours worked in excess of 40 per work week;

    c. Whether Defendants failed to furnish Plaintiff Payne and Plaintiff Palagoachi and the Rule 23 Class with accurate statements with every payment of wages, as required by the NYLL;

    d. The nature and extent of class-wide injury and the measure of damages for those injuries.

## FACTUAL ALLEGATIONS

### *Defendants Constitute Joint Employers*

39. Defendant's operate a package delivery service located in New York City, in the boroughs of Brooklyn, Manhattan and the Bronx.

40. Defendant's act in the interest of itself with respect to employees, pay employees by the same method, and share control over the employees.

41. Defendant's possessed substantial control over Plaintiff's, and other similarly situated employees, working conditions, and over the policies and practices with respect to the employment and compensation of Plaintiff's and all similarly situated employees, referred to herein.

42. Defendant's employed Plaintiff's, and all similarly situated employees, and are Plaintiff's, and other similarly situated employees, employers within the meaning of 29 U.S.C. 201 et seq. and the NYLL.

43. In the alternative, Defendant constitute a single employer of Plaintiff's and all similarly situated employees.

44. At all relevant times, Defendants were Plaintiff's employer within the meaning of the FLSA and NYLL. Defendants had the power to hire and fire Plaintiff's, controlled the terms and

conditions of employment, and determined the rate and method of any compensation in exchange for Plaintiff's services.

*Individual Plaintiff*

45. Plaintiff Murray is a former employee of Defendants who was employed as an on the road Supervisor.

46. Plaintiff Moyle is a former employee of Defendants who was employed as a Business Manager.

47. Plaintiff Welsh is a former employee of Defendants who was employed as an on the road Supervisor.

48. Plaintiff Palagoachi is a former employee of Defendants who was employed as a delivery driver.

49. Plaintiff Payne is a former employee of Defendants who was employed as a delivery driver.

50. Plaintiff's Palagoachi and Payne seek to represent a class of similarly situated individuals under 29 U.S.C. 216(b).

*Plaintiff Murray*

51. Plaintiff Murray was employed by the Defendants from approximately January 4, 2003 until October 8, 2018. Defendants employed Plaintiff Murray as a on the road supervisor.

52. Plaintiff Murray's work duties required neither discretion nor independent judgment. Throughout his employment with Defendants, Plaintiff Murray regularly worked in excess of forty (40) hours per week.

53. Plaintiff Murray is a whistleblower who raised concerns of gender and race-based wage discrimination, Department of Transportation (DOT) violations, massive overtime theft of the delivery drivers and other abuses by UPS management.

54. Plaintiff Murray sustained substantial psychological and monetary injuries as a result of the hostile work environment he was subjected to while an employee of UPS by his former manager, Willie Grey, as well as, UPS senior management.

55. Plaintiff Murray has firsthand knowledge of UPS violating the US Department of Labor's wage and hour laws.

## **Willie Gray Commits DOT Violations and Overtime Theft**

56. Plaintiff Murray is prepared to prove that Willie Gray, as well as, UPS senior management stole hundreds of hours of overtime from a class of drivers. The evidence will show that many drivers start work at 7am or 9am and they punch out at 10pm or 11pm. That is an average of 15 to 16 hours a day. In a 5-day work week these drivers are working an average of 75 to 80 hours a week. Many of these drivers work 6 days a week. Which brings their hours into the mid 80's and 90's. These hours are not reflected on their paychecks.

57. Plaintiff Murray has evidence of some drivers working 17 to 18-hour shifts. These hours were not reflected on the driver's paychecks.

58. Plaintiff Murray is prepared to reveal the scheme that Willie Gray and UPS senior Management instructed the on the road supervisors to execute as it pertains to stealing overtime hours from the delivery drivers.

59. Plaintiff Murray is prepared to reveal how managers and supervisors would go into the GTS (Global Timecard System) and change the punch in and punch out times of the delivery drivers. This illegal act reduces the drivers daily and weekly hours worked. The drivers would then have to beg and plead with their supervisors and managers to pay them for their time. Unfortunately for them the payments never came.

60. In regard to the DOT violations, Plaintiff Murray has evidence to show countless hours of DOT hour manipulation. Time that was stolen is a pattern and practice of the company and its management team to manipulate the DOT rules and regulations.

61. Willie Gray and other senior managers knowingly and willfully require the class as well as, on the road supervisors or work beyond their allotted DOT hours.

62. In addition to the DOT violations of the delivery drivers, Willie Gray and UPS senior management violated the DOT hours of the on the road supervisors as well.

63. On the road supervisors do not punch in or punch out. Their DOT hours are untraceable; therefore, the on the road supervisors are subjected to abuse by Willie Gray and the UPS senior management. On the road supervisors often work 15-18-hour shifts.

## **Plaintiff Murray is a Victim of Wage Discrimination**

64. In addition to his firsthand knowledge of UPS's DOT violations, and the overtime theft committed against the delivery driver, Mr. Murray was a victim of wage discrimination.

65. Mr. Murray earned $80,000.00 base salary as an on the road supervisor while his Caucasian male counterpart, Patrick Scanlon ("Scanlon"), earned over $100,000.00 base salary. Mr. Murray trained Scanlon when Scanlon began his career at UPS.

66. When Mr. Scanlon was hired, he was a new driver trainee. Pursuant to the UPS's policy, new driver trainees are on probation and are required to stay accident free. While in training Mr. Scanlon ran into the back of Mr. Murrays vehicle while Mr. Murrays vehicle was parked on the street. Mr. Scanlon was not fired or reprimanded by UPS. In fact, UPS instructed Mr. Murray not to make a big deal about the accident and intimidated him out of contacting his insurance carrier. Murray was left with thousands of dollars' worth of damage to his vehicle. Damages that still exist today.

67. Mr. Murrays vehicle was not the only vehicle Mr. Scanlon hit. Throughout his time with UPS, Mr. Scanlon ran into several vehicles. None of the accidents were ever reported to the insurance carrier by UPS. With this track record one would assume that Mr. Scanlon would be out of a job, but when you're Caucasian and male, you don't get fired you get promoted within UPS.

68. Shortly after joining the company and crashing into several cars, Mr. Scanlon was promoted by UPS to supervisor.

69. UPS engaged in egregious race and color discrimination when they terminated Mr. Murray.

### **Mr. Murray was terminated for being a whistleblower**

70. Mr. Murray was a whistleblower who exposed the activities of Willie Gray and UPS senior management during an investigation surrounding a failed car accident coverup.

71. Mr. Murray has evidence of many Caucasian on the road supervisors and division managers committing egregious and ethically flawed acts. Actions that UPS senior management is well Willie Gray, was aware of. These Caucasian on the road supervisors and division managers have never been terminated. In fact, they were either reassigned to different location, or transferred to different areas or buildings.

72. Additionally, Willie Gray and UPS senior management consistently denied African American on the road supervisors request to transfer out of their location. Mr. Murray knows of countless African American on the road supervisors who have made formal transfer request to locations and positions that they were qualified for, and they were told they "Fit" the demographics of

their current coverage area[1] better. For example, Orane (an African American male) was denied a transfer request to Pennsylvania. A Caucasian male with less experience and qualifications made the same transfer request and it was granted. Malcom (an African American male) made a transfer request and it was denied. A Caucasian male who was less qualified and less experienced made the same request and it was granted.

73. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation to end DOT violation complaints on behalf of the on the road supervisors who were working 17 hours shifts.

74. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation of supervisors by threatening to write them up and terminate them if they did not use their personal vehicles to deliver UPS packages. On the road supervisors use of their personal vehicles to deliver packages is a violation of the collective bargaining agreement.

75. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation of the truck delivery drivers. Threatening to fire them if they complained about the overtime theft they experienced when they worked 15 to 17-hour days.

76. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation of the package truck drivers and supervisors by forcing the package truck drivers to pay out of pocket for car accidents, as oppose to reporting the accidents to UPS insurance carrier.

## Willie Gray Covered up Accidents and Injuries

77. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation of the supervisors by failing to report countless automobile accidents and forcing them to manipulate the accident scenes in order to decrease the company's insurance liability.

78. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation of the drivers and workers who were injured on the job by prohibiting them from visiting their personal doctors and forcing them to visit designated "company medical experts" who would misdiagnose them. Willie Gray would send on the road supervisors with the drivers

---

[1] Their coverage area is predominantly African American. Their coverage area is comprised of housing projects, narrow poorly kept streets, and are full of violence.

to his medical experts and have the experts downplay the severity of the injury and designate the worker as being able to work on light duty.

79. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation of the supervisors and drivers by making them scan packages as if a valid delivery attempt was made to the package delivery address, when no attempt was made, in order to avoid a missed delivery.

80. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation of the drivers by making them implement a negligent "Driver Release" policy. This policy forces the drivers to leave packages in high risk areas. Drivers are then terminated as a result of this policy if a package is stolen.

81. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation by forcing supervisors to use their personal vehicles to deliver packages. During one of these deliveries Mr. Murrays vehicle was hit, and Willie Gray refused to report it to the insurance carrier. Instead Willie Gray and UPS senior management bullied Mr. Murray into keeping silent.

82. Mr. Murray has evidence of Willie Gray and UPS senior management engaging in workplace intimidation by prohibiting the submissions of gasoline expense reports or change the gasoline expense reports submitted by the on the road supervisors. Willie Gray and UPS Management would also reduce the number of miles reported by the on the road supervisors so it would not look bad on the expense reports.

*Plaintiff Moyle*

83. Mr. Moyle is a veteran of the United States Marine Corps. He fought in the Iraq war and proudly served this country (active duty) for over 5 years.

84. Mr. Moyle was employed by the Defendants from approximately July 9, 2012 until August 21, 2019. Defendants employed Mr. Moyle as a Business Manager.

85. Mr. Moyle's work duties required neither discretion nor independent judgment.

86. Mr. Moyle is a whistleblower who raised concerns of document manipulation, fraudulent reporting of accidents, Department of Transportation (DOT) violations, massive overtime theft of the drivers and other abuses by UPS management.

87. Mr. Moyle sustained substantial psychological and monetary injuries as a result of the hostile work environment he was subjected to while an employee of UPS by his former manager, Chance Stewart, as well as, UPS senior management.

88. Mr. Moyle has firsthand knowledge of UPS violating the US Department of Labor's wage and hour laws.

89. Mr. Moyle is prepared to prove that Chance Stewart, as well as, UPS senior management stole hundreds of hours of overtime from a class of drivers. The evidence will show that many drivers start work at 7am to 9am and they punch out at 10pm 12am. That is an average of 15 to 17 hours a day. In a 5-day work week these drivers are working an average of 75 to 85 hours a week. Many of these drivers work 6 days a week. Which brings their hours into the mid 90's and 100's. These hours are not reflected on their paychecks.

90. Mr. Moyle has evidence of some drivers working 17 to 18-hour shifts. These hours were not reflected on the driver's paychecks.

91. Mr. Moyle is prepared to reveal the scheme that Chance Stewart and UPS senior Management instructed the Business Manager's to execute as it pertains to stealing overtime hours from the delivery drivers.

92. Mr. Moyle is prepared to reveal how managers and supervisors would go into the GTS (Global Timecard System) and change the punch in and punch out times of the delivery drivers. This illegal act reduces the drivers daily and weekly hours worked. The drivers would then have to beg and plead with their supervisors and managers to pay them for their time. Unfortunately for them the payments never came.

93. In regard to the DOT violations, Mr. Moyle has evidence to show countless hours of DOT hour manipulation. Time that was stolen is a pattern and practice of the company and its management team to manipulate the DOT rules and regulations.

94. Chance Stewart and other senior managers knowingly and willfully require the class as well as, Business Managers to work beyond their allotted DOT hours.

95. Over his 7-year career at UPS, Mr. Moyle was under constant pressure from his superiors, such as Chance Stewart, to engage in unethical, and illegal activities in order to cheat workers, customers, and insurance carriers.

96. Mafia like bullying tactics were not just used against Mr. Moyle, it was used as a common tactic to get business done across the board.  Mr. Moyle has evidence to prove that UPS bosses

– all throughout the organization, promote the falsification of company records in an effort to mislead customers, lower insurance premiums, as well as make their personal internal balanced score cards look more favorable.

97. Mr. Moyle is prepared to demonstrate how UPS uses their shoddy and unethical business practices to arbitrarily discipline or discharge its employees at any time and for disguised reasons – such as age, disability status, race or whether or not the individual is part of the 'in crowd'.

98. For example, at the 43rd Street facility, Mr. Moyle is aware of a UPS manager named Gary Graham who is both older, and African American. His manager, Justin Laporte, simply did not like him.

99. Mr. Moyle heard Justin Laporte say the following in regard to Gary Graham,

- "Gary sucks, I can't wait to get rid of him,"
- "He's useless,"
- "He's a waste" and
- "Fuck that guy".

100.    Gary Graham, a 30-year veteran of the company was fired for hiding an injury/accident, something Justin Laporte instructed him to do, and an act Justin Laporte does often himself.

### Tommy Francis forced Mr. Moyle to coverup accidents

101.    Mr. Moyle worked for Tommy Francis when he first entered UPS and was a supervisor. Tommy Francis taught Mr. Moyle how to cover up crashes and injuries by often dispatching Mr. Moyle to the scene of a crash and asking Mr. Moyle to pay for minor damages with his own money.

102.    Tommy Francis thought the number of crashes he covered up was amusing. Tommy Francis kept a little black book where he kept a log of all the injuries and accidents he covered up. Mr. Moyle knew that if he defied Tommy Francis, it would hurt his career. Tommy Francis required everyone that worked under him to cheat.

**UPS cheats customers by making them pay for Next Day Air package delivery, and**
**mismarking the undelivered packages as delivered**

103.    UPS cheats in many different ways. One of the primary ways UPS cheats is with their Next
        Day Air package service. The cheating is widespread across the New York City area (North
        Atlantic District) with delivery drivers being told by their superiors to scan time sensitive
        packages miles from the customer's location, mark them as delivered, only to deliver the
        packages later on that day after the time commitment.

104.    Next Day Air customers are paying a premium to have these packages shipped overnight
        and delivered by 10:30AM.

105.    Managers would either commit the fraud themselves or coerce the delivery drivers to mark
        commercial packages as residential when they came to a business that is closed after hours.
        This falsification avoids a service failure on UPS's part.

106.    One of the biggest proponents of this practice is Chance Stewart. Chance Stewart would
        flat out tell on the road supervisors to make these falsifications.

107.    It was common for Chance Stewart to give instructions to managers and supervisors that
        clearly violated UPS code of conduct. The following are examples of the cheating spear-
        headed by Chance Stewart: annual safety ride manipulation, service failure coverups, insurance
        fraud and auto accident coverups.


**Annual Safety Rides Manipulation**

108.    The company is mandated to perform annual safety rides for all of its employees.  The rides
        are mandated to be all day long and the safety department strictly enforces it. However, in an
        effort to chase performance results, UPS requires front-line supervisors to conduct all day long
        performance rides on the drivers as well.  These rides are called "On the Job Supervision" rides
        or "OJS" rides.

109.    These two rides are required to be done separately, especially since the safety ride
        documents become discoverable legal documents.

110.    Chance Stewart instructed his managers and supervisors to do both rides at the same time,
        tricking the system, by entering the performance ride digitally through a tablet – and the safety
        rides on paper. This is clear falsification.

111.    Only one ride can be performed at one time on the UPS tablet, there is a selection option of either Safety or Performance ride. This is how Chance Stewart maximizes his supervisors time – by falsifying legal documents that state a supervisor spent all day training an employee on safety, when in fact the supervisor did not.

## Service Failure Coverups

112.    On multiple occasions Chance Stewart instructed managers or supervisors to falsify premium Next Day Air packages that are delivered late.

113.    As recently as February 14, 2020, Chance Stewart instructed a supervisor to coverup 280 service failures to UPS customers.  It is UPS's obligation to deliver to commercial addresses by 5pm. If UPS fails to do so and the customer's business closes, the packages are unable to be delivered. Within UPS, this is very bad internally.

114.    Managers get beat up on conference calls and are forced to fill out extra paperwork. If there are excessive service failures in some cases their bonuses (company stock) are threatened or taken away completely.

115.    On February 14, 2020, a truck was loaded with 280 packages to be delivered to 270 Mulberry St and 310 Lafayette St. UPS forgot about these packages which were discovered by a supervisor. Chance Stewart directed this supervisor to falsify all 280 packages and mark each package with a disposition of "Closed Holiday."

116.    Those stores were open all day. UPS simply failed to deliver them because they forgot about them. The customers were not reimbursed for this failure. This is a gross falsification of company records and is common practice at UPS.

## Insurance Fraud and Accident Coverups

117.    On March 11, 2019 there is a text message thread with Chance Stewart and all of his managers.  Village Manager, Paul Williams announced to Chance Stewart through text that he had a crash in his center involving driver Jenelle Torres. The crash was on E. 18th Street. Paul Williams requested that Chance Stewart meet him there. This crash was never reported, never called in, and no paperwork was ever filed.

118.    Jenelle Torres did her job and reported the crash to her manager, Paul Williams. Paul Williams did his job and reported the crash to his manager Chance Stewart. Yet this case was not filed.

119.    Jenelle Torres accident was not filed because it would harm Chance Stewart's balanced score card. Reporting it would create extra paperwork for Chance Stewart and require him to be on a conference call beat-up session the following day.

## Mr. Moyle Blows the Whistle on an Accident Coverup

120.    During the First Quarter of 2019 one of Mr. Moyle drivers, Ramadan Abdul – Salaam, reported to his supervisors Reinaldo Madera that he slipped and fell. Reinaldo Madera, Rey and Alex De La Rosa went out to the scene and spoke with him.

121.    Approximately two weeks later Mr. Abdul- Salaam approached Mr. Moyle and informed him that his leg was still nagging him, and he felt that he should get medical attention.

122.    Mr. Moyle called Chance Stewart to report the injury, he still had hopes that he could suppress it. At that point Mr. Abdul-Salaam had already seen his doctor and sent Mr. Moyle a doctor's note.

123.    Completely disregarding Mr. Abdul-Salaam's doctors note, Chance Stewart asked Mr. Moyle to get in touch with Tony Hussein, a driver at the 43rd Street Facility. Tony Hussein has a common nickname, known throughout the North Atlantic District – "The Safety Mafia". Tony Hussein works hand in hand with the facility manager, Justin Laporte, and together they cover up crashes and injures as they occur. Tony Hussein is known to make accidents and injuries go away.

124.    Tony Hussein the Safety Mafia is a veteran delivery driver who is always readily available to take calls for help from managers and supervisors. After fielding accident calls, Tony Hussein then rushes out to the scene, and convinces drivers to either not report an injury, or to help sweep an accident under the rug. On information and belief, Tony Hussein made an injured UPS driver exit an ambulance and not report his accident injury.

125.    Ignoring Tony Hussein's pressure campaign, Mr. Moyle officially reported Mr. Abdul-Salaam's injury. Mr. Moyle actions angered Chance Stewart and landed Mr. Moyle in a heap of trouble because he reported the injury.

**Mr. Moyle is retaliated against for reporting Mr. Abdul-Salaam's Injury**:

126.    After Mr. Moyle went against Chance Stewart and Tony Hussein's wishes and reported Mr. Abdul-Salaam's injury, he was approached by Chance Stewart to engaged in another coverup.   This time, Chance Stewart demanded that Mr. Moyle work with Tony Hussein regarding a crash that occurred in a center managed by Manny Pujols. Mr. Moyle refused, and that spelled the beginning of the end of his tenure at UPS.

127.    Chance Stewart was on a mission to make Mr. Moyle's life a living hell. He began by requesting that Terri Murphy, the Metro New York Safety Manager, launch an "investigation" into Mr. Moyle concerning Mr. Abdul-Salaam's injury.

128.    Although he was aware of Mr. Abdul-Salaam's injury at the time it happened, Chance Stewart falsely reported Mr. Moyle for failing to report Mr. Abdul-Salaam's injury on time, resulting in a "Lost Time" injury.

129.    A lost time injury is the highest classification of injury internally at UPS. A lost time injury negatively impacts UPS's insurance premiums and it is a one-way ticket to termination for managers who are accused of acquiring them.

130.    As the safety manager for the New York Metro region, Terri Murphy orchestrates and promotes many tactics of covering up injuries and accidents.

131.    Injuries, accidents, and more specifically, lost time injuries are all negative hits on Terri Murphy's balanced scorecard. Upon receiving Chance Stewarts complaint, Terri Murphy was furious that she was being charged with this severe blemish on her BSC.

132.    Terri Murphy directly threatened Mr. Moyle on several occasions. On one of those occasions Terri Murphy said the following "This injury better not go lost time!"

133.    The rules do not apply to everyone. As a result of Mr. Moyle reporting Mr. Abdul-Salaam's injury, he was subjected to conference call harassment, public ridicule, threats of termination, heightened scrutiny of his work product, excessive unnecessary additional training, and harassment by company security.

134.    Mr. Moyle is aware of UPS's pattern and practice of punishing managers who speak up, it's called "grinding."  Grinding is the act of punishing managers and supervisors by making them work in locations far from their home, for extended hours, and during odd hours. Mr. Moyle suffered an immediate increase in the number of hours he was required to work. Mr.

Moyle went from working 40 to 45 hours a week, to being required to work 60 to 70 hours a week.

**<ins>Terri Murphy is the Queen of accident coverups</ins>**:

135.    Mr. Moyle along with other managers at UPS have had several sketchy conversations with Terri Murphy whenever they report auto accidents. Auto accidents at UPS are broken down into different classifications based on severity. It behooves the safety manager to wrongfully downgrade accidents.

- Tier 1 – Least severe (Hit while parked, hit parked vehicle, property damage)
- Tier 2 – Moderate (Sideswipe crash)
- Tier 3 – Severe (pedestrian, intersection accident, fatality)

136.    Within UPS, tier 3 crashes are very bad for business. When there is a tier 3 crash, the president of the district holds a conference call immediately no matter the time, managers are verbally assaulted on these conference calls and delivery drivers often lose their jobs.

137.    When sharing details of a crash with Terri Murphy, she asks questions and make insinuations to lead Mr. Moyle and other managers to report crashes as tier 2 instead of tier 3.

**<ins>Terri Murphy orchestrates auto accident scene manipulation</ins>**:

138.    In addition to tier manipulation, if Terri Murphy sees pictures of the accident scene and it's in an intersection, she would say the following:

- "Are you sure that crash didn't happen outside the intersection, and the truck came to a rest there?"  Or
- "Make sure you don't take any pictures near the crosswalk" or
- "Don't use that picture in the report" or
- "Why don't you call me back in 10 minutes and tell me if we really have to call this one in".

**<ins>Terri Murphy commits insurance fraud</ins>**:

139.    When a UPS driver crashes into a stationary object (wall, mailbox, steps) and causes property damage it is supposed to be a reported crash that goes against Terri Murphy's balance scorecard.

140.   Terri Murphy gets around this by deliberately mischaracterizing these claims to the insurance company as liability property claims that are not caused by the vehicle, therefore they are not considered auto crashes.

### **Mr. Moyle suffered from depression and severe anxiety**:

141.   During the spring of 2019, the stress and pressure became too much for Mr. Moyle. As a United States Marine Corps war veteran, Mr. Moyle's integrity and honor was being attacked.

142.   Mr. Moyle was being punished for going against Chance Stewart and Terri Murphy, by reporting the injury of Mr. Abdul-Salaam. He was required to work longer hours and was being threatened to be relocated to a branch over a hundred miles from his home.

143.   Mr. Moyle has witnessed countless supervisors and managers get rotated to undesirable locations far from their home and required to work hours that are inhumane if they go against UPS management.

144.   For example, in 2018 during Mr. Moyle's time as the Knickerbocker manager in Manhattan South, Mr. Moyle covered the entire operation when his manager, Frank Casalinho would take vacation.

During one particular week that Mr. Moyle was covering, Brian Cannon, Frank Casalinho's manager, reached out to Mr. Moyle for an update on the Manhattan South operation.

Brian replied by saying "Nice job, how come Manhattan South can't do it when Frank is there?  All roads lead to Frank.  He fucking sucks.  I can't wait to send that guy packing"

Shortly after Brian Cannon was promoted to be president of the North Atlantic District, and shortly after that he did exactly what he promised. He sent Frank packing.

145.   Brian Cannon sent Frank Casalinho to an operation in upstate New York. One of Frank's buildings was located over 100 miles away from his home. This goes against the maximum miles outlined by UPS company policy.

146.   It was a known fact that Brian didn't like Frank, even poking fun of him during meetings. Now Brian was in a position where he could make Frank miserable – and he did.

**Mr. Moyle goes on Short-term Disability, and is notified that he was being demoted and reassigned to a far location**

147.   Mr. Moyle's depression came to a head on May 9, 2019 when he was summoned to 43rd Street office to be interviewed by security.

148.   This was a game implemented by Chance Stewart and Terri Murphy as part of their retaliation against Mr. Moyle. They subjected Mr. Moyle to constant drilling and fake investigations from UPS company security.

149.   This constant harassment caused Mr. Moyle to have a panic attack, which resulted in a diagnosis of depression and severe anxiety.

150.   While out on disability leave, Mr. Moyle's position as the Knickerbocker manager was given to Brian Mactavish. He then learned that upon his return he would be relocated to a location far away from his home.

151.   Mr. Moyle was not offered any accommodations.

**UPS pressure campaign for United Way Campaign**

152.   Another unethical business practice is the way that UPS executes its annual United Way campaign. Once a year they strong arm all of their employees to give their money away in order to put the company in a positive light with the public.

153.   Contributing is supposed to be voluntary, supervisors and managers have preset amounts which they are "strongly" encouraged to give. The amounts are $750 for supervisors and $1000 for managers.

154.   Upper management keeps track of the names of individuals who do not give during the campaign, and those individuals are retaliated against.

155.   United Way is huge topic of conversation on conference calls, and operations that are lagging behind are singled out and asked to "PUSH" harder.  What does that mean?  How do you 'push' people to be charitable?  You retaliate against them by withholding their promotions, reassigning them to unfavorable locations, and unfavorable shifts.

## **Manhattan North 2017 Cheating Scandal**

156. Perhaps the biggest cheating scandal to rock the North Atlantic District occurred during 2017 in the Manhattan North facility. The facility manager at the time was Justin Laporte and his boss was Anthony Celano.

157. Anthony Celano was in charge of Justin's territory, as well as the Bronx and Westchester County. Anthony Celano worked for Brian Cannon, who was the operations manager of New York Metro.

158. Justin Laporte had his supervisors change timecards nightly. This happened on a very large scale. The supervisors would add 'miles driven' and 'packages delivered' to employees' timecards, making them look much more productive than they really were.

159. Justin Laporte personally swept dozens of injuries and accidents under the rug, often paying for vehicle damage with his own money. Justin Laporte would convince his employees to not report injuries, and instead would pay them to stay home and rest.

*Plaintiff Welsh*

160. Plaintiff Welsh has served in the United States Marine Corps and the Israeli Defense Forces. Mr. Welsh has received numerous commendations for his involvement in countless missions beyond the wire. As a Marine and an Israeli soldier, Mr. Welsh followed orders. When superiors at UPS instructed him to work as directed, Mr. Welsh took their words seriously. And like the military, Mr. Welsh trusted them to guide him towards understanding and interpreting UPS methods and procedures properly.

161. Mr. Welsh was employed by the Defendants from approximately June 26, 2016 until July 20, 2019. Defendants employed Mr. Welsh as a on the Road Supervisor.

162. Mr. Welsh's work duties required neither discretion nor independent judgment.

163. Mr. Welsh is a whistleblower who raised concerns of document manipulation, fraudulent reporting of accidents, management readiness exam cheating, DOT violations, massive overtime theft of the drivers and other abuses by UPS management.

164. Mr. Welsh sustained substantial psychological and monetary injuries as a result of the hostile work environment he was subjected to while an employee of UPS by his former manager, Chance Stewart, as well as, UPS senior management.

165.    Mr. Welsh has firsthand knowledge of UPS violating the US Department of Labor's wage and hour laws.

166.    Mr. Welsh is prepared to prove that Anthony Celano, as well as, UPS senior management stole hundreds of hours of overtime from a class of drivers. The evidence will show that many drivers start work at 7am to 9am and they punch out at 10pm 12am. That is an average of 15 to 17 hours a day. In a 5-day work week these drivers are working an average of 75 to 85 hours a week. Many of these drivers work 6 days a week. Which brings their hours into the mid 90's and 100's. These hours are not reflected on their paychecks.

167.    Mr. Welsh has evidence of some drivers working 17 to 18-hour shifts. These hours were not reflected on the driver's paychecks.

**Anthony Celano was a master cheater**

168.    On Friday, November 25, 2016 as Mr. Welsh was closing down the building, Anthony Celano instructed Mr. Welsh, along with a fellow on the road supervisor, to stay at the office "as long as it takes to scrub out all discrepancies."

169.    What this means is that hundreds, if not a thousands, of packages that had not been delivered that day would have scans on them to excuse their service failures. It helps a manager's numbers, which help a manager's balanced scorecard, which directly affects a manager's pay raise and their likelihood of promotion.

170.    Mr. Welsh had no idea what discrepancies were or what it meant to 'scrub' ODSE at the time, but he sat along with Alfonso Macera[2] and 'scrubbed' ODSE until approximately 2 a.m.

171.    The next morning, while heading to work, Anthony Celano reached out to Mr. Welsh asking where the print outs of the scrubbed discrepancies could be found, in case he was audited by a superior. As Mr. Welsh arrived to work, he gave him the print outs, but Anthony Celano was fuming.

172.    He tossed the stack of documents at Mr. Welsh's feet, saying to him: 'It's too late, you fucking idiot. I should have you go work for Danny."

173.    Mr. Welsh requested a sit-down with Anthony Celano later that day, wanting to clear the air. When they met, Mr. Welsh asked him to criticize him for his performance. In this case, his

---

[2] An on car supervisor who was later arrested for stealing off routes and selling them to Bronx pawn shops.

performance was sub-par in Anthony Celano's eyes because Mr. Welsh had forgotten to place a stack of papers on his desk at 2 a.m. after unknowingly cheating on his behalf.

174.    Mr. Welsh told Anthony Celano that he expected to be able to own both his successes and his failures. Anthony Celano interrupted Mr. Welsh, saying "I'll tell you whatever the fuck I feel like." He then handed Mr. Welsh his phone and said "Go ahead. Call the 1-800 number on me. I dare you. It won't be the first time." He then threw Mr. Welsh out of his office.

175.    This was Mr. Welsh's first taste of a culture that encourages the falsification of delivery records.

<u>**Next Day Air Cheating**</u>

176.    As previously mentioned with Mr. Moyle, Mr. Welsh has first hand knowledge and experience with UPS's falsification of delivery records during the service of "Next Day Air" packages.

177.    Mr. Welsh has evidence to prove that UPS senior management treat Next Day Air packages as a 'red-hot' item and a key element of a management personnel's balanced scorecard.

178.    Every week in the Yonkers Center between 2017 and 2018, drivers were instructed to "drop the package on the door, and not scan if it's late." A UPS employee would later input the tracking number on an online system (ETT), which would ensure that the delivery time would show as occurring before 10:30 A.M.

<u>**Creative bookkeeping. Scamming customers out of millions of dollars**</u>

179.    The company, using what Anthony Celano would refer to as "creative bookkeeping," was fleecing customers out of refunds for packages delivered late. Mr. Welsh was instructed to falsify thousands of U.S. Post Office deliveries, especially during the holiday season.

<u>**You must Obey Daddy, or you will face retaliation**</u>

180.    Anthony Celano impressed upon Mr. Welsh the importance of obeying orders. He often said, "Remember who Daddy is" and Mr. Welsh witnessed several conversations where Anthony Celano talked about making sure that, at the very least, subordinates that he considered disloyal got transferred to unfavorable locations and different positions in the company that would make them miserable. 'You can always get sent across the river,' Mr. Welsh heard him say.

**Terri Murphy, the Queen of coverups**

181.     Another thing Mr. Welsh learned at UPS was to cover up injuries and accidents. Mr. Welsh first learned this from Terri Murphy, a safety coordinator in the Bronx Division, who once asked one of Mr. Welsh partners if we could possibly "manage" around an injury.

182.     Terri Murphy made it clear to Mr. Welsh that it was expected of him to do everything after an injury occurred to "manage" it. When Mr. Welsh asked Ms. Murphy what it meant to manage an injury, she immediately became agitated and told him to ask his partners what it meant. When Mr. Welsh saw this happening at nearly every level of the Bronx Division, he took it as policy. After all, when his superiors gave him an instruction, Mr. Welsh followed them, assuming that they are acting in the name of integrity.

183.     Terri Murphy was not the only senior manager to instruct Mr. Welsh to cheat and lie, Rhonda Ward, Anthony Celano, Justin LaPorte, Howard McLeish and several others, instructed him to do so as well.

184.     Mr. Welsh was warned by Tim O'Connor, one of his former business managers that, "there are ways for me to get what I want. I can always 30/60/90 you if you don't give me my results." Mr. Welsh quickly realized that following orders was paramount to maintaining job security.

185.     Mr. Welsh was required to manage countless injuries and accidents for UPS. One memorable instance involved having a UPS driver move his vehicle after an accident, so that in the pictures taken of the accident it would look like the driver was less at fault than he actually was. This act affected UPS's insurance premiums and saved UPS money.

**Justin LaPorte and the Management Readiness Scheme**

186.     Mr. Welsh was instructed by Justin LaPorte to take the Management Readiness Exam for Jeff Harris, Erica Diaz and Jose Ponce.

187.     Justin LaPorte gave Mr. Welsh the following instruction, "You'll really be a team player on this, Roy. It will mean a lot for me, a lot for Anthony (Celano) and a lot for Brian (Cannon)." Mr. Welsh later realized that this was not true - that he would indeed be executing the entirety of the test and that Mr. LaPorte was sacrificing Mr. Welsh's integrity in a coercive way.

188.     Mr. Welsh took the management exam for Jose Ponce on his personal laptop and he answered Jeff Harris and Erica Diaz exam questions over the phone and in person.

25

## **Hector Fortis called Mr. Welsh a Faggot**

189.    One of the most distressing moments of Mr. Welsh's employment with UPS came in his dealings with Hector Fortis, a former service provider and current Local 804 Business Agent in the Metro New York Ops Group.

190.    A few months before Mr. Welsh's left UPS he had an interaction with Hector Fortis in which Hector Fortis called Mr. Welsh a "faggot." Mr. Welsh approached Hector Fortis immediately after to clear up the incident and let him know that it was not acceptable. He became enraged and approached Mr. Welsh in a threatening manner.

191.    Mr. Welsh told Hector Fortis that it is unacceptable for hourly employees to perceive that their business agent harbors homophobic views. Rather than apologize, Hector Fortis screamed at Mr. Welsh.

192.    Mr. Welsh filed a complaint with Lloyd Hall, his business manager. Lloyd Hall told him it would blow over, and Hector Fortis's bark was worse than his bite. Mr. Welsh reiterated that his bark was his concern as homophobia is unacceptable to him.

193.    Mr. Welsh called the 1-800 number to complain of Hector Fortis's behavior, for fear of his safety. Mr. Welsh mentioned on the call that hate crimes are on the rise in New York City and that hateful language often correlates with such crimes. Mr. Welsh also reported this incident to Human Resources as well. He never heard anything else from Defendant Corporation on the matter.

## **Mr. Welsh is retaliated against, and was not allowed to attend Shabbat Dinner**

194.    The work culture at UPS was a toxic combination of impossible hours and a ruthless pursuit of profit and entrenched dishonesty.

195.    This dishonesty mixed with homophobia produced a level of retaliation that is unthinkable. After Mr. Welsh reported Hector Fortis's behavior it became nearly impossible for Mr. Welsh to get time off from work or a flexible work schedule that would allow him to freely practice his religious faith.

196.    After reporting Hector Fortis, requests to attend Shabbat dinners was met with a "maybe," which later turned into a "no."

**Mr. Welsh is required to work unthinkable hours without help**

197.    Mr. Welsh worked Tuesday-Saturday for the last year at UPS. Before reporting Hector
Fortis, Mr. Welsh worked an average of 40-50 hours a week. After complaining about Hector
Fortis, in another act of retaliation, Mr. Welsh was required to work from 7 a.m. until after 11
p.m.

198.    During this time period Mr. Welsh was responsible for everything that occurred in the
operation from dispatch until the end of the day. Mr. Welsh performed these duties without the
benefit of a secretary and often without a mechanic present.

199.    There were several instances where Mr. Welsh paid a secretary out of his own pocket ($50
dollars plus dinner) in order to have assistance with driver timecards at the end of the day so
he could go home at a manageable hour.

200.    Mr. Welsh knows for a fact that Rhonda Ward was consulted about the Yonkers Center not
having a secretary on Saturdays and no action was taken to correct the problem. There were a
few instances where Mr. Welsh received calls from Rhonda Ward and Lloyd Hall after 11:30
pm on Saturday, asking questions about the results of the operation. All of these calls were
responses to phone calls Mr. Welsh had made hours earlier.

**Retaliation for reporting Hector Fortis lead to severe anxiety and depression**

201.    This constant retaliation caused Mr. Welsh to develop high blood pressure. This led Mr.
Welsh to seek medical attention, which resulted in a diagnosis of depression and severe
anxiety.

202.    Mr. Welsh went on short term disability leave. He was not afforded any accommodations,
and as a result he resigned from the company.

*Plaintiff Palagoachi*

203.    Plaintiff Palagoachi's work duties required neither discretion nor independent judgment.

204.    Throughout his employment with Defendants, Plaintiff Palagoachi regularly worked in
excess of forty (40) hours per week.

205.    From Approximately October 2017 until May 2018, Plaintiff Palagoachi worked as a
package delivery driver from approximately 8:00 a.m. until on or about 11:00 pm., Sunday
through Friday typically 90 hours per week.

206.   Throughout his employment, Defendants paid Plaintiff Palagoachi his wages through check or direct deposit.

207.   Plaintiff Palagoachi's pay did not vary even when he was required to start earlier or work a longer day than his usual schedule. For example, Defendants required Plaintiff Palagoachi to start work hours earlier or work longer days when there was a shortage of staff and did not pay him overtime pay for the additional time he worked.

208.   Plaintiff Palagoachi kept track of the hours he worked because it is reflected on his pay stubs under the "hours" column. Defendants utilizes a time tracking device, such as punch cards.

209.   Notifications in the form of posted notices and written correspondences, was not given to Plaintiff Palagoachi regarding overtime and wages under the FLSA and NYLL.

210.   Defendants did not provide Plaintiff Palagoachi an accurate statement of wages, as required by NYLL 195(3).

211.   Plaintiff Palagoachi is prepared to prove that Willie Gray and UPS Senior management instructed him to hide numerous automobile accidents.

212.   Plaintiff Palagoachi is prepared to prove that Willie Gray and UPS Senior management instructed him to lie about delivery records like missed packages, and falsely manipulating delivery attempts. The scheme Mr. Palagoachi was required to employ is a follow: he was instructed to go close to the customers home, scan the package, and place the package in the truck even if Mr. Palagoachi never made the delivery attempt.

*Plaintiff Payne*

213.   Plaintiff Payne's work duties required neither discretion nor independent judgment.

214.   Throughout his employment with Defendants, Plaintiff Payne regularly worked in excess of forty (40) hours per week.

215.   From Approximately August 2017 until June 2018, Plaintiff Payne worked as a package delivery driver from approximately 8:00 a.m. until on or about 11:00 pm., Sunday through Friday typically 90 hours per week.

216.   Throughout his employment, Defendants paid Plaintiff Payne his wages through check or direct deposit.

217.   Plaintiff Payne's pay did not vary even when he was required to start earlier or work a longer day than his usual schedule. For example, Defendants required Plaintiff Payne to start work hours earlier or work longer days when there was a shortage of staff and did not pay him overtime pay for the additional time he worked.

218.   Plaintiff Payne kept track of the hours he worked because it is reflected on his pay stubs under the "hours" column. Defendants utilizes a time tracking device, such as punch cards.

219.   Notifications in the form of posted notices and written correspondences, was not given to Plaintiff Payne regarding overtime and wages under the FLSA and NYLL.

220.   Defendants did not provide Plaintiff Payne an accurate statement of wages, as required by NYLL 195(3).

221.   Plaintiff Payne is prepared to prove that Willie Gray and UPS Senior management instructed him to hide numerous automobile accidents.

222.   Plaintiff Payne is prepared to prove that Willie Gray and UPS Senior management instructed him to lie about delivery records like missed packages, and falsely manipulating delivery attempts. The scheme Plaintiff Payne was required to employ is a follow: he was instructed to go close to the customers home, scan the package, and place the package in the truck even if Plaintiff Payne never made the delivery attempt.

*Defendants' General Employment Practices*

223.   At all-times relevant to this Complaint, Defendants maintained a policy and practice of requiring Plaintiff's and all similarly situated employees, to work in excess of 40 hours a week without paying them appropriate overtime compensation as required by federal and state laws.

224.   Plaintiffs are victims of Defendants' common policy and practices which violate their rights under the FLSA and New York Labor Law by, *inter alia*, not paying them the wages they are owed for the hours they worked.

225.   Defendants habitually require Plaintiff's to work additional hours beyond their regular shifts but did not provide them with any additional compensation.

226.   Upon information and belief, these practices by Defendants were done willfully to disguise the actual number of hours Plaintiff's, and all similarly situated employees, worked, and to avoid paying Plaintiff's and all similarly situated employees properly for their full hours worked.

227.    Defendants engaged in their unlawful conduct pursuant to a corporate policy of minimizing labor costs and denying employees compensation by knowingly violating the FLSA and NYLL.

228.    After the fatal accident involving a Walmart delivery truck driver and comedian Tracy Morgan, one would think companies like Defendants would take DOT rules and regulations seriously. Unfortunately, Defendant does not. In the face of this tragic accident, Defendant has decided to put profits over people. Instead of putting safety first, Defendant prefers to manipulate the DOT hours of their employees and endanger the lives of their employees and the general public.

229.    Defendants' unlawful conduct was intentional, willful, in bad faith, and caused significant damages to Plaintiff's and all similarly situated current and former employees.

**FLSA Collective Action Claims**

230.    Plaintiff's bring this FLSA overtime compensation, and liquidated damages claims as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all similarly situated employees (the "FLSA Class Members"), i.e., persons who are or were employed by Defendant's, on or after the date that is three years before the filing of the complaint in this case (the "FLSA Class Period").

231.    At all relevant times, Plaintiff's and other members of the FLSA Class were similarly situated in that they had substantially similar job requirements and pay provisions, and have been subject to Defendants' common practices, policies, programs, procedures, protocols and plans including willfully failing and refusing to pay them the required overtime pay at a one and one-half their regular rates for work in excess of forty (40) hours per workweek under the FLSA, and willfully failing to keep records required by the FLSA.

232.    The claims of Plaintiff's stated herein are similar to those of the other employees.

## TITLE VII Of the Civil Rights Act Of 1964 Claims

233.    Defendants have engaged in egregious acts of race, religious, and ADA discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended.

234.    Plaintiffs willfully and intentionally pay Caucasian employees substantially more, than they pay non-Caucasian employees who perform the same job under similar circumstances, regardless of experience or qualifications. Plaintiffs can point to no legitimate factor such as a, seniority system, merit system, productivity system, or any factor other than race and gender, to excuse their blatant acts of wage discrimination.

235.    Not only do Plaintiffs commit gender and race discrimination in violation of Title VII of the Civil Rights Act of 1964, they also retaliate against employees who are courageous enough to speak up and demand equality.

236.    Plaintiff Murray, Plaintiff Welsh, and Plaintiff Moyle are victims of Defendant's retaliation.


## FIRST CAUSE OF ACTION

## FAIR LABOR STANDARDS ACT-OVERTIME WAGES

### (Brought on behalf of Plaintiff Payne and Plaintiff Palagoachi and the Rule 23 Class)

237.    Plaintiff Payne and Plaintiff Palagoachi repeats and realleges all paragraphs above as though fully set forth herein.

238.    The overtime wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq*., and the supporting federal regulations, apply to Defendants and protect Plaintiff's and the FLSA Class members.

239.    Defendants, in violation of 29 U.S.C. § 207(a)(1), failed to pay Plaintiff's and the FLSA Class Members overtime compensation at a rate of one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a work week.

240.    Defendants' failure to pay Plaintiff's and the FLSA Class members, overtime compensation was willfully within the meaning of 29 U.S.C. § 255(a).

241.    As a result of Defendants' willful violations of the FLSA, Plaintiff's and the FLSA class members have suffered damages by being denied overtime compensation in amounts to be determined at trial, and are entitled to recovery to such amounts, liquidated damages,

prejudgment interest, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. §§ 201 *et seq*.

## SECOND CAUSE OF ACTION
### VIOLATION OF THE OVERTIME PROVISIONS
### OF THE NEW YORK STATE LABOR LAW
**(Brought on behalf of Plaintiff Payne and Plaintiff Palagoachi and the Rule 23 Class)**

242.    Plaintiff Payne and Plaintiff Palagoachi and all similarly situated employees, repeats and realleges all paragraphs above as though fully set forth herein.

243.    Defendants, in violation of N.Y. Lab. Law § 190 et seq., and supporting regulations of the New York State Department of Labor, failed to pay Plaintiff's and all similarly situated employees, overtime compensation at rates of one and one-half times the regular rate of pay for each hour worked in excess of forty (40) hours in a work week.

244.    Defendants' failure to pay Plaintiff's and all similarly situated employees, overtime compensation was willful within the meaning of N.Y. Lab. Law § 663.

245.    Plaintiff's and all similarly situated employees, are entitled to recover from Defendants their unpaid overtime wages, liquidated damages as provided for by the NYLL, reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest.

## THIRD CAUSE OF ACTION
### VIOLATION OF THE TIMELY PAYMENT PROVISIONS
### OF THE NEW YORK LABOR LAW
**(Brought on behalf of Plaintiff Payne and Plaintiff Palagoachi and the Rule 23 Class)**

246.    Plaintiff Payne and Plaintiff Palagoachi and all similarly situated employees, repeats and realleges all paragraphs above as though set forth fully herein.

247.    Defendants did not pay Plaintiff's, and all similarly situated employees, on a weekly basis in violation of NYLL § 191.

248.    Defendants are liable to Plaintiff's and all similarly situated employees, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE SPREAD OF HOURS WAGE ORDER

## OF THE NEW YORK COMMISSIONER OF LABOR

**(Brought on behalf of Plaintiff Payne and Plaintiff Palagoachi and the Rule 23 Class)**

249.    Plaintiff Payne and Plaintiff Palagoachi and all similarly situated employees, repeats and realleges all paragraphs above as though fully set forth herein.

250.    Defendants failed to pay Plaintiff's and all similarly situated employees, one additional hour's pay at the basic minimum wage rate before allowances for each day Plaintiff's and all similarly situated employees, spread of hours exceeded ten hours in violation of NYLL §§ 650 *et seq*. and 12 N.Y.C.R.R. §§ 146-1.6.

251.    Defendants' failure to pay Plaintiff's and all similarly situated employees, an additional hour's pay for each day Plaintiff's and all similarly situated employees, spread of hours exceeded ten hours was willful within the meaning of NYLL § 663.

252.    Plaintiff's and all similarly situated employees, was damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

## VIOLATION OF THE NOTICE AND RECORDKEEPING

## REQUIREMENTS OF THE NEW YORK LABOR LAW

**(Brought on behalf of Plaintiff Payne and Plaintiff Palagoachi and the Rule 23 Class)**

253.    Plaintiff Payne and Plaintiff Palagoachi and all similarly situated employees, repeats and realleges all paragraphs above as though fully set forth herein.

254.    Defendants failed to provide Plaintiff's and all similarly situated employees, with a written notice, in English and in Spanish (Plaintiff's Palagoachi primary language), containing: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; and tighten telephone number of the employer, as required by NYLL § 195(1).

255.    Plaintiff's and all similarly situated employees are damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## VIOLATION OF THE WAGE STATEMENT PROVISIONS
## OF THE NEW YORK LABOR LAW
**(Brought on behalf of Plaintiff Payne and Plaintiff Palagoachi and the Rule 23 Class)**

256.    Plaintiff Payne and Plaintiff Palagoachi and all similarly situated employees, repeats and realleges all paragraphs above as though fully set forth herein.

257.    With each payment of wages, Defendants failed to provide Plaintiff's and all similarly situated individuals, with an accurate statement listing each of the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay as basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked; and the number of overtime hours worked, as required by NYLL § 195(3).

258.    Due to Defendants' violation of NYLL, Article 6, § 195(3), Plaintiff's and all similarly situated employees, are entitled to statutory penalties of two hundred fifty dollars for each workweek that Defendants failed to provide them with accurate wage statements, or a total of five thousand dollars, and reasonable attorneys' fees and costs as provided for by NYLL, Article 6, § 198(1-d).

## SEVENTH CAUSE OF ACTION
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
**(Brought on behalf of Plaintiff Murray and the Rule 23 Class)**

259.    Plaintiff Murray and all similarly situated employees, repeats and realleges all paragraphs above as though fully set forth herein.

260.    At all relevant times, Plaintiff's and all similarly situated employees, have been subject to Defendants' common practices, policies, programs, procedures, protocols and plans including

willfully engaging in conduct that violates the Civil Rights Act of 1964 § 701 et seq., 42 U.S.C.A. § 2000e *et seq*.

261.    This claim is authorized and instituted pursuant to Title VII of the Civil Rights Act, 42 U.S.C.§2000e *et seq*., based upon the discriminatory employment practices of Defendants. Specifically, Plaintiff's complains that Defendants discriminated against them in wages based upon their race and gender, causing them to suffer substantial injury and damages.

262.    Upon information and belief, Plaintiff Murray and all similarly situated employees, are paid less than the rate at which their similarly situated Caucasian colleagues are paid for a job requiring equal skill and performed under similar working conditions.

263.    In addition, upon information and belief, Plaintiff Murray and similarly situated employees, were offered less than the rate at which their similarly situated Caucasian colleagues are paid for a job requiring equal skill and performed under similar working conditions.

264.    Defendants' failure to pay Plaintiff Murray and all similarly situated employees, equally with their Caucasian coworkers was based on the Defendants disdain for Plaintiffs race and gender, in violation of Title VII of the Civil Rights Act, 42 U.S.C.§2000e *et seq*.

265.    Plaintiff Murray, and all similarly situated employees are damaged in an amount to be determined at trial.

## EIGHT CAUSE OF ACTION
### VIOLATION OF THE NYS PROPERTY DAMAGE STATUTE
#### (Brought on behalf of Plaintiff Murray)

266.    Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein.

267.    At all relevant times, Plaintiff Murray have been subject to Defendants' common practices, policies, programs, procedures, protocols and plans including willfully engaging in conduct that violates the CPLR 214 (4), an action to recover damages for an injury to property.

268.    This claim is authorized and instituted pursuant to CPLR 214 (4), based upon the unethical patterns and practices of the defendants. Specifically, Plaintiff Murray complains that Defendants caused substantial property damage to his vehicle when they refused to file a claim with their insurance carrier after one of their drivers ran Defendants vehicle into Plaintiff Murrays parked vehicle.

269.   Defendants' failure to pay Plaintiff Murray or to report the accident to their insurance carrier was based on the Defendants desire to cheat and commit insurance fraud. As a result, Plaintiff Murray suffered property damage in violation of CPLR 214 (4).

270.   Plaintiff Murray is damaged in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress
### (Plaintiff Moyle and Plaintiff Welsh)

271.   Plaintiff Moyle repeats and realleges all paragraphs above as though fully set forth herein.

272.   As their employer, defendants had a fiduciary duty towards Mr. Moyle and Mr. Welsh to ensure that their work environment did not subject them to harassment or retaliation, all of which hold the potential of causing deep emotional harm in the event of a breach.

273.   Defendants had a duty to care for Mr. Moyle and Mr. Welsh's well-being.

274.   As alleged above, defendants negligently breached the duty they owed Mr. Moyle and Mr. Welsh.

275.   As a direct and proximate result of defendants' breach, Mr. Moyle and Mr. Welsh suffered the emotional distress and trauma alleged above.

276.   It was reasonably foreseeable that defendants' actions and omissions described above would cause genuine and substantial emotional distress and mental harm to the average employee, including Mr. Moyle and Mr. Welsh.

277.   Defendants actions and omissions warrant an award of punitive damages.

## TENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Plaintiff Moyle and Plaintiff Welsh)

278.   Plaintiff Moyle repeats and realleges all paragraphs above as though fully set forth herein.

279.   As their employer, defendants conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and appropriately can be regarded as atrocious and utterly intolerable in a civilized society.

280.   As a direct and proximate result of defendants' intentional infliction of emotional distress, Mr. Moyle and Mr. Welsh suffered the emotional distress and trauma alleged above.

281.    Defendants actions and omissions warrant an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
### Constructive Discharge in violation of NYSHRL
### (Plaintiff Moyle and Plaintiff Welsh)

282.    A constructive discharge, occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

283.    For Plaintiff Moyle and Plaintiff Welsh to successfully plead a claim for retaliation under the NYSHRL or NYCHRL, he must demonstrate that: "(1) he has engaged in protected activity, (2) his employer was aware that he participated in such activity, (3) he suffered an adverse employment action based upon his activity, and (4) there is a causal connection between the protected activity and the adverse action."

284.    At all relevant times, Plaintiff Moyle and Plaintiff Welsh have been subject to Defendants' common practices, policies, programs, procedures, protocols and plans including willfully engaging in conduct that violates New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.

285.    As their employer, defendants engaged in egregious prohibited conduct listed above. This egregious prohibited conducted caused Plaintiff Moyle and Plaintiff Welsh to suffer with severe depression and anxiety, which led to them to resign from their jobs.

286.    Defendants actions and omissions warrant an award of punitive damages.

## TWELFTH CAUSE OF ACTION
### Constructive Discharge in violation of NYCHRL
### (Plaintiff Moyle and Plaintiff Welsh)

287.    A constructive discharge, occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

288.   For Plaintiff Moyle and Plaintiff Welsh to successfully plead a claim for retaliation under the NYSHRL or NYCHRL, he must demonstrate that: "(1) he has engaged in protected activity, (2) his employer was aware that he participated in such activity, (3) he suffered an adverse employment action based upon his activity, and (4) there is a causal connection between the protected activity and the adverse action."

289.   Plaintiff Moyle and Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

290.   As their employer, defendants engaged in egregious prohibited conduct listed above. This egregious prohibited conducted caused Plaintiff Moyle and Plaintiff Welsh to suffer with severe depression and anxiety, which led to them to resign from their jobs.

291.   Defendants actions and omissions warrant an award of punitive damages.

## THIRTEENTH CAUSE OF ACTION
### Unlawful Retaliation in violation of NYCHRL
### (Plaintiff Moyle and Plaintiff Welsh)

292.   Plaintiff Moyle and Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

293.   At all relevant times, Plaintiff Moyle and Plaintiff Welsh have been subject to Defendants' common practices, policies, programs, procedures, protocols and plans including willfully engaging in conduct that violates New York City Human Rights Law ("NYCHRL"), Administrative Code of City of New York § 8-107 (7).

294.   Plaintiff Moyle and Plaintiff Welsh participated in a protected activity by making internal complaints via the 1800 hotline, complaining to upper management, and contacting human resources on a myriad of claims. After doing so, Plaintiff Moyle and Plaintiff Welsh allege defendant corporation took a number of adverse employment actions against them, including, inter alia, being written-up and subjected to heighten scrutiny of their work product, making them work egregious hours and shifts, prohibiting them from partaking in their religious observances (Shabbat Dinner), and in the case of Plaintiff Moyle, demoting him while he was on short term disability leave.

295.   The causal connection between the protected activity and the adverse employment actions are evidenced by their temporal proximity.

296.    As their employer, defendants engaged in egregious prohibited conduct listed above. This egregious prohibited conducted caused Plaintiff Moyle and Plaintiff Welsh to suffer with severe depression and anxiety, which led to them to resign from their jobs.

297.    Defendants actions and omissions warrant an award of punitive damages.

## FOURTEENTH CAUSE OF ACTION

### Unlawful Retaliation in violation of NYSHRL

### (Plaintiff Moyle and Plaintiff Welsh)

298.    Plaintiff Moyle and Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

299.    At all relevant times, Plaintiff Moyle and Plaintiff Welsh have been subject to Defendants' common practices, policies, programs, procedures, protocols and plans including willfully engaging in conduct that violates New York State Human Rights Law ("NYSHRL"), Executive Law State of New York § 296.

300.    Plaintiff Moyle and Plaintiff Welsh participated in a protected activity by making internal complaints via the 1800-hotline, complaining to upper management, and contacting human resources on a myriad of claims. After doing so, Plaintiff Moyle and Plaintiff Welsh allege defendant corporation took a number of adverse employment actions against them, including, inter alia, being written-up and subjected to heighten scrutiny of their work product, making them work egregious hours and shifts, prohibiting them from partaking in their religious observances (Shabbat Dinner), and in the case of Plaintiff Moyle, demoting him while he was on short term disability leave.

301.    The causal connection between the protected activity and the adverse employment actions are evidenced by their temporal proximity.

302.    As their employer, defendants engaged in egregious prohibited conduct listed above. This egregious prohibited conducted caused Plaintiff Moyle and Plaintiff Welsh to suffer with severe depression and anxiety, which led to them to resign from their jobs.

303.    Defendants actions and omissions warrant an award of punitive damages.

## FIFTEENTH CAUSE OF ACTION

### Unlawful Retaliation in violation of Title VII of the Civil Rights Act of 1964
### (Plaintiff Moyle, Plaintiff Welsh and Plaintiff Murray)

304.    Plaintiff Moyle and Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

305.    At all relevant times, Plaintiff Moyle, Plaintiff Murray, and Plaintiff Welsh have been subject to Defendants' common practices, policies, programs, procedures, protocols and plans including willfully engaging in conduct that violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

306.    Plaintiff Moyle, Plaintiff Murray, and Plaintiff Welsh participated in a protected activity by making internal complaints via the 1800 hotline, complaining to upper management, and contacting human resources on a myriad of claims. After doing so, Plaintiff Moyle, Plaintiff Murray, and Plaintiff Welsh allege defendant corporation took a number of adverse employment actions against them, including, inter alia, being written-up and subjected to heighten scrutiny of their work product, making them work egregious hours and shifts, prohibiting them from partaking in their religious observances (Shabbat Dinner), and in the case of Plaintiff Moyle, demoting him while he was on short term disability leave. In the case of Plaintiff Murray, he blew the whistle during and internal investigation and was terminated.

307.    The causal connection between the protected activity and the adverse employment actions are evidenced by their temporal proximity.

308.    As their employer, defendants engaged in egregious prohibited conduct listed above. This egregious prohibited conducted caused Plaintiff Moyle, Plaintiff Murray, and Plaintiff Welsh to suffer with severe depression and anxiety, which led to them to resign from their jobs. In the case of Mr. Murray, it led to his retaliatory termination.

309.    Defendants actions and omissions warrant an award of punitive damages.

## SIXTEENTH CAUSE OF ACTION
### VIOLATION OF THE REHABILITATION ACT
### (Brought on behalf of Plaintiff Moyle and Plaintiff Welsh)

310.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that: No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

311.    Because depression and severe anxiety substantially limits at least one of Plaintiff Moyle and Plaintiff Welsh's major life activities Plaintiff Moyle and Plaintiff Welsh are individuals with a disability under the Rehabilitation Act.

312.    Plaintiff Moyle and Plaintiff Welsh was fully qualified to be a Business Manager and on the Road Supervisor and could perform all the essential functions of the position. Plaintiff Moyle and Plaintiff Welsh worked for Defendant for over three and seven years respectively, before they were diagnosed with Severe Depression and Anxiety and would be constructively discharged as a result.

313.    The Defendant Corporation receives federal financial assistance to which Section 504 of the Rehabilitation Act applies.

314.    The Defendants Company Policy mandates that disabled employees that take medical leave, call in accidents, or reports injuries, must be demoted, transferred to far locations, given unfavorable work schedules and hours, and placed under heightened scrutiny until they either quit, or until the Defendant acquires enough grounds to terminate them.

315.    The Defendant does not individually assess on a case-by-case basis whether an individual with a disability can perform the essential functions of the job and be employed by the Defendant, or whether a reasonable accommodation would permit an individual with a disability to be employed by the Defendant.

316.    Instead, by terminating or forcing out disabled employees who exercise their rights to take disability leave, regardless of their ability to perform the essential functions of the job (with or without reasonable accommodation), the Defendant has denied individuals with disabilities, including Plaintiff Moyle and Plaintiff Welsh, the benefits of an opportunity of employment with a federal contractor, has discriminated against individuals with depression and sever anxiety, and has required and endorsed discrimination on the basis of disability, all in violation of the Rehabilitation Act.

317.    Plaintiff Moyle and Plaintiff Welsh was damaged in an amount to be determined at trial.

## SEVENTEENTH CAUSE OF ACTION

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

#### (Brought on behalf of Plaintiff Moyle)

318.    The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

319.    Plaintiff Moyle repeats and realleges all paragraphs above as though fully set forth herein.

320.    Because depression and severe anxiety substantially limits at least one of Plaintiff Moyle's major life activities Plaintiff Moyle is an individual with a disability under the ADA.

321.    Plaintiff Moyle was fully qualified to be a Business Manager and could perform all the essential functions of the position. Plaintiff Moyle worked for Defendant for over seven years, before he was diagnosed with depression and severe anxiety and would be demoted and removed from his role while he was out on short term disability leave.

322.    As a result of the defendant's actions, Plaintiff Moyle has suffered and will continue to suffer both economic and non-economic harm.

## EIGHTEENTH CAUSE OF ACTION

### VIOLATION OF THE NYSHRL and NYC ADMINISTRATIVE CODE

#### (Brought on behalf of Plaintiff Moyle)

323.    To establish a prima facie case of disability disparate treatment, plaintiff must show that (1) he is an individual with a disability, (2) he is otherwise qualified to perform the basic functions of her job, and (3) he was discriminated against because of his disability.

324.    Plaintiff Moyle repeats and realleges all paragraphs above as though fully set forth herein.

325.    Because depression and severe anxiety substantially limits at least one of Plaintiff Moyle's major life activities Plaintiff Moyle is an individual with a disability under the NYCHRL.

326.    Plaintiff Moyle was fully qualified to be a Business Manager and could perform all the essential functions of the position. Plaintiff Moyle worked for Defendant for over seven years, before he was diagnosed with depression and severe anxiety and would be demoted and removed from his role while he was out on short term disability leave.

327.    As a result of the defendant's actions, Plaintiff Moyle has suffered and will continue to suffer both economic and non-economic harm.

### NINETEENTH CAUSE OF ACTION
### VIOLATION OF NYC ADMINISTRATIVE CODE
**(Brought on behalf of Plaintiff Welsh for Religious observance Discrimination)**

328.    Pursuant to N.Y.C. Admin. Code § 8-107(3) (a) It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego a practice of, his or her creed or religion, including but not limited to the observance of any particular day or days or any portion thereof as a Sabbath or holy day or the observance of any religious custom or usage, and the employer shall make reasonable accommodation to the religious needs of such person.

329.    Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

330.    Plaintiff Welsh participated in a protected activity by making internal complaints via the 1800 hotline, complaining to upper management, and contacting human resources on a myriad of claims. After doing so, Plaintiff Welsh allege defendant corporation took a number of adverse employment actions against him, including, inter alia, being written-up and subjected to heighten scrutiny of his work product, making him work egregious hours and shifts, prohibiting him from partaking in his religious observances (Shabbat Dinner).

331.    The causal connection between the protected activity and the adverse employment actions are evidenced by their temporal proximity.

332.    As his employer, defendant engaged in egregious prohibited conduct listed above. This egregious prohibited conducted caused Plaintiff Welsh to suffer with severe depression and anxiety, which led to them to resign from his job.

333.    Defendants actions and omissions warrant an award of punitive damages.

## TWENTIETH CAUSE OF ACTION
### VIOLATION OF NYC ADMINISTRATIVE CODE
**(Brought on behalf of Plaintiff Welsh for**
**Aiding and Abetting brought against Lloyd Hall)**

334.    Pursuant to N.Y.C. Admin. Code § 8-107(6) Aiding and abetting. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.

335.    Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

336.    Plaintiff Welsh participated in a protected activity by making internal complaints via the 1800 hotline, complaining to upper management, and contacting human resources on a myriad of claims. After doing so, Plaintiff Welsh allege defendant Lloyd Hall took a number of adverse employment actions against him, including, inter alia, being written-up and subjected to heighten scrutiny of his work product, making him work egregious hours and shifts, prohibiting him from partaking in his religious observances (Shabbat Dinner).

337.    These acts were implemented by Lloyd Hall.

338.    The causal connection between the protected activity and the adverse employment actions are evidenced by their temporal proximity.

339.    As his supervisor and or manager, defendant Lloyd Hall engaged in egregious prohibited conduct listed above. This egregious prohibited conducted caused Plaintiff Welsh to suffer with severe depression and anxiety, which led him to resign from his job.

340.    Defendants actions and omissions warrant an award of punitive damages.

## TWENTY FIRST CAUSE OF ACTION
### VIOLATION OF NYC ADMINISTRATIVE CODE
**(Brought on behalf of Plaintiff Moyle for**
**Aiding and Abetting brought against Chance Stewart)**

341.    Pursuant to N.Y.C. Admin. Code § 8-107(6) Aiding and abetting. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.

342.    Plaintiff Moyle repeats and realleges all paragraphs above as though fully set forth herein.

343.     Plaintiff Moyle participated in a protected activity by making internal complaints via the 1800 hotline, complaining to upper management, and contacting human resources on a myriad of claims. After doing so, Plaintiff Moyle allege defendant Chance Stewart took a number of adverse employment actions against him, including, inter alia, being written-up and subjected to heighten scrutiny of his work product, making him work egregious hours and shifts, and demoting him while he was on short term disability leave.

344.     These acts were implemented by Chance Stewart.

345.     The causal connection between the protected activity and the adverse employment actions are evidenced by their temporal proximity.

346.     As his supervisor and or manager, defendant Chance Stewart engaged in egregious prohibited conduct listed above. This egregious prohibited conducted caused Plaintiff Moyle to suffer with severe depression and anxiety, which led him to resign from his job.

347.     Defendants actions and omissions warrant an award of punitive damages.


## TWENTY SECOND CAUSE OF ACTION
## VIOLATION OF NYC ADMINISTRATIVE CODE
### (Brought on behalf of Plaintiff Murray for
### Aiding and Abetting brought against Willie Gray)

348.     Pursuant to N.Y.C. Admin. Code § 8-107(6) Aiding and abetting. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.

349.     Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein.

350.     Plaintiff Murray participated in a protected activity by making internal complaints via the 1800 hotline, complaining to upper management, and contacting human resources on a myriad of claims. After doing so, Plaintiff Murray allege defendant Willie Gray took a number of adverse employment actions against him, including, inter alia, being written-up and subjected to heighten scrutiny of his work product, making him work egregious hours and shifts, and terminating him after he participated in an internal investigation.

351.     These acts were implemented by Willie Gray.

352.     The causal connection between the protected activity and the adverse employment actions are evidenced by their temporal proximity.

353.    As his supervisor and or manager, defendant Willie Gray engaged in egregious prohibited conduct listed above. This egregious prohibited conducted lead to a retaliatory investigation and ultimately Plaintiff Murray's termination.

354.    Defendants actions and omissions warrant an award of punitive damages.

<u>**TWENTY THIRD CAUSE OF ACTION**</u>

**VIOLATION OF NYC ADMINISTRATIVE CODE**

**(Brought on behalf of Plaintiff Moyle, Plaintiff Murray, and Plaintiff Welsh for Employer liability for discriminatory conduct by employee, agent or independent contractor brought against Defendant corporation)**

355.    New York City Human Rights Law § 8-107(13)(b), imposes liability on the employer for its employee's conduct in three instances: (1) where the offending employee exercised managerial or supervisory responsibility; (2) where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action'; and (3) where the employer should have known of the offending employee's unlawful discriminatory conduct yet failed to exercise reasonable diligence to prevent it.

356.    Plaintiff Moyle, Plaintiff Murray, and Plaintiff Walsh ("Plaintiff's") repeats and realleges all paragraphs above as though fully set forth herein.

357.    There is sufficient evidence from which a reasonable trier of fact could find that Defendant Corporation knew or should have known about Willie Gray, Chance Stewart, Tommy Francis, Terri Murphy, Anthony Celano, Rhonda Ward, Tim O'Connor, and Howard McLeish's conduct.

358.    Defendants have engaged in egregious acts of discrimination, theft of time, insurance fraud, and cheating. When Plaintiff's complained or went against Defendants unethical and illegal acts, Defendants retaliated.

359.    The causal connection between the protected activity and the adverse employment actions are evidenced by their temporal proximity.

360.    As the employer, defendant engaged in egregious prohibited conduct listed above. This egregious prohibited conducted caused Plaintiff's to suffer with severe depression and anxiety, which led to their termination or resignation.

361.    Defendants actions and omissions warrant an award of punitive damages.

## TWENTY FOURTH CAUSE OF ACTION

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

**(Brought on behalf of Plaintiff Welsh)**

362.    Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

363.    At all relevant times, Plaintiff Welsh have been subject to Defendants' common practices, policies, programs, procedures, protocols and plans including willfully engaging in conduct that violates the Civil Rights Act of 1964 § 701 et seq., 42 U.S.C.A. § 2000e *et seq*.

364.    This claim is authorized and instituted pursuant to Title VII of the Civil Rights Act, 42 U.S.C.§2000e *et seq*., based upon the discriminatory employment practices of Defendants. Specifically, Plaintiff Welsh complains that Defendant discriminated against him based upon his religious practices, causing him to suffer substantial injury and damages.

365.    Upon information and belief, Plaintiff Welsh endured disparate treatment from his managers and supervisors, and he was denied his request of reasonable accommodations so he can attend Shabbat dinners, and engage in other Jewish religious practices.

366.    A disparate treatment claim, in turn, may be established by showing either (1) adverse job action under circumstances giving rise to an inference of discrimination on the basis of religion, or (2) harassment on the basis of religion that amounts to a hostile work environment.

367.    After Plaintiff Welsh complained internally about the homophobic actions of a colleague, and after he refused to continue to coverup accidents and injuries, he was retaliated against by his managers and supervisors. A part of that retaliation was the prohibition of Mr. Welsh participating or practicing his religious fate.

368.    Defendant's failure to accommodate Plaintiff Welsh was done out of retaliation and their disdain for individuals who are Jewish, in violation of Title VII of the Civil Rights Act, 42 U.S.C.§2000e *et seq*.

369.    Plaintiff Welsh was damaged in an amount to be determined at trial.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff's respectfully requests that this Court enter judgment against Defendants by:

a) Designating this action as a collective action and authorizing prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all putative class members apprising them of the pendency of this action, and permitting them to promptly file consents to be Plaintiffs in the FLSA claims in this action;

b) Declaring that Defendants violated the minimum wage provisions of, and associated rules and regulations under, the FLSA as to Plaintiff's and the FLSA Class members;

c) Declaring that Defendants violated the overtime wage provisions of, and associated rules and regulations under, the FLSA as to Plaintiff's and the FLSA Class members;

d) Declaring that Defendants violated the record keeping requirements of, and associated rules and regulations under, the FLSA with respect to Plaintiff's and the FLSA Class members' compensation, hours, wages, and any deductions or credits taken against wages;

e) Declaring that Defendants' violations of the provisions of the FLSA were willful as to Plaintiff 's and the FLSA Class members;

f) Awarding Plaintiff's and the FLSA Class Members damages for the amount of unpaid minimum wages, overtime compensation, and damages for any improper deductions or credits taken against wages under the FLSA as applicable;

g) Awarding Plaintiff's and the FLSA Class members liquidated damages in an amount equal to 100% of their damages for the amount of unpaid minimum wage and overtime compensation, and damages for any improper deductions or credits taken against wages under the FLSA as applicable pursuant to 29 U.S.C. § 216(b);

h) Declaring that Defendants violated the minimum wage provisions of, and rules and orders promulgated under, the NYLL as to Plaintiff's and all similarly situated employees;

i) Declaring that Defendants violated the overtime wage provisions of, and rules and orders promulgated under, the NYLL as to Plaintiff's and all similarly situated employees;

j) Declaring that Defendants violated the timely payment provisions of, and rules and orders promulgated under, the NYLL as to Plaintiff's and all similarly situated employees;

k) Declaring that Defendants violated the notice and record keeping requirements of the NYLL with respect to Plaintiff's and all similarly situated employee's compensation, hours, wages and any deductions of credits taken against wages;

l) Declaring that Defendants' violations of the New York Labor Law and spread of hour wages order were willful as to Plaintiff's and the FLSA Class members;

m) Declaring that Defendants violated the federal Equal Pay Act of 1963 with respect to Plaintiff Murray and all similarly situated employees, compensation, hours, wages and any deductions of credits taken against wages;

n) Declaring that Defendants' violations of the federal Equal Pay Act of 1963 was willful as to Plaintiff Murray, and all similarly situated employees;

o) Declaring that Defendants violated Title VII of the Civil Rights Act of 1964 with respect to Plaintiff's and all similarly situated employee's compensation, hours, wages and any deductions of credits taken against wages;

p) Declaring that Defendants' violations of Title VII of the Civil Rights Act of 1964 were willful as to Plaintiff's and all similarly situated employees;

q) Awarding Plaintiff's and all similarly situated employees' damages for the amount of unpaid minimum wage and overtime compensation, and for any improper deductions or credits taken against wages, as well as awarding spread hours pay under the NYLL as applicable;

r) Awarding Plaintiff's and all similarly situated employees' damages for Defendants' violation of the NYLL notice and recordkeeping provisions, pursuant to NYLL §§ 198(1-b), 198(1-d);

s) Awarding Plaintiff's liquidated damages in an amount equal to one hundred percent (100%) of the total amount of minimum wage, overtime compensation, and spread of hours pay shown to be owed pursuant to NYLL § 663 as applicable; and liquidated damages pursuant to NYLL § 198(3);

t) Awarding Plaintiff's and the FLSA Class members pre-judgment and post-judgment interest as applicable;

u) Awarding Plaintiff's and the FLSA Class members the expenses incurred in this action, including costs and attorneys' fees;

v) Award Plaintiff Murray, and all others similarly situated employees the value of all compensation and benefits lost and that they will lose in the future as a result of Defendants' unlawful conduct that violated the federal and state Equal Pay laws;

w) Award Plaintiff's, and all others similarly situated compensatory and punitive damages that stem from Defendants' violation of federal and state Equal Pay laws;

x) Award Plaintiff Murray, and all others similarly situated employees the value of all compensation and benefits lost and that they will lose in the future as a result of Defendants' unlawful conduct that violated Title VII of the Civil Rights Act of 1964;

y) Award Plaintiff Murray, and all others similarly situated compensatory and punitive damages that stem from Defendants' violation of Title VII of the Civil Rights Act of 1964;

z) Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

aa) Providing that if any amounts remain unpaid upon the expiration of ninety (90) days following issuance of judgment, or ninety (90) days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen (15%) percent, as required by NYLL § 198(4); and

bb) All such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff 's and all similarly situated employees, demand a trial by jury on all issues triable by a jury.

Dated: New York, New York
April 13, 2020

By:  Tyrone A. Blackburn, Esq.

_____/s/ Tyrone Blackburn_____
Tyrone A. Blackburn, Esq.
Attorney for Plaintiff's
1242 E. 80th Street, 3rd Floor
Brooklyn, New York 11236
Telephone: (347) 342-7432