**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

—————————————————————————— x

FARI MURRAY,
DANIEL MOYLE,
ROY WELSH,
CARLOS PALAGUACHI,
ROBERT SANTIAGO,
AHMED RADWAN
and
WARREN PAYNE,
*individually and on behalf of others similarly*
*situated,*

                                     Plaintiffs

-against-


UNITED PARCELS SERVICE, INC.,
WILLIAM GREY,
CHANCE STEWART, and
LLOYD HALL

                               Defendants.

—————————————————————————— x

Case Number 20-1427
DEMAND FOR JURY TRIAL
COLLECTIVE ACTION
UNDER 29 U.S.C. § 216(b)
AMENDED COMPLAINT

       Plaintiff Fari Murray ("Plaintiff Murray" or "Mr. Murray"), Plaintiff Daniel Moyle ("Plaintiff Moyle" or "Mr. Moyle"), Plaintiff Roy Welsh ("Plaintiff Welsh" or "Mr. Welsh"), Plaintiff Carlos Palaguachi ("Plaintiff Palaguachi" or "Mr. Palaguachi"), Plaintiff Robert Santiago ("Plaintiff Santiago" or "Mr. Santiago"), Plaintiff Ahmed Radwan ("Plaintiff Radwan" or "Mr. Radwan") and Plaintiff Warren Payne ("Plaintiff Payne" or "Mr. Payne") (Collectively, "Plaintiff's") individually and on behalf of others similarly situated, by and through their attorney, Tyrone Blackburn Esq, upon their knowledge and belief, and as against United Parcels Service, Inc. d/b/a UPS ("Defendant Corporation"), William Grey, Chance Stewart, and Lloyd Hall or ("Defendants") alleges as follows:


## NATURE OF ACTION:

1. This is an action for monetary and declaratory relief to redress Defendants' violation of Plaintiffs' workplace rights. Plaintiffs seek relief for employment discrimination in violation

of N.Y. Labor Law § 190 et seq. and 650 et seq. (The "NYLL"), for violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), CPLR 214 (4), the New York Equal Pay Act, ("NYSHRL") N.Y. Exec. Law § 290 et seq., (NYSHRL) N.Y. Exec. Law § 296, ("NYCHRL") Administrative Code of City of New York § 8-107 (7), Administrative Code of City of New York § 8-107 (6), Unjust Enrichment, N.Y. Lab. Law § 215 and 740, and Administrative Code of City of New York § 8-107 (13).

2.  At all times relevant to this Complaint, Defendants maintained a policy and practice of knowingly and willfully compensating black On-Road Supervisors, less than their Caucasian colleagues, in violation of Title VII of the Civil Rights Act of 1964 and New York City and state equal pay laws.

3.  At all times relevant to this Complaint, Defendants maintained a policy and practice of requiring Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan and Plaintiff Payne, and other similarly situated employees, to work an excess of forty (40) hours a week without providing the overtime compensation required by state law and regulations.

4.  Plaintiffs now bring this action on behalf of themselves and other similarly situated employees for unpaid minimum and overtime wages, according to N.Y. Labor Law § 190 et seq. and 650 et seq. (The "NYLL"), including applicable liquidated damages, interest, attorneys' fees, and costs.

5.  Plaintiffs seek certification of this action as a collective action on behalf of themselves individually, former employees, and all other similarly situated employees who elect to opt-in to this action according to N.Y. Labor Law § 190 et seq. and 650 et seq., specifically, the collective action provision of N.Y. CLS CPLR § 901.

## ADMINISTRATIVE PROCEDURES

6.  Plaintiff Murray filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for his Title VII race wage discrimination claim. Plaintiff Murray was provided a Notice of Right to Sue by the EEOC. All conditions precedent to the filing of the suit have been performed or have occurred.

7.  Plaintiff Moyle filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for his Title VII disability discrimination claim. Plaintiff Moyle was

provided a Notice of Right to Sue by the EEOC. All conditions precedent to the filing of the suit have been performed or have occurred.

8. Plaintiff Welsh filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for his Title VII Disability and Religious Observance Discrimination claims. Plaintiff Welsh was provided a Notice of Right to Sue by the EEOC. All conditions precedent to the filing of the suit have been performed or have occurred.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C § 1331 (federal question) Title VII and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

10. The venue is proper in this district under 28 U.S.C § 1391(b) and (c) because all, or a substantial portion of, the events or omissions giving rise to the claims occurred in this district, Defendants maintain several branches and offices within this district, and defendants operate a package delivery business located in this district. Further, Plaintiffs are or were employed by Defendants in this district.

## PARTIES

### *Plaintiffs*

11. Plaintiff Fari Murray is an adult, English-speaking African American male who resides in Westchester County, New York.

12. Plaintiff Daniel Moyle is an adult, English-speaking Caucasian male who resides in Bronx County, New York.

13. Plaintiff Roy Welsh is an adult, English-speaking Caucasian male who resides in New Orleans, Louisiana. Plaintiff Welsh is Jewish, and he is religiously observant.

14. Plaintiff Carlos Palaguachi is an adult, Spanish Speaking Latinx male who resides in Bronx County, New York.

15. Plaintiff Warren Payne is an adult, English-speaking African American male who resides in Kings County, New York.

16. Plaintiff Robert Santiago is an adult, English, and Spanish-speaking male who resides in Kings County, New York.

17. Plaintiff Ahmed Radwan is an adult, English, and Arabic-speaking male who resides in Kings County, New York.

18. Plaintiff Murray was employed by Defendant United Parcels Service from approximately January 4, 2003, to October 8, 2018.

19. Plaintiff Moyle was employed by Defendant United Parcels Service from approximately July 9, 2012, to August 21, 2019.

20. Plaintiff Welsh was employed by Defendant United Parcels Service from approximately June 26, 2016, until July 20, 2019.

21. Plaintiff Palaguachi was employed by Defendant United Parcels Service from approximately October 2017 until May 2018.

22. Plaintiff Payne was employed by Defendant United Parcels Service from approximately August 2017 until June 2018.

23. Plaintiff Radwan was employed by Defendant United Parcels Service from approximately July 2018 until October 1, 2018.

24. Plaintiff Santiago was employed by Defendant United Parcels Service from approximately April 7, 2014, until October 18, 2020.

25. Plaintiff Payne consents to be a party plaintiff according to N.Y. CLS CPLR § 901, and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

*Defendants*

26. Defendant Corporation owns, operates, or controls a package delivery service business at all relevant times, located at 10401 Foster Avenue, Brooklyn, NY 11236 under the name "United Parcel Service, Inc."

27. Defendant William Grey is a Business Manager at Defendant Corporation. He is also the former supervisor of Plaintiff Murray. As the Business Manager, William Grey has an ownership interest in Defendant corporation through its management benefits plan. Additionally, William Grey can hire and fire. He directed the actions of his employees (including Mr. Murray), and he set their schedules.

28. Defendant Chance Stewart is a District Manager of Defendant Corporation. He is also the former supervisor of Plaintiff Moyle. As the District Manager, Chance Stewart has an ownership interest in Defendant corporation through its management benefits plan.

Additionally, Chance Stewart can hire and fire. He directed the actions of his employees (including Mr. Moyle), and he set their schedules.

29. Defendant Lloyd Hall is a Business Manager at Defendant Corporation. He is also the former supervisor of Plaintiff Welsh. As the Business Manager, Lloyd Hall has an ownership interest in Defendant corporation through its management benefits plan. Additionally, Lloyd Hall could hire and fire. He directed the actions of his employees (including Mr. Welsh), and he set their schedules.

## COLLECTIVE ACTION ALLEGATIONS

30. Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago and Plaintiff Palaguachi (collectively, "NYLL Collective" or "NYLL Class") bring the First Cause of Action, an NYLL claim, on behalf of themselves and all similarly situated persons who work or have worked as Delivery Drivers for Defendant Corporation who elect to opt-in or waives their right to opt-out of this action.

31. Defendants are liable under the NYLL for, among other things, failing to compensate the NYLL Collective adequately.

32. Upon information and belief, consistent with Defendants' policies and patterns or practices, NYLL Collective was not paid the proper premium overtime compensation of one and a half times their regular rates of pay for all hours worked beyond 40 hours per workweek.

33. Upon information and belief, all of the work the NYLL Collective has performed has been assigned by Defendant, and Defendant has been aware of all of the work that Plaintiff and the NYLL Collective have performed.

34. Upon information and belief, as part of their regular business practice, Defendant has intentionally, willfully, and repeatedly engaged in a pattern, practice, and policy of violating the NYLL concerning the NYLL Collective. This policy and pattern or practice include, but is not limited to, willfully failing to pay their employees, including the NYLL Collective, proper premium overtime wages for all hours worked more than 40 hours per workweek.

## CLASS ACTION ALLEGATIONS[1]

35. The NYLL collective brings the NYLL claims under N.Y. CLS CPLR § 901, on behalf of themselves and a class of persons consisting of:

> All persons who work or have worked as delivery drivers for Defendant Corporation in New York State between 2014 and the date of final judgment in this matter (the "Rule 901 Class" or "NYLL Collective").

36. The Rule 901 Class Members are so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

37. Plaintiff's claims are typical of those claims that any Rule 901 Class Member could allege, and the relief sought is typical of the relief which would be sought by each Rule 901 Class Member in separate actions.

38. Plaintiffs and the Rule 901 Class Members have all been injured in that they have been uncompensated or under-compensated due to Defendants' standard policies, practices, and patterns of conduct. Defendants' corporate-wide policies and practices affected all Rule 901 Class Members similarly, and Defendants benefited from the same type of unfair and wrongful acts as to each of the Rule 901 Class Members.

39. Plaintiffs can fairly and adequately protect the Rule 901 Class Members' interests and have no interests antagonistic to the Rule 901 Class Members.

40. Plaintiffs are represented by attorneys who are experienced and competent.

41. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to prosecute a lawsuit against corporate defendants vigorously. Class action treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

42. Common questions of law and fact exist as to the Rule 901 Class that predominate over any questions only affecting Plaintiff's and the Rule 901 Class Members individually and include, but are not limited to, the following:

---

[1] The NYLL **clearly states** that for employees who are exempt from the FLSA under the Motor Carrier Exemption, employers must provide overtime compensation at a rate of one and one-half times the minimum wage. Hayward v. IBI Armored Servs., 954 F.3d 573, 576 (2d Cir. 2020).

a. Whether Defendants failed to compensate the Rule 901 Class for all hours worked at their regular rate(s) of pay;

b. Whether Defendants failed to compensate the Rule 901 Class for hours worked more than 40 per workweek;

c. Whether Defendants failed to furnish the Rule 901 Class with accurate statements with every payment of wages, as required by the NYLL;

d. The nature and extent of the class-wide injury and the measure of damages for those injuries.

## **FACTUAL ALLEGATIONS**

### *Defendants Constitute Joint Employers*

43. Upon information and belief, Defendant Corporation and Individual Defendant's operate a package delivery service in New York City, in Brooklyn, Manhattan, and the Bronx.

44. Upon information and belief, Defendant Corporation and Individual Defendant's act in the interest of itself concerning employees, pay employees by the same method and share control over the employees.

45. Upon information and belief, Defendant Corporation and Individual Defendant's possessed substantial control over Plaintiff's, and other similarly situated employees, working conditions, and over the policies and practices concerning the employment and compensation of Plaintiff's and all similarly situated employees, referred to herein.

46. Upon information and belief, Defendant Corporation and Individual Defendant's employed Plaintiff's, and all similarly situated employees, and are Plaintiff's, and other similarly situated employees, employers within the meaning of N.Y. CLS CPLR § 901et seq. and the NYLL.

47. In the alternative, Defendant constitutes a single employer of Plaintiff's and all similarly situated employees.

48. Upon information and belief, at all relevant times, Defendants were Plaintiff's employer within the meaning of the NYLL. Defendants had the power to hire and fire Plaintiffs, controlled the terms and conditions of employment, and determined the rate and method of any compensation in exchange for Plaintiff's services.

*Individual Plaintiff*

49. Plaintiff Murray is a former employee of Defendants who was employed as an On-Road Supervisor. With over 15 years of experience working for UPS (first as a driver and ending as an On-Road supervisor), Plaintiff Murray is more than qualified to have worked as an On the Road Supervisor.

50. According to the Job Posting for On-Road Supervisor on UPS job site, the following "Duties" are required:

    a. Must be a U.S. Citizen or National of the U.S., an alien lawfully admitted for permanent residence, or an alien authorized to work in the U.S. for this employer,

    b. Must be currently located in the exact geographic location as the job or willing to relocate yourself,

    c. Must have experience identifying customer needs,

    d. Must be able to deliver packages and demonstrate,

    e. Previous driving experience required,

    f. Must be at least 21 years of age,

    g. Knowledge of GTS and SEAS,

    h. Must be able to perform observations,

51. When he became an On-Road supervisor, Plaintiff Murry was a UPS delivery driver for five months, satisfying the driving, package delivery, customer needs, GTS and SEAS, and observations experience requirement On-Road Supervisor. Plaintiff Murray is currently 40 years old, which means he was well over 21 years old when he assumed the On-Road Supervisor role. As a US citizen who resides in Westchester County at the time of his employment, Plaintiff Murray satisfied the US citizen and geographic location requirements for an On-Road Supervisor.

52. Plaintiff Moyle is a former employee of Defendants who was employed as a Business Manager. With over seven years of experience working for UPS, first as a package delivery driver (7 months), then as an On-Road-Supervisor (3 years), and ending as a Business Manager. Plaintiff Moyle is more than qualified to have worked as a Business Manager for UPS.

53. Plaintiff Welsh is a former employee of Defendants who was employed as an On-Road-Supervisor. With over three years of experience working for UPS first as a driver (1 month) and ending as an on the road supervisor, Plaintiff Welsh is more than qualified to have worked as an On-Road Supervisor.

54. When he became an On-Road supervisor, Plaintiff Welsh was a previous UPS delivery driver for one month, satisfying the driving, package delivery, customer needs, GTS and SEAS, and

observations experience requirement for On-Road Supervisor. Plaintiff Welsh is currently 36 years old, which means he was well over 21 years old when he assumed the On-Road Supervisor role. As a US citizen who resided in NYC at the time of his employment, Plaintiff Welsh satisfied the US citizen and geographic location requirements for an On-Road Supervisor.

55. Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan and Plaintiff Payne are former employee of Defendants who was employed as a delivery driver.

56. According to UPS's Jobsite, the job description for Delivery Drivers is as follows:

> "This is a physical, fast-paced, outdoor position that involves continual lifting, lowering, and carrying packages that typically weigh 25 - 35 lbs. and may weigh up to 70 lbs. A DOT physical exam is required. Package Delivery Drivers must have excellent customer contact and driving skills. Some UPS facilities may require the ability to drive a delivery vehicle with a standard (manual) transmission. Qualified applicants must have a valid driver's license issued in the state that they live. Package Delivery Drivers are expected to comply with UPS appearance guidelines and wear the company-provided uniform."

57. Plaintiff Payne, Plaintiff Santiago, Plaintiff Radwan and Plaintiff Palaguachi were more than qualified to work as package delivery drivers. They are capable of lifting packages that weigh between 25-35 lbs; they have drivers' licenses in New York, they possessed excellent customer service, and they possessed the ability to drive a delivery vehicle with a standard transmission.

58. Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan and Payne seek to represent a class of similarly situated individuals under N.Y. CLS CPLR § 901.

*Plaintiff Murray*

59. Plaintiff Murray was employed by the Defendants from approximately January 4, 2003, until October 8, 2018. Defendants employed Plaintiff Murray as an On-Road supervisor.

60. Plaintiff Murray's work duties required neither discretion nor independent judgment. Plaintiff Murray regularly worked more than forty (40) hours per week throughout his employment with Defendants.

61. Plaintiff Murray is a whistleblower who raised concerns of gender and race-based wage discrimination, Department of Transportation (DOT) violations, massive overtime theft of the delivery drivers, and other abuses by UPS management and Beverly – Human Resource Manager.

62. Plaintiff Murray sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS by his former manager/Supervisor, William Grey, and UPS senior management.

63. Plaintiff Murray has firsthand knowledge of UPS violating the US Department of Labor and NYS Department of Labor's wage and hour laws.

### WILLIAM GREY COMMITS DOT VIOLATIONS AND OVERTIME THEFT

64. Plaintiff Murray is prepared to prove that William Grey (Mr. Murray's former manager/supervisor) and UPS senior management stole hundreds of hours of overtime from a class of drivers. The evidence will show that many drivers start work at 7 am, or 9 am, and they punch out at 10 pm or 11 pm. That is an average of 10 to 16 hours a day. In a 5-day work week, these drivers work an average of 50 to 80 hours a week. Many of these drivers work six days a week, which brings their hours into the mid-'80s and '90s. These hours are not reflected on their paychecks.

65. Plaintiff Murray has evidence of some drivers working 15 to 18-hour shifts. These hours were not reflected on the driver's paychecks.

66. Plaintiff Murray is prepared to reveal the scheme that William Grey and UPS senior management instructed the On-Road-Supervisors to execute as it pertains to stealing overtime hours from the delivery drivers.

67. Upon information and belief, Plaintiff Murray is prepared to reveal how managers and supervisors would go into the GTS (Global Timecard System) and change the delivery drivers' punch-in and punch-out times. This illegal act reduces the driver's daily and weekly hours worked. The drivers would then beg and plead with the On-Road-Supervisor (Mr. Murray), who would then beg and plead with William Grey to pay the drivers their missing wages. Unfortunately, due to William Grey's denials, the payments never came.

68. Upon information and belief regarding the DOT violations, Plaintiff Murray has evidence to show countless hours of DOT hour manipulation. The stolen time is a pattern and practice of the company and its management team to manipulate the DOT rules and regulations.

69. Upon information and belief, William Grey and other senior managers knowingly and willfully require the class and Mr. Murray and On-Road-Supervisors or work beyond their allotted DOT hours.

70. Upon information and belief, in addition to the DOT violations of the delivery drivers, William Grey and UPS senior management violated the DOT hours of Mr. Murray and other On-Road-Supervisors as well.

71. Upon information and belief, On-Road-Supervisors do not punch in or punch out. Their DOT hours are untraceable; therefore, the On-Road supervisors are subjected to abuse by William Grey and the UPS senior management. On-Road supervisors often work 15-18-hour shifts.

## PLAINTIFF MURRAY IS A VICTIM OF WAGE DISCRIMINATION

72. Upon information and belief, in addition to his firsthand knowledge of UPS's DOT violations and the overtime theft committed against the delivery drivers, Mr. Murray was a victim of wage discrimination.

73. Upon information and belief, Mr. Murray earned an $80,000.00 base salary as an on the road supervisor, while his Caucasian male counterpart, Patrick Scanlon ("Scanlon"), earned over $100,000.00 base salary. Mr. Murray trained Scanlon when Scanlon began his career at UPS.

74. Upon information and belief, Mr. Murray was just as qualified as Scanlon (if not more qualified) for On-Road-Supervisor's position. As previously stated, Mr. Murray has over 15 years of experience working for UPS in many positions, while Scanlon's only qualification was being white.

75. Upon information and belief, when Mr. Scanlon was hired, he was a new driver trainee. According to the UPS's policy, new driver trainees are on probation and must stay accident-free. While in training, Mr. Scanlon ran into Mr. Murray's vehicle while Mr. Murray's vehicle was parked on the street. Mr. Scanlon was not fired or reprimanded by UPS. UPS instructed Mr. Murray not to make a "big deal" about the accident and intimidated him out of contacting his insurance carrier. Murray was left with thousands of dollars' worth of damage to his vehicle. Damages that still exist today.

   a. Mr. Murray informed William Grey about the accident and the damage to his vehicle. Mr. Murray asked William Grey to call the insurance carrier and report the accident, and William Grey refused. William Grey told Mr. Murray that he did not want any accidents reported on the balanced scorecard. He warned Mr. Murray against reporting the accident to his insurance carrier, citing that Mr. Murray's insurance carrier would contact UPS resulting in a negative hit to the balanced scorecard.

   b. William Grey threatened Mr. Murray's job and reminded him about what happens to employees who make a "big deal" of accidents. He instructed Mr. Murray to "work something out" with Scanlon.

    c.  As a result of William Grey's threat and out of fear of losing his job, Mr. Murray did not contact his insurance carrier or UPS's insurance carrier. Unfortunately for Mr. Murray, he attempted to secure payment from Scanlon, and Scanlon never paid.

    d.  As was the case with accident coverups, William Grey required Mr. Murray to work "magic" with the vehicle's accident. Unfortunately for Mr. Murray, he was not able to work magic after Scanlon hit his vehicle. Mr. Murray was left holding the bag.

76.  Upon information and belief, Mr. Murray's vehicle was not the only vehicle Scanlon hit. Throughout his time with UPS, Scanlon ran into several vehicles. None of the accidents were ever reported to the insurance carrier by UPS. With this track record, one would assume that Scanlon would be out of a job, but you don't get fired when you're Caucasian and male. You get promoted within UPS.

77.  Upon information and belief, shortly after joining the company and crashing into several cars, Scanlon was promoted by UPS to On-Road-Supervisor.

78.  Upon information and belief, in addition to Scanlon, Mr. Murray was compensated less than Roy Welsh, Carl Lucateli, Joseph Simeone, and Robert "Bob" Walsh. These individuals were all Caucasian, they were all On-Road-Supervisors when Mr. Murray was employed with UPS (several of them survived Mr. Murray's tenure at UPS), and they all possessed the same skills and knowledge that Mr. Murray had when he assumed the role as On-Road Supervisor.

79.  Upon information and belief, as an On-Road-Supervisor, there is no difference between the job descriptions, duties, or requirements for Scanlon, Roy Welsh, Carl Lucateli, Joseph Simeone, Robert "Bob" Walsh, or Mr. Murray.

## MR. MURRAY WAS TERMINATED FOR BEING A WHISTLEBLOWER AND RAISING CONCERNS OF RACE DISCRIMINATION

80.  In the act of retaliation for being a whistleblower and for raising claims of race discrimination, Mr. Murray was terminated for exposing the activities of William Grey and UPS senior management during an investigation on or about august to September 2018 surrounding a failed car accident coverup which William Grey orchestrated.

    a.  Upon information and belief, during the investigation, Mr. Murray provided Beverly (HR manager of the 43rd Street Manhattan, NY location) with printed screenshots of text messages concerning the unpaid overtime and straight time hours of delivery drivers. Example of Screenshots provided:

i. On or about August 17, 2017 at 9:05 am, a driver named Blackmon, sent Mr. Murray a text messages of a screenshot of the time that was reduced from his timecard. His timecard reflected that he worked over 70 hours for the week, yet William Grey went into the GTS and reduced his hours to 57:13.

ii. On or about November 7, 2017 at 7:18 pm Driver Li sent Mr. Murray a text message stating the following: Are u able to fix my time from Saturday? I started at 9 and left 8:21 pm."

iii. On or about December 11, 2017 at 7:11pm, a driver named Creed sent Mr. Murray a text message stating the following: "Was Thursday 8th 7:00 to 21:47". Creed followed up 2 days later on December 13, 2017 at 11:31am stating the following: "Let me know if u can fix me hrs if not I'll go to willi (referring to William Grey).

iv. On or about May 3, 2018 and May 4, 2018 at 7:44 pm and 1:35 pm Driver Scott sent Mr. Murray a text message stating "please fix my time" and "please fix my hrs dude".

v. On or about May 5, 2018, at 3:59 pm, Driver Qualis Townsend sent Mr. Murray the following text message: "can you fix my hours in from yesterday" and at 4:01 pm, "smh they didn't put my hours in from the road yesterday".

vi. On or about November 10, 2017 at 7:15 pm, Driver Pritchard sent Mr. Murray the following text message: "Good morning Fari. This is Pritchard. Listen Tuesday the 7th is still in unresolved. It is showing as a schedule day off. Please help me. Thank you." This driver worked on this day and his whole timecard was deleted and was set up as if he had the day scheduled off not to work.

vii. On or about October 27, 2017 and November 9, 2017 at 8:50 am and 8:35 am, Driver Harris Solomon sent the following text messages to Mr. Murray: "10-25 (Wednesday) Im missing 2 hours I worked from 9:00am-8:30pm" and "Wednesday 9:00-6:15 pm, checked timecard its 6 hours……pls correct".

viii. On or about August 24, 2018, Mr. Murray received a text message from Oleg Gezner concerning his hours worked and his missing overtime. The message said: "Mon, Aug 20/18 8:20 AM -10:40 PM; Tue, Aug 21/18 8:40 AM – 11:13 PM, Wed, Aug 22/18 8:40 AM – 11:34 PM; and Thu, Aug 23/18 8:40 AM-9:29 PM. In 4 days this driver worked nearly 54 hours. This driver was only paid for 40 hours.

    1. A day later the driver sent a follow-up message to Mr. Murray, "and take a look at my timecard before it is to late". Don't forget to change my timecard when u get a chance".

ix. On or about September 26, 2018 at 3:36 pm, Mr. Murray received a text message from Driver Jackson: "fix my timecard from yesterday 8:40-730pm". This was never fixed.

x. On or about August 22, 2018 at 12:02pm, Creed sent Mr. Murray a text stating the following: "Don't forget to put in the ½ hr u owe me". Creed followed up on August 24, 2018 at 8:34pm stating the following: "did u put that ½ hr u owe me".

xi. On or about September 28, 2017 at 9:43 pm, Mr. Murray received the following text message from Driver Rose Sheldon: "Farah please don't forget to put my hours in 9am 2027 thx".

xii. On or about May 7, 2018 at 8:48am, Mr. Murray received the following text message from a UPS driver: "did u take care of the hr u owe me for last week"

xiii. On or about February 19, 2018 at 12:30 pm, Mr. Murray received the following text message from UPS driver Creed: "I need u to change my timecard for last Thursday I started at 7:00 someone change it to 7:50". At 8:00 pm Creed followed up with the following: "Today is the last day to correct it so it comes on this week check."

xiv. On or about January 18, 2018 at 1:14pm, Mr. Murray received the following text message from Creed: "did u put in my missing hrs?" Four days later on January 19, 2018 at 11:19 am, Creed followed up with the following: "Don't forget me with some help". Mr. Murray responded, "Can only add 1 hour". Creed replied, "so add 1 hour a week then".

xv. On or about October 23, 2017 at 10:19 am, Mr. Murray received the following text message from UPS driver Clarke Anthony: "I got paid time only for 2 days and I finished my assignment on both days I didn't take lunch those days I spoke to Willie."

xvi. On or about July 21, 2018 at 8:37 pm, Mr. Murray received the following text message from UPS driver Cece: "Hey.. This dumb chick never put in my hour the last few times I worked I've been looking for her but she don't be in.." At 8:38pm Cece followed up with the following: "The way she talking to me right now I'm about to come there and drag her Fari" Mr. Murray responded, "I'll take care if it when did u finish". Cece responded, "After 7:30 I think ask Lara" "thanks you're the best".

xvii. On or about May 2, 2018 at 7:08 pm, Mr. Murray received the following text message from UPS driver Calix: "you never put that time in for me boss".

xviii. On or about July 27, 2018 at 11:06 am Mr. Murray received a text message from Driver McKenzie: "Plz remember to put the 1:15mins back for me"

xix. On or about May 16, 2018 at 3:29 pm Mr. Murray received the following text message from Driver Mchchearan: "Remember to fix my time".

xx. On or about April 4, 2017 at 10:18 am, Mr. Murray received a text message from Driver Lara: "Yo don't forget about my 3 hours."

xxi. On or about September 11, 2017 at10:02 am, Mr. Murray received a text message from Driver Emile: "Please don't forget my timecard. Mon: holiday pay, Tues: 8:10-8:12, Wed: 8:40-8:36, Thurs: 8:40-10:44, Fri: oph 8hrs."

xxii. On or about September 20, 2018 at 2:03 pm, Mr. Murray received a text message from Eli Fernandez: "Kara said she doesn't see the hours on her check for the last 2 days as helping."

xxiii. On or about May 14, 2018 at 7:26 pm, Mr. Murray received a text message from Driver Darling: "the adjustment is 41 minutes or .68 clicks from Monday last week thank you."

b. Upon information and belief, during the investigation, Mr. Murray provided Beverly photos showing that On-Road Supervisors and drivers are required to deliver packages with their vehicles while not being compensated for their mileage or gas.[2]

c. Upon information and belief, during the investigation, Mr. Murray provided Beverly details of the discriminatory and unfair treatment of Latinx, African American, and Indian delivery drivers compared to the Caucasian drivers.

    i. Upon information and belief, Mr. Murray provided examples of Driver Ramkishun (Indian) and Driver Acosta (Latinx) who got into an accident while delivering packages. William Grey and UPS senior management decided to terminate Driver Ramkishun and Driver Acosta while covering up the numerous accidents that Scanlon, a Caucasian driver who (while on probation) got into several automobile accidents while driving the UPS truck, was not terminated for his woeful driving, but was promoted to On-Road Supervisor instead. Regrettably, Mr. Murray noted that he believed that the only justification for this apparent discrepancy in treatment is that Driver Ramkishun and Driver Acosta are Indian and Latinx, while Scanlon is Caucasian.

d. Upon information and belief, during the investigation, Mr. Murray provided Beverly details of the discriminatory and unfair treatment of Latinx, and African American On-Road Supervisors compared to the Caucasian On-Road Supervisors. UPS engages in redlining-like practices to keep black and brown employees in less favorable neighborhoods.

    i. Upon information and belief, Mr. Murray provided the following examples of William Grey and UPS senior management patterns and consistently denying African Americans on the road supervisors' request to transfer out of their location. In denying these transfer requests, William Grey and UPS senior management stated that these employees "Fit" the demographics of their current coverage area.[3] Better.

    ii. Upon information and belief, Mr. Murray provided the specific example of Orane Sewell (an African American male) who was denied a transfer request to Pennsylvania. A Caucasian male named Alex Gorza with less experience and qualifications made the same transfer request, and it was granted.

    iii. Upon information and belief, Mr. Murray provided another example of Malcolm (an African American male) who made a transfer request denied, while a Caucasian male named Brian Pollard, who was less qualified and less experienced, made the same request a few weeks later and it was granted.

---

[2] On Wednesday, October 28, 2020, at approximately 2:24 pm, this writer witnessed a UPS package delivery guy delivering packages out of a "Rent Me! @ Empire Rent A Car" mini truck with a NYS license plate # 25375MJ. This was not a UPS issued vehicle, and the package delivery man was wearing a UPS uniform. Photographs can be provided. Mr. Murray is prepared to present the photos he gave to Beverly to this Court.
[3] Their coverage area is predominantly African American. Their coverage area is comprised of housing projects, narrow, poorly kept streets, and are full of violence.

iv.  Upon information and belief, Mr. Murray noted that he believed that the only justification for this apparent discrepancy in treatment is that Malcolm and Orane Sewell are African American, while Alex Gorza and Brian Pollard are Caucasian.

e.  Upon information and belief, Mr. Murray provided Beverly details of his claims of discrimination during the investigation. Mr. Murray pointed out that he was paid less than all of his Caucasian counterparts who are On-Road Supervisors (Patrick Scanlon, Roy Welsh, Carl Lucateli, Joseph Simeone, and Robert "Bob" Walsh). Regrettably, Mr. Murray noted that he believed that the only justification for this apparent discrepancy in compensation is that Mr. Murray is African American, and his colleagues are all Caucasian. Mr. Murray learned of the salary difference through conversations with the comparators.

i.  Mr. Murray also pointed to the fact that he was required to deliver packages out of his vehicle[4] and was never compensated for his time, gas, or milage.

ii.  On or about March 30, 2018, at 5:50 pm, Mr. Murray texted William Grey the following: "My expense account? last month, never got approved n now this month". William Grey responded, "I approved" "Unless John didn't. resubmit". William Grey then said, "call me." When Mr. Murray called him, William Grey chastised him for putting this request in text messaged and informed him that they stopped approving the expense report because they were over budget.

81.  Upon information and belief, Mr. Murray has evidence that many Caucasian On-Road Supervisors and division managers commit egregious and ethically flawed acts. Actions that UPS senior management and William Grey were aware of. These Caucasian On-Road supervisors and division managers have never been terminated. They were either reassigned to a different location or transferred to different areas or buildings.

82.  Upon information and belief, Mr. Murray has raised concerns to UPS Human Recourses concerning William Grey and UPS senior managements acts of workplace intimidation, which are used to quash DOT violation complaints on behalf of the On-Road-Supervisors who were working 17 hour shifts.

---

[4] Photos can be provided.

a. These On-Road-Supervisors would be required to work a 17-hour shift, return home, get a handful of hours of sleep, and then return to work for an in-person meeting or another shift.

b. In the case of Plaintiff Murray, on several occasions, after working a 17-hour shift, he would be sleeping on himself while driving on the highway heading home to Westchester, NY, or returning to work at the UPS facility in Brooklyn, NY. This drive typically takes Mr. Murray over an hour to complete in either direction. This was a clear and present danger to Mr. Murray and the public's health and safety at large. Mr. Murray was not the only On-Road Supervisor that complained about this. William Grey did not care about Mr. Murray's concerns, and he demanded that he showed up to work for the shifts or the meetings. Mr. Murray raised these concerns to Beverly.

c. According to the Federal Motor Carrier Safety Administration[5] ("FMCSA"):

**Summary of Hours-of-Service Regulations**

| The table summarizes the HOS regulations for property-carrying and passenger-carrying drivers. | |
|---|---|
| **HOURS-OF-SERVICE REGULATIONS** | |
| **PROPERTY-CARRYING DRIVERS** | **PASSENGER-CARRYING DRIVERS** |
| **11-Hour Driving Limit**<br>May drive a maximum of 11 hours after 10 consecutive hours off duty. | **10-Hour Driving Limit**<br>May drive a maximum of 10 hours after 8 consecutive hours off duty. |
| **14-Hour Limit**<br>May not drive beyond the 14th consecutive hour after coming on duty, following 10 consecutive hours off duty. Off-duty time does not extend the 14-hour period. | **15-Hour Limit**<br>May not drive after having been on duty for 15 hours, following 8 consecutive hours off duty. Off-duty time is not included in the 15-hour period. |
| **30-Minute Driving Break**<br>Drivers must take a 30-minute break when they have driven for a period of 8 cumulative hours without at least a 30-minute interruption. The break may be satisfied by any non-driving period of 30 consecutive | |

---

[5] https://www.fmcsa.dot.gov/regulations/hours-service/summary-hours-service-regulations

The table summarizes the HOS regulations for property-carrying and passenger-carrying drivers.

**HOURS-OF-SERVICE REGULATIONS**

| | |
|---|---|
| minutes (i.e., on-duty not driving, off-duty, sleeper berth, or any combination of these taken consecutively). | |
| **60/70-Hour Limit**<br>May not drive after 60/70 hours on duty in 7/8 consecutive days. A driver may restart a 7/8 consecutive day period after taking 34 or more consecutive hours off duty. | **60/70-Hour Limit**<br>May not drive after 60/70 hours on duty in 7/8 consecutive days. |
| **Sleeper Berth Provision**<br>Drivers may split their required 10-hour off-duty period, as long as one off-duty period (whether in or out of the sleeper berth) is at least 2 hours long and the other involves at least 7 consecutive hours spent in the sleeper berth. All sleeper berth pairings MUST add up to at least 10 hours. When used together, neither time period counts against the maximum 14- hour driving window. | **Sleeper Berth Provision**<br>Drivers using a sleeper berth must take at least 8 hours in the sleeper berth and may split the sleeper berth time into two periods provided neither is less than 2 hours. All sleeper berth pairings MUST add up to at least 10 hours. |
| **Adverse Driving Conditions**<br>Drivers are allowed to extend the 11-hour maximum driving limit and 14-hour driving window by up to 2 hours when adverse driving conditions are encountered. | **Adverse Driving Conditions**<br>Drivers are allowed to extend the 10-hour maximum driving time and 15-hour on-duty limit by up to 2 hours when adverse driving conditions are encountered. |
| **Short-Haul Exception**<br>A driver is exempt from the requirements of §395.8 and §395.11 if: the driver operates within a 150 air-mile radius of the normal work reporting location, and the driver does not exceed a maximum duty period of 14 hours. Drivers using the short-haul exception in §395.1(e)(1) must report and return to the | **Short-Haul Exception**<br>A driver is exempt from the requirements of §395.8 and §395.11 if: the driver operates within a 150 air-mile radius of the normal work reporting location, and the driver does not exceed a maximum duty period of 14 hours. Drivers using the short-haul exception in §395.1(e)(1) must report and return to the normal work |

18

| The table summarizes the HOS regulations for property-carrying and passenger-carrying drivers. | |
|---|---|
| **HOURS-OF-SERVICE REGULATIONS** | |
| normal work reporting location within 14 consecutive hours and stay within a 150 air-mile radius of the work reporting location. | reporting location within 14 consecutive hours and stay within a 150 air-mile radius of the work reporting location. |

    d. Plaintiff Murray and the other On-Road-Safety managers were not afforded the rights to follow the summary of hours safety regulations provided by the FMCSA.

83. Upon information and belief, Mr. Murray has evidence of William Grey and UPS senior management engaging in workplace intimidation of supervisors by threatening to write them up and terminate them if they did not use their vehicles to deliver UPS packages. On-Road supervisors' use of their vehicles to deliver packages is a violation of the collective bargaining agreement.

    a. Upon information and belief, on a group text with the On-Road Supervisors discussing the shortage of delivery trucks, William Grey says the following: "what about the cars at the other end." (meaning the employee parking lot). Orane Sewell, one of On-Road Supervisor, replied, "y don't u guys get cars earlier? We sent out nine drivers in their cars. Now at 12 pm, we're taking out stragglers.[6]"

84. Upon information and belief, Mr. Murray has evidence of William Grey and UPS senior management engaging in workplace intimidation of the truck delivery drivers and threatening to fire them if they complained about the overtime theft they experienced when they worked 15 to 17-hour days.

85. Upon information and belief, Mr. Murray has evidence of William Grey and UPS senior management engaging in workplace intimidation of the package truck drivers and supervisors by forcing the package truck drivers to pay out of pocket for car accidents instead of reporting the accidents to UPS insurance carrier. This is one of many forms of unjust enrichment orchestrated by UPS.

---

[6] When there are stragglers (leftover packages), the supervisors have to deliver the packages out of their vehicles.

## **WILLIAM GREY COVERED UP ACCIDENTS AND INJURIES:**

86. Upon information and belief, Mr. Murray has evidence of William Grey and UPS senior management engaging in workplace intimidation of the supervisors by failing to report countless automobile accidents [7] and forcing them to manipulate the accident scenes to decrease the company's insurance liability. For example:

   a. In a text message, William Grey instructed Mr. Murray to move the UPS vehicle into the middle of the block, by saying "make it more in the middle of the street." This is important because the insurance carrier charges UPS more for accidents in the intersection than in the middle of the block.

   b. On or about January 8, 2018, at 9:37 am, Mr. Murray received the following text message from William Grey: "Call me ASAP." Mr. Murray called William Grey at 9:41 am. They spoke for several minutes, and William Grey provided Mr. Murray with the address to an accident scene. At 10:16 am, William Grey asked Mr. Murray, "are u there." At 10:17 am, Mr. Murray responded, "No 7 mins". At 10:18 am, William Grey responded, "Magic" (which is code for coverup).

   c. On or about October 2, 2017, at 8:26 pm near Avenue J and E 5th Street in Brooklyn, NY, there was an accident with a UPS delivery truck in the intersection. William Grey instructed Mr. Murray to go to the screen of the accident and "work magic." William Grey did not report this accident.

   d. On or about March 1, 2018, at 3:22 pm, Willie Grey sent Mr. Murray the following text message: "try reg duty if possible and still work with him." "Thanks, and I can still give him off Monday. Will have comp # for meds later today, or in am." In this case, a driver got hurt, and William Grey is instructing Mr. Murray to get the doctor to put him on regular duty, so it does not come up as a lost-time injury, and they will give him off on Monday.

87. Upon information and belief, Mr. Murray has evidence of William Grey and UPS senior management engaging in workplace intimidation of the drivers and workers who were injured on the job by prohibiting them from visiting their doctors and forcing them to visit designated "company medical experts" who would misdiagnose them.

   a. On or about August 30, 2017, at 6:58 am, Mr. Murray received a text message from Driver Rose Sheldon: "Gm going to the hospital still limping ice didn't work think I need some muscle relaxer?" Mr. Murray informed William Grey, and William Grey instructed him to stop the driver from going to the hospital. At 8:18 am, Mr. Murray sent a text message to the driver, "call me asap." During that call, Mr. Murray convinced the driver not to take workman's comp or medical leave. William Grey did not report this accident.

   b. On or about August 1, 2018, at 3:45 pm, Mr. Murray received a text message from Deshaun Davis. It was a text of an injury to Deshaun Davis suffered while on the job. William Grey prohibited Mr. Murray from filing an accident report, and instead, he instructed him to offer time off and the number to a "UPS friendly" doctor.

---

[7] This is a clear danger to public health and safety.

    c.   On or about May 11, 2018, at 4:44 pm, Mr. Murray received a text message from Driver Reel, stating: "I'm taking a couple of mins to go get this cleaned up, Got caught on a city garbage can." This driver had a massive gash in his hand. This accident was not reported, and William Grey instructed Mr. Murray to take care of it, stopping the driver from seeking medical attention and going out on medical leave.

88. Upon information and belief, William Grey would send On-Road-Supervisors with the drivers to his medical experts and have the experts downplay the severity of the injury and designate the worker to work on light or regular duty.

89. On one occasion, via text message William Grey instructed Mr. Murray to coach an emergency room doctor to give the injured delivery driver a regular duty return to work status:

    a.   On or about March 1, 2018 at 2:05 pm, Mr. Murray received the following text from William Grey: "Call me". Mr. Murray called. They spoke for about 30 mins about an injured driver who would need medical attention, and possible medical leave. At 3:21pm William Grey sent the following text message: "Did u understand". At 3:22pm William Grey instructed Mr. Murray to get the Emergency doctor to provide the injured driver with "reg duty if possible…". William Grey followed up at 3:24pm with "Thanks and can still give him off Monday. Will have comp # for Meds later today or in the am".

90. Upon information and belief, Mr. Murray has evidence of William Grey and UPS senior management engaging in workplace intimidation of the supervisors and drivers by making them scan packages as if a valid delivery attempt was made to the package delivery address, when no attempt was made, to avoid a missed delivery.

91. Upon information and belief, Mr. Murray has evidence of William Grey and UPS senior management engaging in workplace intimidation of the drivers by making them implement a negligent "Driver Release" policy.  This policy forces the drivers to leave packages in high-risk areas. Drivers are then terminated as a result of this policy if a package is stolen.

92. Upon information and belief, Mr. Murray has evidence of William Grey and UPS senior management engaging in workplace intimidation by prohibiting the submissions of gasoline expense reports or change the gasoline expense reports submitted by the On-Road Supervisors. William Grey and UPS Management would also reduce the number of miles reported by the On-Road Supervisors to "look bad" on the expense reports. This is a clear act of unjust enrichment by UPS.

*Plaintiff Moyle*

93. Mr. Moyle is a veteran of the United States Marine Corps. He fought in the Iraq war and proudly served this country (active duty) for over five years.

94. Mr. Moyle was employed by the Defendants from approximately July 9, 2012, until August 21, 2019. Defendants employed Mr. Moyle as a Business Manager.

95. Mr. Moyle's work duties required neither discretion nor independent judgment.

96. Mr. Moyle is a whistleblower who raised concerns of document manipulation, fraudulent reporting of accidents, Department of Transportation (DOT) hours of service violations, massive overtime theft of the driver and other abuses by UPS management.

97. Mr. Moyle sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS by his former manager, Chance Stewart, and UPS senior management.

98. Mr. Moyle has firsthand knowledge of UPS violating the US Department of Labor's wage and hour laws.

99. Chance Stewart and UPS senior management stole hundreds of hours of overtime from a class of drivers. The evidence will show that many drivers start work at 7 am to 9 am, and they punch out at 10 pm 12 am. That is an average of 15 to 17 hours a day. In a 5-day work week, these drivers work an average of 65 to 75 hours a week. Many of these drivers work six days a week, which brings their hours into the mid-'80s and '90s. These hours are not reflected on their paychecks.

100. Mr. Moyle has evidence of some drivers working 17 to 18-hour shifts. These hours were not reflected on the driver's paychecks.

101. Mr. Moyle is prepared to reveal the scheme that Chance Stewart and UPS senior management instructed the Business Manager to execute as it pertains to stealing overtime hours from the delivery drivers.

102. Mr. Moyle is prepared to reveal how managers and supervisors would go into the GTS and change the delivery drivers' punch-in and punch-out times. This illegal act reduces the driver's daily and weekly hours worked. The drivers would then have to beg and plead with their supervisors and managers to pay them for their time. Unfortunately for them, the payments never came.

103.    Upon information and belief regarding the DOT violations, Mr. Moyle has evidence to show countless hours of DOT hour manipulation. The stolen time is a pattern and practice of the company and its management team to manipulate the DOT rules and regulations.

104.    Upon information and belief, Chance Stewart and other senior managers knowingly and willfully require the class and Business Managers to work beyond their allotted DOT hours.

105.    Upon information and belief, over his 7-year career at UPS, Mr. Moyle was under constant pressure from his superiors, such as Chance Stewart, to engage in unethical and illegal activities to cheat workers, customers, and insurance carriers.

106.    Upon information and belief, the mafia-like bullying tactics were not just used against Mr. Moyle, and it was used as a common tactic to get business done across the board.  Mr. Moyle has evidence to prove that UPS bosses – throughout the organization, promote the falsification of company records to mislead customers, lower insurance premiums, and make their internal balanced scorecards look more favorable.

107.    Upon information and belief, Mr. Moyle is prepared to demonstrate how UPS uses their shoddy and unethical business practices to discipline or discharge its employees at any time arbitrarily and for disguised reasons – such as age, disability status, race, or whether or not the individual is part of the "in-crowd."

    a.    For example, at the 43rd Street facility, Mr. Moyle is aware of a UPS manager named Gary Graham, both older and African American. His manager, Justin Laporte, did not like him.

108.    Upon information and belief, Mr. Moyle heard Justin Laporte say the following regarding Gary Graham,

- "Gary sucks. I can't wait to get rid of him,"
- "He's useless,"
- "He's a waste," and
- "Fuck that guy."

109.    Upon information and belief, Gary Graham, a 30-year veteran of the company, was fired for hiding an injury/accident, something Justin Laporte instructed him to do, and an act Justin Laporte often does himself.

## TOMMY FRANCIS FORCED MR. MOYLE TO COVERUP ACCIDENTS

110.     Upon information and belief, Mr. Moyle worked for Tommy Francis when he first entered UPS and was a supervisor. Tommy Francis taught Mr. Moyle how to cover up crashes and injuries by often dispatching Mr. Moyle to the scene of a crash and asking Mr. Moyle to pay for minor damages with his own money.

111.     Upon information and belief, Tommy Francis thought the number of crashes he covered up was amusing. Tommy Francis kept a little black book where he kept a log of all the injuries and accidents he covered up. Mr. Moyle knew that if he defied Tommy Francis, it would hurt his career. Tommy Francis required everyone that worked under him to cheat.

## UPS CHEATS CUSTOMERS BY MAKING THEM PAY FOR NEXT DAY AIR PACKAGE DELIVERY, AND MISMARKING THE UNDELIVERED PACKAGES AS DELIVERED

112.     Upon information and belief, UPS cheats in many different ways. One of the primary ways UPS cheats is with their Next Day Air package service. The cheating is widespread across the New York City area (North Atlantic District), with delivery drivers being told by their superiors to scan time-sensitive packages miles from the customer's location, mark them as delivered, and deliver the packages later on that day after the time commitment.

113.     Upon information and belief, Next Day Air customers are paying a premium to have these packages shipped overnight and delivered by 10:30 am.

114.     Upon information and belief, Managers would either commit the fraud themselves or coerce the delivery drivers to mark commercial packages as residential when they came to a closed business after hours. This falsification avoids a service failure on UPS's part.

115.     Upon information and belief, one of the biggest proponents of this practice is Chance Stewart. Chance Stewart would flat out tell On-Road-Supervisors to make these falsifications.

116.     William Grey engaged in this practice as well.

   a.   On or about December 28, 2017, at 8:16 pm, Mr. Murray received the following text message from William Grey: "Very important to have accurate reports. No, after 8s and no late air and no missed. Very important." At 9:14 pm, he followed up with, "I can't stress the importance of NO after 8s NO late Air or missed. I need you to make sure the reports show that. Please verify" at 9:17 pm, he followed up again with, "Make sure Naj takes out all late air." William Grey instructs Mr. Murray to ensure that the office assistant, Naj, falsifies the reports to show no late airs, liable to customer refunds.

117.    Upon information and belief, it was common for Chance Stewart to give instructions to managers and supervisors that violated UPS's code of conduct. The following are examples of the violations spear-headed by Chance Stewart: annual safety ride manipulation, service failure coverups, insurance fraud, and auto accident coverups.

## ANNUAL SAFETY RIDES MANIPULATION

118.    Upon information and belief, the company must perform annual safety rides for all of its employees.  The rides are mandated to be all day long, and the safety department strictly enforces it. However, to chase performance results, UPS requires front-line supervisors to conduct all-day-long performance rides on the drivers.  These rides are called "On the Job Supervision" rides or "OJS" rides.

119.    Upon information and belief, these two rides must be done separately, especially since the safety ride documents become discoverable legal documents.

120.    Upon information and belief, Chance Stewart instructed his managers and supervisors to do both rides simultaneously, tricking the system by entering the performance ride digitally through a tablet – and the safety rides on paper. This is clear falsification.

121.    Upon information and belief, only one ride can be performed at one time on the UPS tablet, and there is a selection option of either Safety or Performance ride. This is how Chance Stewart maximizes his supervisor's time – by falsifying legal documents that state a supervisor spent all day training an employee on safety, when in fact, the supervisor did not.

## SERVICE FAILURE COVERUPS

122.    Upon information and belief, on multiple occasions, Chance Stewart instructed managers or supervisors to falsify premium Next Day Air packages delivered late.

123.    Upon information and belief, as recently as February 14, 2020, Chance Stewart instructed a supervisor to coverup 280 service failures to UPS customers.  It is UPS's obligation to deliver to commercial addresses by 5 pm. If UPS fails to do so and the customer's business closes, the packages cannot be delivered. Within UPS, this is not good.

124.    Upon information and belief, managers get beat up on conference calls and are forced to fill out extra paperwork. If there are excessive service failures, in some cases, their bonuses (company stock) are threatened or taken away altogether.

125.    Upon information and belief, on February 14, 2020, a truck was loaded with 280 packages to be delivered to 270 Mulberry St. and 310 Lafayette St. UPS forgot about these packages, which a supervisor discovered. Chance Stewart directed this supervisor to falsify all 280 packages and mark each package with a disposition of "Closed Holiday."

126.    Upon information and belief, those stores were open all day. UPS simply failed to deliver them because they forgot about them. The customers were not reimbursed for this failure. This is a gross falsification of company records and is standard practice at UPS.

## INSURANCE FRAUD AND ACCIDENT COVERUPS

127.    Upon information and belief, on March 11, 2019, at 9:32 pm, there is a text message thread with Chance Stewart and all of his managers. Village Manager Paul Williams informed Chance Stewart through text that he had a crash in his center involving driver Jenelle Torres. The crash was on E. 18th Street. Paul Williams requested that Chance Stewart meet him there. This crash was never reported, never called in, and no paperwork was ever filed.

128.    Upon information and belief, Jenelle Torres did her job and reported the crash to her manager, Paul Williams. Paul Williams did his job and reported the crash to his manager Chance Stewart. Yet this accident was covered up and not reported to UPS's insurance.

129.    Upon information and belief, the Jenelle Torres accident was not filed because it would harm Chance Stewart's balanced scorecard. Reporting it would create extra paperwork for Chance Stewart and require him to be on a conference call beat-up session the following day.

## MR. MOYLE BLOWS THE WHISTLE ON AN ACCIDENT COVERUP

130.    Upon information and belief, during the First Quarter of 2019, one of Mr. Moyle's drivers, Ramadan Abdul – Salaam, reported to his supervisor Reinaldo Madera that he slipped and fell. Reinaldo Madera, Rey, and Alex De La Rosa went out to the scene and spoke with him.

131.    Upon information and belief, approximately two weeks later, Mr. Abdul- Salaam approached Mr. Moyle and informed him that his leg was still nagging him, and he felt that he should get medical attention.

132.    Upon information and belief, Mr. Moyle called Chance Stewart to report the injury. Chance Stewart instructed Mr. Moyle to suppress the injury. At that point, Mr. Abdul-Salaam had already seen his doctor and sent Mr. Moyle a doctor's note.

133.    Upon information and belief, while completely disregarding Mr. Abdul-Salaam's doctor's note, Chance Stewart sent Mr. Moyle a texted message stating the following: "Also Call Tony Hussein. Do u have his number". Tony Hussain is a driver at the 43rd Street Facility. Tony Hussein has a common nickname known throughout the North Atlantic District – "The Safety Mafia." Tony Hussein works hand in hand with the facility manager, Justin Laporte, and together they cover up crashes and injures as they occur. Tony Hussein is known to make accidents and injuries go away.

134.    Upon information and belief, Tony Hussein the Safety Mafia is a veteran delivery driver who is always readily available to take calls for help from managers and supervisors. After fielding accident calls, Tony Hussein then rushes out to the scene and convinces drivers to either not report an injury or to help sweep an accident under the rug. Upon information and belief, Tony Hussein made an injured UPS driver exit an ambulance and not report his accident injury.

135.    Upon information and belief, ignoring Tony Hussein's pressure campaign, Mr. Moyle officially reported Mr. Abdul-Salaam's injury. Mr. Moyle's actions angered Chance Stewart and landed Mr. Moyle in a heap of trouble.

## MR. MOYLE IS RETALIATED AGAINST FOR REPORTING
## MR. ABDUL-SALAAM'S INJURY:

136.    Upon information and belief, after Mr. Moyle went against Chance Stewart and Tony Hussein's wishes and reported Mr. Abdul-Salaam's injury, he was approached by Chance Stewart to engage in another coverup.  This time, Chance Stewart demanded that Mr. Moyle work with Tony Hussein regarding a crash in a center managed by Manny Pujols. Mr. Moyle refused, and that spelled the beginning of the end of his tenure at UPS.

137.    Upon information and belief, Chance Stewart was on a mission to make Mr. Moyle's life a living hell. He began by requesting that Terri Murphy, the Metro New York Safety Manager, launch an "investigation" into Mr. Moyle concerning Mr. Abdul-Salaam's injury.

138.   Upon information and belief, although he was aware of Mr. Abdul-Salaam's injury at the time it happened, Chance Stewart falsely reported Mr. Moyle for failing to report Mr. Abdul-Salaam's injury on time, resulting in a "Lost Time.[8]" injury.

139.   As the safety manager for the New York Metro region, Terri Murphy orchestrates and promotes many tactics of covering up injuries and accidents.

140.   Upon information and belief, injuries, accidents, and, more specifically, lost time injuries are all negative hits on Terri Murphy's balanced scorecard. Upon receiving Chance Stewarts' complaint, Terri Murphy was furious that she was charged with this severe blemish on her BSC.

141.   Upon information and belief, Terri Murphy directly threatened Mr. Moyle on several occasions. On one of those occasions, Terri Murphy said the following "This injury better not go lost time!"

142.   Upon information and belief, the rules do not apply to everyone. As a result of Mr. Moyle reporting Mr. Abdul-Salaam's injury, he was subjected to conference call harassment, public ridicule, threats of termination, heightened scrutiny of his work product, excessive, unnecessary additional training, and harassment by company security.

143.   Mr. Moyle is aware of UPS's pattern and practice of punishing managers who speak up, and it's called "grinding.[9]" Mr. Moyle suffered an immediate increase in the number of hours he was required to work. Mr. Moyle went from working 40 to 45 hours a week to being required to work 60 to 70 hours a week.

### TERRI MURPHY IS THE QUEEN OF ACCIDENT COVERUPS:

144.   Mr. Moyle, along with other managers at UPS, has had several sketchy conversations with Terri Murphy whenever they report auto accidents. Auto accidents at UPS are broken down into different classifications based on severity. It behooves the safety manager to downgrade accidents wrongfully.

- Tier 1 – Least severe (Hit while parked, hit a parked vehicle, property damage)
- Tier 2 – Moderate (Sideswipe crash)

---

[8] A lost-time injury is the highest classification of injury internally at UPS. A lost-time injury negatively impacts UPS's insurance premiums, and it is a one-way ticket to termination for managers accused of acquiring them.

[9] Grinding is the act of punishing managers and supervisors by making them work in locations far from their home, for extended hours, and during odd hours.

- Tier 3 – Severe (pedestrian, intersection accident, fatality)

145.    Within UPS, tier 3 crashes are very bad for business. When there is a tier 3 crash, the district president holds a conference call immediately no matter the time, managers are verbally assaulted on these conference calls, and delivery drivers often lose their jobs.

146.    When sharing details of a crash with Terri Murphy, she asks questions and makes insinuations to lead Mr. Moyle and other managers to report crashes as tier 2 instead of tier 3.

### TERRI MURPHY ORCHESTRATES AUTO ACCIDENT SCENE MANIPULATION:

147.    In addition to tier manipulation, if Terri Murphy sees pictures of the accident scene and it's in an intersection, she would say the following:

- "Are you sure that crash didn't happen outside the intersection, and the truck came to a rest there?"  Or
- "Make sure you don't take any pictures near the crosswalk" or
- "Don't use that picture in the report" or
- "Why don't you call me back in 10 minutes and tell me if we have to call this one in".

### TERRI MURPHY COMMITS INSURANCE FRAUD:

148.    Upon information and belief, when a UPS driver crashes into a stationary object (wall, mailbox, steps) and causes property damage, it is supposed to be a reported crash that goes against Terri Murphy's balanced scorecard.

149.    Upon information and belief, Terri Murphy gets around this by deliberately mischaracterizing these claims to the insurance company as liability property claims not caused by the vehicle; therefore, they are not considered auto crashes.

### MR. MOYLE SUFFERED FROM DEPRESSION AND SEVERE ANXIETY:

150.    During the spring of 2019, the stress and pressure became too much for Mr. Moyle. As a United States Marine Corps war veteran, Mr. Moyle's integrity and honor were being attacked.

151.    Mr. Moyle was being punished for going against Chance Stewart and Terri Murphy by reporting the injury of Mr. Abdul-Salaam. He was required to work longer hours and was being threatened to be relocated to a branch over a hundred miles from his home.

152.    Mr. Moyle has witnessed countless supervisors and managers get rotated to undesirable locations far from their home and required to work hours that are inhumane if they go against UPS management.

153.    For example, in 2018, during Mr. Moyle's time as the Knickerbocker manager in Manhattan South, Mr. Moyle covered his manager's entire operation, Frank Casalinho would take a vacation.

During one particular week that Mr. Moyle was covering, Brian Cannon, Frank Casalinho's manager, reached out to Mr. Moyle for an update on the Manhattan South operation.

Brian replied by saying "Nice job, how come Manhattan South can't do it when Frank is there?  All roads lead to Frank.  He fucking sucks.  I can't wait to send that guy packing"

Shortly after Brian Cannon was promoted to be president of the North Atlantic District, and shortly after that he did exactly what he promised. He sent Frank packing.

154.    Brian Cannon sent Frank Casalinho to an operation in upstate New York. One of Frank's buildings was located over 100 miles away from his home. This goes against the maximum miles outlined by UPS company policy.

155.    Upon information and belief, it was a known fact that Brian didn't like Frank, even poking fun of him during meetings.  Now Brian was in a position where he could make Frank miserable – and he did.

## MR. MOYLE GOES ON SHORT-TERM DISABILITY, AND IS NOTIFIED THAT HE WAS BEING DEMOTED AND REASSIGNED TO UPSTATE NEW YORK

156.    Mr. Moyle's depression came to a head on May 9, 2019, when he was summoned to the 43rd Street office to be interviewed by security.

157.    This was a game implemented by Chance Stewart and Terri Murphy as part of their retaliation against Mr. Moyle. They subjected Mr. Moyle to constant drilling and fake investigations from UPS company security.

158.    This constant harassment caused Mr. Moyle to have a panic attack, which resulted in a diagnosis of depression and severe anxiety.

   a.   Mr. Moyle was out on medical leave for 3.5 months.

   b.   Mr. Moyle's doctor prescribed Lorazepam.[10] and Duloxetine[11].

   c.   The side effects of Lorazepam:

---

[10] This medication is used to treat anxiety. Lorazepam belongs to a class of drugs known as benzodiazepines, which act on the brain and nerves (central nervous system) to produce a calming effect.

[11] Duloxetine is used to treat the major depressive disorder in adults.

       i. Drowsiness, dizziness, loss of coordination, headache, nausea, blurred vision, change in sexual interest/ability, constipation, heartburn, or appetite change.

  d. The side effects of Duloxetine:

       i. Difficulty sleeping, headaches, feeling dizzy, blurred vision, and constipation or diarrhea.

159. Upon information and belief, 40 days into his disability leave, Mr. Moyle's position as the Knickerbocker manager was given to Brian Mactavish. He then learned through Leo Cummings (Chance Stewarts' supervisor) and Chance Stewart that he would be relocated to a location in Upstate New York upon his return.

160. Upon information and belief, Mr. Moyle had a conversation with Leo Cummings and Chance Stewart one month before his medical leave was scheduled to end. Mr. Moyle informed them that he would need the following accommodations to return to work:

  a. Ability to audio record conversations to aid with the issues he had concerning memory retention.
  b. Natural lighting in his workspace, or a "white noise" machine or noise-canceling headphones to aid with his ability to concentrate.
  c. A set schedule so Mr. Moyle could attend therapy and frequent doctor visits. As well as to balance out the groggy effects of the medication, Mr. Moyle was prescribed.

161. Upon information and belief, Leo Cummings and Chance Stewart denied Mr. Moyle's accommodation request and failed to provide him with any alternatives.

162. Upon information and belief, Leo Cummings and Chance Stewart informed Mr. Moyle that his new job location would be in Upstate New York, and when he returned, he would no longer be a District Manager. As a result, Mr. Moyle resigned 3.5 months into his medical leave. Mr. Moyle walked away from his employee benefits.

## UPS PRESSURE CAMPAIGN FOR UNITED WAY CAMPAIGN

163. Upon information and belief, another unethical business practice is how UPS executes its annual United Way campaign. Once a year, they strong-arm all of their employees to give their money away to put the company in a positive light with the public.

164. Upon information and belief, contributing is supposed to be voluntary; supervisors and managers have preset amounts which they are "strongly" encouraged to give. The amounts are $750 for supervisors and $1000 for managers.

165. Upon information and belief, upper management keeps track of individuals who do not give during the campaign, and those individuals are retaliated against.

166.    Upon information and belief, United Way is a huge topic of conversation on conference calls, and operations that are lagging are singled out and asked to "PUSH" harder.  What does that mean?  How do you 'push' people to be charitable?  You retaliate against them by withholding their promotions, reassigning them to unfavorable locations, and unfavorable shifts.

## MANHATTAN NORTH 2017 SCANDAL

167.    Upon information and belief, perhaps the biggest cheating scandal to rock the North Atlantic District occurred during 2017 in the Manhattan North facility. The facility manager at the time was Justin Laporte, and his boss was Anthony Celano.

168.    Upon information and belief, Anthony Celano was in charge of Justin's territory and the Bronx and Westchester County. Anthony Celano worked for Brian Cannon, who was the operations manager of New York Metro.

169.    Upon information and belief, Justin Laporte had his supervisors change timecards nightly. This happened on a very large scale. The supervisors would add 'miles are driven' and 'packages delivered' to employees' timecards, making them look much more productive than they were.

170.    Justin Laporte personally swept dozens of injuries and accidents under the rug often paying for vehicle damage with his own money. Justin Laporte would convince his employees not to report injuries and pay them to stay home and rest.

### Plaintiff Welsh

171.    Plaintiff Welsh has served in the United States Marine Corps and the Israeli Defense Forces. Mr. Welsh has received numerous commendations for his involvement in countless missions beyond the wire. As a Marine and an Israeli soldier, Mr. Welsh followed orders. When superiors at UPS instructed him to work as directed, Mr. Welsh took their words seriously. And like the military, Mr. Welsh trusted them to guide him towards understanding and interpreting UPS methods and procedures correctly.

172.    Mr. Welsh was employed by the Defendants from approximately June 26, 2016, until July 20, 2019. Defendants employed Mr. Welsh as an On-Road Supervisor.

173.    Mr. Welsh's work duties required neither discretion nor independent judgment.

174.    Mr. Welsh is a whistleblower who raised concerns of document manipulation, fraudulent reporting of accidents, management readiness exam cheating, DOT hours of service regulation violations, massive overtime theft of the driver's other abuses by UPS management.

175.    As was the case with Mr. Murray, when Mr. Welsh raised his concerns with human resources surrounding the discriminatory and retaliatory actions of his supervisor and one of the UPS employees, he also raised concerns about the lack of safety concerning the number of hours on-road- supervisors are required to work, as well as the quick turnaround time for them to return to work for meetings or to work a recent shift.

176.    Mr. Welsh sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS by his former manager, Chance Stewart, and UPS senior management.

177.    Mr. Welsh has firsthand knowledge of UPS violating the US Department of Labor's wage and hour laws.

178.    Mr. Welsh is prepared to prove that Anthony Celano and UPS senior management stole hundreds of hours of overtime from a class of drivers. The evidence will show that many drivers start work at 7 am to 9 am, and they punch out at 10 pm 12 am. That is an average of 15 to 17 hours a day. In a 5-day work week, these drivers work an average of 50 to 70 hours a week. Many of these drivers work six days a week, which brings their hours into the mid-'80s and '90s. These hours are not reflected on their paychecks.

179.    Upon information and belief, Mr. Welsh has evidence of some drivers working 17 to 18-hour shifts. These hours were not reflected on the driver's paychecks.


**ANTHONY CELANO INSTRUCTS STAFF TO SCRUB ALL DISCREPANCIES**

180.    On Friday, November 25, 2016, as Mr. Welsh was closing down the building, Anthony Celano instructed Mr. Welsh, along with a fellow On-Road Supervisor, to stay at the office "as long as it takes to scrub out all discrepancies."

181.    Upon information and belief, what this means is that hundreds, if not thousands of packages that had not been delivered that day would have scans on them to excuse their service failures. It helps a manager's numbers, which help a manager's balanced scorecard, which directly affects a manager's pay raise and promotion likelihood.

182.   Upon information and belief, Mr. Welsh had no idea what discrepancies were or what it meant to 'scrub' ODSE at the time, but he sat along with Alfonso Macera[12] And 'scrubbed' ODSE until approximately 2 am.

183.   Upon information and belief, the next morning, while heading to work, Anthony Celano reached out to Mr. Welsh asking where the printouts of the scrubbed discrepancies could be found, in case he was audited by a superior. As Mr. Welsh arrived at work, he gave him the printouts, but Anthony Celano was fuming.

184.   He tossed the stack of documents at Mr. Welsh's feet, saying to him: 'It's too late, you fucking idiot. I should have you go work for Danny."

185.   Mr. Welsh requested a sit-down with Anthony Celano later that day, wanting to clear the air. When they met, Mr. Welsh asked him to criticize him for his performance. In this case, his performance was sub-par in Anthony Celano's eyes because Mr. Welsh had forgotten to place a stack of papers on his desk at 2 am after unknowingly cheating on his behalf.

186.   Mr. Welsh told Anthony Celano that he expected to own both his successes and failures. Anthony Celano interrupted Mr. Welsh, saying, "I'll tell you whatever the fuck I feel like." He then handed Mr. Welsh his phone and said, "Go ahead. Call the 1-800 number on me. I dare you. It won't be the first time." He then threw Mr. Welsh out of his office; this was Mr. Welsh's first taste of a culture that encourages delivery records' falsification.

## NEXT DAY AIR CHEATING

187.   As previously mentioned with Mr. Moyle, Mr. Welsh has firsthand knowledge and experience with UPS's falsification of delivery records during the service of "Next Day Air" packages.

188.   Mr. Welsh is prepared to prove that UPS senior management treats Next Day Air packages as a 'red-hot' item and a vital element of a management personnel's balanced scorecard.

189.   Every week in the Yonkers Center between 2017 and 2018, drivers were instructed to "drop the package on the door, and not scan if it's late." A UPS employee would later input the tracking number on an online system (ETT), ensuring that the delivery time would show as occurring before 10:30 am.

---

[12] An On-Road supervisor was later arrested for stealing off routes and selling them to Bronx pawn shops.

## CREATIVE BOOKKEEPING
## SCAMMING CUSTOMERS OUT OF MILLIONS OF DOLLARS

190.    Upon information and belief, the company, using what Anthony Celano would refer to as "creative bookkeeping," was fleecing customers out of refunds for packages delivered late. Mr. Welsh was instructed to falsify thousands of U.S. Post Office deliveries, especially during the holiday season.

## YOU MUST OBEY DADDY, OR YOU WILL FACE RETALIATION

191.    Upon information and belief, Anthony Celano impressed upon Mr. Welsh the importance of obeying orders. He often said, "Remember who Daddy is," and Mr. Welsh witnessed several conversations where Anthony Celano talked about making sure that, at the very least, subordinates that he considered disloyal got transferred to unfavorable locations and various positions in the company that would make them miserable. 'You can always get sent across the river,' Mr. Welsh heard him say.

## TERRI MURPHY, THE QUEEN OF COVERUPS

192.    Upon information and belief, another thing Mr. Welsh learned at UPS was to cover up injuries and accidents. Mr. Welsh first learned this from Terri Murphy, who once asked one of Mr. Welsh's partners if we could "manage" around an injury.

193.    Upon information and belief, Terri Murphy made it clear to Mr. Welsh that it was expected of him to do everything after an injury occurred to "manage" it. When Mr. Welsh asked Ms. Murphy what it meant to manage an injury, she immediately became agitated and told him to ask his partners what it meant. When Mr. Welsh saw this happening at nearly every level of the Bronx Division, he took it as policy. After all, when his superiors gave him an instruction, Mr. Welsh followed them, assuming that they are acting in the name of integrity.

194.    Upon information and belief, Terri Murphy was not the only senior manager to instruct Mr. Welsh to cheat and lie; Rhonda Ward, Anthony Celano, Justin LaPorte, Howard McLeish, and several others instructed him to do so as well.

195.    Upon information and belief, Mr. Welsh was warned by Tim O'Connor, one of his former business managers that, "there are ways for me to get what I want. I can always 30/60/90 you

if you don't give me my results." Mr. Welsh quickly realized that following orders was paramount to maintaining job security.

196.    Upon information and belief, Mr. Welsh was required to manage countless injuries and accidents for UPS. One memorable instance involved having a UPS driver move his vehicle after an accident so that in the pictures taken of the accident, it would look like the driver was less at fault than he was. This act affected UPS's insurance premiums and saved UPS money.

### JUSTIN LAPORTE AND THE MANAGEMENT READINESS SCHEME

197.    Upon information and belief, Mr. Welsh was instructed by Justin LaPorte to take the Management Readiness Exam for Jeff Harris, Erica Diaz, and Jose Ponce.

198.    Upon information and belief, Justin LaPorte gave Mr. Welsh the following instruction, "You'll be a team player on this, Roy. It will mean a lot for me, a lot for Anthony (Celano) and a lot for Brian (Cannon)." Mr. Welsh later realized that this was not true - that he would indeed be executing the entirety of the test and that Mr. LaPorte was sacrificing Mr. Welsh's integrity in a coercive way.

199.    Upon information and belief, Mr. Welsh took the management exam for Jose Ponce on his laptop, and he answered Jeff Harris and Erica Diaz's exam questions over the phone and in person.

### HECTOR FORTIS CALLED MR. WELSH A FAGGOT

200.    Upon information and belief, one of the most distressing moments of Mr. Welsh's employment with UPS came in his dealings with Hector Fortis, a former service provider and current Local 804 Business Agent in the Metro New York Ops Group.

201.    Upon information and belief, a few months before Mr. Welsh left UPS; he had an interaction with Hector Fortis in which Hector Fortis called Mr. Welsh a "faggot." Mr. Welsh, a heterosexual male who has many LGBTQ members amongst his family, friends, and staff, approached Hector Fortis immediately after to clear up the incident and let him know that it was not acceptable. Hector became enraged and approached Mr. Welsh in a threatening manner[13].

---

[13] He got in his face, nose to nose.

202.    Upon information and belief, Mr. Welsh told Hector Fortis that it is unacceptable for hourly employees to perceive that their business agent harbors homophobic views. Rather than apologizing, Hector Fortis screamed at Mr. Welsh.

203.    Upon information and belief, Mr. Welsh filed a complaint with Lloyd Hall, his business manager. Lloyd Hall told him it would blow over, and Hector Fortis's bark was worse than his bite. Mr. Welsh reiterated that his bark was his concern as homophobia is unacceptable to him due to the many relationships, he has with members of the LGBTQ community and the fact that some of the staff identify as gay. He also raised concerns about his physical safety since Hector got into his face in a threatening manner.

204.    Lloyd Hall warned Mr. Welsh against making a "big deal" out of this incident and reminded him that bad things happen to managers and employees who create UPS problems.

205.    Upon information and belief, Mr. Welsh called the 1-800 number to complain of Hector Fortis's behavior for fear of his safety. Mr. Welsh mentioned on the call that hate crimes are on the rise in New York City and that hateful language often correlates with such crimes. Mr. Welsh reported this incident to Human Resources as well. He never heard anything else from Defendant Corporation on the matter.

### MR. WELSH IS RETALIATED AGAINST,
### AND WAS NOT ALLOWED TO ATTEND SHABBAT DINNER

206.    Upon information and belief, this dishonesty mixed with homophobia produced a level of retaliation that is unthinkable. After Mr. Welsh reported Hector Fortis's behavior, it became nearly impossible for Mr. Welsh to get time off from work or a flexible work schedule that would allow him to practice his religious faith – Judaism freely.

207.    Upon information and belief, the retaliation came in two forms: first. Lloyd Hall denied every request that Mr. Welsh made to attend Shabbat dinners. Ms. Welsh's request would be met with a nonchalant "maybe," which later turned into a "no."

208.    The second form of retaliation came in the form of schedule manipulation. Throughout his career at UPS, Mr. Welsh had a set schedule due to his religious observances. Mr. Welsh would work in the mornings so he could be home by sundown. After going against Lloyd Hall's wishes by reporting Hector Fortis, Mr. Welsh found himself working all day, with threats of termination if he went home.

209.   Upon information and belief, Mr. Hall began the practice of making a late request for assignments and demanding that Mr. Welsh stay behind to do the work. Mr. Welsh requested to work from home to comply with his religious practices, and Lloyd Hall refused.

## MR. WELSH IS REQUIRED TO WORK
## UNTHINKABLE HOURS WITHOUT HELP

210.   Mr. Welsh worked Tuesday-Saturday from 6:30 am to 5 pm. This schedule was in line with his religious practices and would allow Mr. Welsh to be home before sunset.

211.   Upon information and belief, after reporting Hector Fortis, Mr. Welsh's work schedule changed dramatically. Mr. Welsh went from work an average of 40-50 hours a week to work from 7 am until after 11 pm.

212.   During this period, Mr. Welsh was responsible for everything in operation from dispatch until the end of the day. Mr. Welsh performed these duties without the benefit of a secretary and often without a mechanic present.

213.   There were several instances where Mr. Welsh paid a secretary out of his pocket ($50 plus dinner) to have assistance with driver timecards at the end of the day so he could go home at a manageable hour. Upon information and belief, Mr. Welsh was the only On-Road Supervisor who had to pay out of pocket to have a secretary at his location. Mr. Welsh's comparator, Fari Murray, did not have this experience.

214.   Upon information and belief, Mr. Welsh knows for a fact that Rhonda Ward was consulted about the Yonkers Center not having a secretary on Saturdays, and no action was taken to correct the problem. There were a few instances where Mr. Welsh received calls from Rhonda Ward and Lloyd Hall after 11:30 pm on Saturday, asking questions about the operation results. All of these calls were responses to phone calls Mr. Welsh made hours earlier. They purposely called in late to keep Mr. Welsh at work all day.

## RETALIATION FOR REPORTING HECTOR FORTIS
## LED TO SEVERE ANXIETY AND DEPRESSION

215.   Upon information and belief, this constant retaliation caused Mr. Welsh to develop high blood pressure. This led Mr. Welsh to seek medical attention, which resulted in a diagnosis of depression and severe anxiety.

    a.   Mr. Welsh was out on medical leave for two months.

    b.   Mr. Welsh's was prescribed Escitalopram[14].

    c.   The side effects of Escitalopram are:

        i.   blurred vision, tunnel vision, eye pain or swelling, or seeing halos around lights;

        ii.   racing thoughts, unusual risk-taking behavior, feelings of extreme happiness or sadness;

        iii.   Low sodium levels in the body include headache, confusion, slurred speech, severe weakness, vomiting, loss of coordination, and feeling unsteady.

216.    Upon information and belief, as a result of experiencing some of the side effects of Escitalopram, Mr. Welsh informed Lloyd Hall and Justin LaPorte (Lloyd's manager) that he would need reasonable accommodations when he returned to work after his short-term disability leave. Upon information and belief, Mr. Welsh requested the following accommodations:

    a.   A return to the set schedule of 6 am-5 pm so he could be home by sundown;
    b.   The ability to work from home two days out of the week so he could attend medical appointments;
    c.   White light in the office to reduce headaches and improve concentration.
    d.   Removal of Hector Fortis from the facility or his work shift.
    e.   The ability to take lunch break free of retribution.

217.    Upon information and belief, Lloyd Hall denied Mr. Welsh's accommodations request and informed him that he would be transferred to the Parsippany New jersey pre-load location. In light of this apparent act of retaliation and left with no other alternative, Mr. Welsh resigned from the company.

## **WAGE AND HOUR PLAINTIFFS**[15]

### *Plaintiff Palaguachi*

218.    Upon information and belief, Plaintiff Palaguachi's work duties required neither discretion nor independent judgment.

219.    Upon information and belief, throughout his employment with Defendants, Plaintiff Palaguachi regularly worked more than forty (40) hours per week.

---

[14] Escitalopram sold under the brand names Cipralex and Lexapro, among others, is an antidepressant of the selective serotonin reuptake inhibitor (SSRI) class. Escitalopram is mainly used to treat a major depressive disorder or generalized anxiety disorder.

[15] See Exhibit A: Estimation of overtime hours owed.

220. Upon information and belief, from approximately October 2017 until May 2018, Plaintiff Palaguachi worked as a package delivery driver from approximately 8:00 am until on or about 11:00 pm., Sunday through Friday, typically 50 to 90 hours per week.

221. Upon information and belief, Defendants paid Plaintiff Palaguachi his wages through check or direct deposit throughout his employment.

222. Upon information and belief, Plaintiff Palaguachi's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Palaguachi to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime pay for the additional time he worked.

223. Upon information and belief, Plaintiff Palaguachi kept track of the hours he worked because it is reflected on his pay stubs under the "hours" column. Defendants utilize a time tracking device, such as punch cards.

224. Upon information and belief, notifications in posted notices and written correspondences were not given to Plaintiff Palaguachi regarding overtime and wages under the NYLL.

225. Upon information and belief, Defendants did not provide Plaintiff Palaguachi an accurate statement of wages, as required by NYLL 195(3).

226. Upon information and belief, Plaintiff Palaguachi is prepared to prove that William Grey and UPS Senior management instructed him to hide numerous automobile accidents.

227. Upon information and belief, Plaintiff Palaguachi is prepared to prove that William Grey and UPS Senior management instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Mr. Palaguachi was required to employ is a follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Mr. Palaguachi never made the delivery attempt.

228. Upon information and belief, Plaintiff Palaguachi was required to deliver packages with his vehicle while not compensated for the milage or gas he used.

229. Upon information and belief, Defendant William Grey and UPS senior management required Plaintiff Palaguachi to deliver packages out of his vehicle during the holiday season, such as thanksgiving, easter, and Christmas.

*Plaintiff Payne*

230. Upon information and belief, Plaintiff Payne's work duties required neither discretion nor independent judgment.

231. Upon information and belief, Plaintiff Payne regularly worked more than forty (40) hours per week throughout his employment with Defendants.

232. Upon information and belief, from Approximately August 2017 until June 2018, Plaintiff Payne worked as a package delivery driver from approximately 8:00 am until on or about 11:00 pm., Sunday through Friday, typically 50 to 90 hours per week.

233. Upon information and belief, Defendants paid Plaintiff Payne his wages through check or direct deposit throughout his employment.

234. Upon information and belief, Plaintiff Payne's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Payne to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime pay for the additional time he worked.

235. Upon information and belief, Plaintiff Payne kept track of the hours he worked because it is reflected on his pay stubs under the "hours" column. Defendants utilize a time tracking device, such as punch cards.

236. Upon information and belief, notifications in the form of posted notices and written correspondences were not given to Plaintiff Payne regarding overtime and wages under the NYLL.

237. Upon information and belief, Defendants did not provide Plaintiff Payne an accurate statement of wages, as required by NYLL 195(3).

238. Upon information and belief, Plaintiff Payne is prepared to prove that William Grey and UPS Senior management instructed him to hide numerous automobile accidents.

239. Upon information and belief, Plaintiff Payne is prepared to prove that William Grey and UPS Senior management instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Plaintiff Payne was required to employ is a follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Plaintiff Payne never made the delivery attempt.

240. Upon information and belief, Plaintiff Payne was required to deliver packages with his vehicle while not compensated for the milage or gas he used.

241.    Upon information and belief, Defendant William Grey and UPS senior management required Plaintiff Payne to deliver packages out of his vehicle during the holiday season, such as thanksgiving, easter, and Christmas.

*Plaintiff Santiago*

242.    Upon information and belief, Plaintiff Santiago's work duties required neither discretion nor independent judgment.

243.    Upon information and belief, Plaintiff Santiago regularly worked more than forty (40) hours per week throughout his employment with Defendants.

244.    Upon information and belief, from Approximately April 7, 2014, until October 18, 2020, Plaintiff Santiago worked as a package delivery driver from approximately 8:00 am until on or about 11:00 pm., Sunday through Friday, typically 50 to 90 hours per week.

245.    Upon information and belief, Defendants paid Plaintiff Santiago his wages through check or direct deposit throughout his employment.

246.    Upon information and belief, Plaintiff Santiago's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Santiago to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime pay for the additional time he worked.

247.    Upon information and belief, Plaintiff Santiago kept track of the hours he worked because it is reflected on his pay stubs under the "hours" column. Defendants utilize a time tracking device, such as punch cards.

248.    Upon information and belief, posted notices and written correspondences were not given to Plaintiff Santiago regarding overtime and wages under the NYLL.

249.    Upon information and belief, Defendants did not provide Plaintiff Santiago an accurate statement of wages, as required by NYLL 195(3).

250.    Upon information and belief, Plaintiff Santiago is prepared to prove that William Grey and UPS Senior management instructed him to hide numerous automobile accidents.

251.    Upon information and belief, Plaintiff Santiago is prepared to prove that William Grey and UPS Senior management instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Plaintiff Santiago was required to employ

is a follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Plaintiff Santiago never made the delivery attempt.

252. Upon information and belief, Plaintiff Santiago was required to deliver packages with his vehicle while not compensated for the milage or gas he used.

253. Upon information and belief, Defendant William Grey and UPS senior management required Plaintiff Santiago to deliver packages out of his vehicle during the holiday season, such as thanksgiving, easter, and Christmas.

*Plaintiff Radwan*

254. Upon information and belief, Plaintiff Radwan's work duties required neither discretion nor independent judgment.

255. Upon information and belief, Plaintiff Radwan regularly worked more than forty (40) hours per week throughout his employment with Defendants.

256. Upon information and belief, from Approximately July 2018 until October 1, 2018, Plaintiff Radwan worked as a package delivery driver from approximately 8:00 am until on or about 11:00 pm., Sunday through Friday, typically 50 to 90 hours per week.

257. Upon information and belief, Defendants paid Plaintiff Radwan his wages through check or direct deposit throughout his employment.

258. Upon information and belief, Plaintiff Radwan's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Radwan to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime pay for the additional time he worked.

259. Upon information and belief, Plaintiff Radwan kept track of the hours he worked because it is reflected on his pay stubs under the "hours" column. Defendants utilize a time tracking device, such as punch cards.

260. Upon information and belief, notifications in the form of posted notices and written correspondences were not given to Plaintiff Radwan regarding overtime and wages under the NYLL.

261. Upon information and belief, Defendants did not provide Plaintiff Radwan an accurate statement of wages, as required by NYLL 195(3).

262.    Upon information and belief, Plaintiff Radwan is prepared to prove that William Grey and UPS Senior management instructed him to hide numerous automobile accidents.

263.    Upon information and belief, Plaintiff Radwan is prepared to prove that William Grey and UPS Senior management instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Plaintiff Radwan was required to employ is a follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Plaintiff Radwan never made the delivery attempt.

264.    Upon information and belief, Plaintiff Radwan was required to deliver packages with his vehicle while not compensated for the milage or gas he used.

265.    Upon information and belief, Defendant William Grey and UPS senior management required Plaintiff Radwan to deliver packages out of his vehicle during the holiday season, such as thanksgiving, easter, and Christmas.

*Defendants' General Employment Practices*

266.    At all times relevant to this Complaint, Defendants maintained a policy and practice of requiring Plaintiffs and all similarly situated employees to work more than 40 hours a week without paying them appropriate overtime compensation as required by federal and state laws.

267.    Upon information and belief, Plaintiffs are victims of Defendants' standard policy and practices, which violate their rights under the New York Labor Law by, among other things, not paying them the wages they are owed for the hours they worked.

268.    Upon information and belief, Defendants habitually required Plaintiff's to work additional hours beyond their regular shifts but did not provide them with any additional compensation.

269.    Upon information and belief, Defendants' practices were done willfully to disguise the actual number of hours Plaintiffs and all similarly situated employees worked and avoid paying Plaintiffs and all similarly situated employees appropriately for their total hours worked.

270.    Upon information and belief, Defendants engaged in their unlawful conduct according to a corporate policy of minimizing labor costs and denying employees compensation by knowingly violating the NYLL.

271.    Upon information and belief, Defendants' unlawful conduct was intentional, willful, in bad faith, and caused significant damages to Plaintiff's and all similarly situated current and former employees.

## NYLL COLLECTIVE ACTION CLAIMS[16]

272.   Plaintiffs bring this NYLL overtime compensation and liquidated damages claims as a collective action according to N.Y. CLS CPLR § 901et seq. on behalf of all similarly situated employees (the "NYLL Class Members"), i.e., persons who are or were employed by Defendant's, on or after the date that is three years before the filing of the complaint in this case (the "NYLL Class Period").

273.   At all relevant times, Plaintiffs and other members of the NYLL Class were similarly situated in that they had substantially similar job requirements and pay provisions, and have been subject to Defendants' standard practices, policies, programs, procedures, protocols, and plans, including willfully failing and refusing to pay them the required overtime pay at a one and one-half their regular rates for work over forty (40) hours per workweek under the NYLL, and willfully failing to keep records required by the NYLL.

274.   The claims of plaintiffs stated herein are similar to those of the other employees.

## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 CLAIMS

275.   Defendants have engaged in egregious acts of race, religion, and ADA discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended.

276.   Plaintiffs willfully and intentionally pay Caucasian employees substantially more than they pay non-Caucasian employees who perform the same job under similar circumstances, regardless of experience or qualifications. Plaintiffs can point to no legitimate factor such as a seniority system, merit system, productivity system, or any factor other than race and gender to excuse their blatant acts of wage discrimination.

277.   Not only do Plaintiffs commit religious and race discrimination in violation of Title VII of the Civil Rights Act of 1964, but they also retaliate against employees who are courageous enough to speak up and demand equality.

278.   Plaintiff Murray, Plaintiff Welsh, and Plaintiff Moyle are victims of Defendant's retaliation.

---

[16] As detailed above in Plaintiff Murray's section of the pleading, ¶ 83-84, in addition to Plaintiff's Palaguachi, Payne, Santiago, and Radwan, there are at least 20 additional drivers who had their overtime and straight time is stolen by Defendant corporation. Additionally, Plaintiffs Murray, Welsh, and Moyle are prepared to testify under penalty of perjury that they changed or reduced the hours of hundreds of drivers throughout the duration of their employment. Plaintiff Murray is also prepared to attest that the UPS facility he worked in has over 130 hourly package delivery drivers. This is more than the minimum required for NYLL class certification.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE OVERTIME PROVISIONS
### OF THE NEW YORK STATE LABOR LAW FOR FAILURE TO PAY
### MINIMUM AND STRAIGHT-TIME WAGES
### (Brought on behalf of the NYLL Collective)

279.   Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago, and Plaintiff Palaguachi, and all similarly situated employees repeats and realleges all paragraphs above as though fully set forth herein.

280.   As detailed above, the NYLL Collective was qualified to work as Package Delivery Drivers.

281.   Upon information and belief, Defendant corporation and Defendant William Grey (in his capacity as a senior manager and shareholder of defendant corporation) ("Defendants"), in violation of N.Y. Lab. Law § 190 et seq., and supporting regulations of the New York State Department of Labor, failed to pay Plaintiff's and all similarly situated employees, overtime compensation at rates of one and one-half times the regular rate of pay for each hour worked more than forty (40) hours in a workweek.

282.   Upon information and belief, Defendants' failure to pay Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago, and Plaintiff Palaguachi and all similarly situated employees, overtime compensation was willful within the meaning of N.Y. Lab. Law § 663.

283.   Upon information and belief, Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago, and Plaintiff Palaguachi, and all similarly situated employees are entitled to recover from Defendants their unpaid overtime wages, liquidated damages as provided for by the NYLL, reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE NOTICE AND RECORDKEEPING
### REQUIREMENTS OF THE NEW YORK LABOR LAW
### (Brought on behalf of NYLL Collective)

284.   Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago, and Plaintiff Palaguachi, and all similarly situated employees repeats and realleges all paragraphs above as though fully set forth herein.

285.   Upon information and belief, upon their hiring and throughout their employment, Defendant corporation and Defendant William Grey (in his capacity as a senior manager and

shareholder of defendant corporation) ("Defendants") failed to provide Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago and Plaintiff Palaguachi and all similarly situated employees, with a written notice, in English, Spanish, or Arabic (Plaintiff's Palaguachi primary language), containing: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular payday designated by the employer; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if separate; and telephone number of the employer, as required by NYLL § 195(1).

286.   Upon information and belief, Defendants had numerous opportunities to cure this issue throughout their employment, but they never did. Defendants could have cured this during training, hiring, performance reviews, and on payday.

287.   Upon information and belief, Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago, and Plaintiff Palaguachi, and all similarly situated employees are damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

**VIOLATION OF THE WAGE STATEMENT PROVISIONS**
**OF THE NEW YORK LABOR LAW**
**(Brought on behalf of the NYLL Collective)**

288.   Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago, and Plaintiff Palaguachi, and all similarly situated employees repeats and realleges all paragraphs above as though fully set forth herein.

289.   Upon information and belief, with each payment of wages, Defendant corporation and Defendant William Grey (in his capacity as a senior manager and shareholder of defendant corporation) ("Defendants") failed to provide Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago, and Plaintiff Palaguachi and all similarly situated individuals, with an accurate statement listing each of the following: the dates of work covered by that payment of wages; the name of the employee; the name of employer; address and phone number of the employer; rate or rates of pay as basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of

pay; the number of regular hours worked; and the number of overtime hours worked, as required by NYLL § 195(3).

290.   Upon information and belief, due to Defendants' violation of NYLL, Article 6, § 195(3), Plaintiff Payne, Plaintiff Radwan, Plaintiff Santiago, and Plaintiff Palaguachi and all similarly situated employees are entitled to statutory penalties of two hundred fifty dollars for each workweek that Defendants failed to provide them with accurate wage statements, or a total of five thousand dollars, and reasonable attorneys' fees and costs as provided for by NYLL, Article 6, § 198(1-d).

## FOURTH CAUSE OF ACTION

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Brought on behalf of Plaintiff Murray against UPS)

291.   Plaintiff Murray and all similarly situated employees repeats and realleges all paragraphs above as though fully set forth herein.

292.   At all relevant times, Plaintiff's and all similarly situated employees have been subject to Defendants' standard practices, policies, programs, procedures, protocols, and plans, including willfully engaging in conduct that violates the Civil Rights Act of 1964 § 701 et seq., 42 U.S.C.A. § 2000e *et seq*.

293.   This claim is authorized and instituted according to Title VII of the Civil Rights Act, 42 U.S.C.§2000e *et seq*., based upon the discriminatory employment practices of Defendants. Specifically, Plaintiff complains that Defendants discriminated against him in wages based upon his race, causing him to suffer substantial injury and damages.

294.   Upon information and belief, Plaintiff Murray is an African American male, making him a member of a protected class. With over 15 years of employment with UPS, Mr. Murray is beyond qualified for the On-Road-Supervisor position.

295.   Upon information and belief, Plaintiff Murray and all similarly situated employees are paid less than the rate at which their similarly situated Caucasian colleagues are paid for a job (On-Road-Supervisor) requiring equal skill and performed under similar working conditions. There is no difference in job responsibilities for On-Road-Supervisors.

296.   Upon information and belief, Mr. Murrays Caucasian comparators are Roy Welsh, Patrick Scanlon, Carl Lucateli, Joseph Simeone, and Robert "Bob" Walsh. All of these individuals are On-Road Supervisors. Upon information and belief, they all worked as On-Road Supervisors

while Mr. Murray worked as an On-Road Supervisor. Mr. Murray was equally as qualified as these individuals to execute the role of On-Road Supervisor. Upon information and belief, all of these individuals were paid substantially more than Mr. Murray even though they did the identical job.

297. Upon information and belief, Plaintiff Murray notified Beverly (HR Manager) of his wage discrimination claims on or about the ending of summer and the beginning of fall 2018.

298. Upon information and belief, Plaintiff Murray and similarly situated employees were offered less than the rate at which their similarly situated Caucasian colleagues are paid for a job requiring equal skill and performed under similar working conditions.

299. Defendants' failure to pay Plaintiff Murray and all similarly situated employees, equally with their Caucasian coworkers, was based on the Defendant's disdain for Plaintiff's race and gender, in violation of Title VII of the Civil Rights Act, 42 U.S.C.§2000e *et seq*.

300. Upon information and belief, Plaintiff Murray was allegedly terminated because he followed William Grey's instruction and "covered up" an accident. Ironically, when Brian Pollard (a Caucasian On Road Supervisor) and his manager Dawn Mitchell (Caucasian Manager) covered up accidents, and Dawn admitted to it, both of these individuals kept their jobs. Brian Pollard was promoted shortly after. The only difference between Plaintiff Murray, Brian Pollard, and Dawn Mitchell is that Plaintiff Murray is Black.

301. Plaintiff Murray and all similarly situated employees are damaged in an amount to be determined at trial.


## FIFTH CAUSE OF ACTION

### Constructive Discharge in violation of NYSHRL & NYCHRL
### (Plaintiff Moyle and Plaintiff Welsh)

302. A constructive discharge occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

303. Upon information and belief, as described in the sixth Cause of action below, and as detailed above, Plaintiff Welsh and Plaintiff Moyle were recipients of harassment, retaliation, targeting, extended hours, undesirable shifts, displacement, transfers to undesirable far locations.

304.    Upon information and belief, the individuals who engaged in the actions listed above are Lloyd Hall and Chance Stewart. Lloyd Hall and Chance Stewarts' intention was to punish Mr. Welsh and Mr. Moyle for engaging in the protective activities listed in the sixth cause of action.

305.    Upon information and belief, Lloyd Hall and Chance Stewart used the tools available to them (scheduling, undesirable reassignments, investigations, heighten ridicule of work product, threats, denial of reasonable accommodations, and coercion) to create unpleasant and challenging working conditions for Mr. Welsh and Mr. Moyle.

306.    Upon information and belief, as a result of Lloyd Hall and Chance Stewarts' unbearable actions, Mr. Welsh and Mr. Moyle resigned from the company.

307.    As their joint employer, defendant corporation, and individual defendants Hall and Stewart engaged in egregious prohibited conduct listed above. This conduct caused Plaintiff Moyle and Plaintiff Welsh to suffer severe depression and anxiety, which led them to resign from their jobs.

308.    Defendants' actions and omissions warrant an award of punitive damages.

## SIXTH CAUSE OF ACTION
### Unlawful retaliation in violation of NYCHRL & NYSHRL
### (Plaintiff Moyle, and Plaintiff Welsh)

309.    Plaintiff Moyle and Plaintiff Welsh repeat and reallege all paragraphs above as though fully set forth herein.

310.    At all relevant times, Plaintiff Moyle and Plaintiff Welsh have been subject to Defendants' standard practices, policies, programs, procedures, protocols, and plans, including willfully engaging in conduct that violates New York City Human Rights Law ("NYCHRL"), Administrative Code of City of New York § 8-107 (7).

311.    At all relevant times, Plaintiff Moyle and Plaintiff Welsh have been subject to Defendants' standard practices, policies, programs, procedures, protocols, and plans, including willfully engaging in conduct that violates New York State Human Rights Law ("NYSHRL"), Executive Law State of New York § 296.

312.    Plaintiff Moyle and Plaintiff Welsh participated in protected activity by making internal complaints via the 1800 hotline, complaining to upper management, and contacting human resources on many claims. After doing so, Plaintiff Moyle and Plaintiff Welsh allege defendant corporation took several adverse employment actions against them, including, among other

things, being written-up and subjected to heightened scrutiny of their work product, denial of their disability accommodations request, making them work egregious hours and shifts, prohibiting them from partaking in their religious observances (Shabbat Dinner), and the case of Plaintiff Moyle, demoting him while he was on short term disability leave.

313.   For Plaintiff Moyle and Plaintiff Welsh to successfully plead a claim for retaliation under the NYSHRL or NYCHRL, they must demonstrate that: "(1) he has engaged in protected activity, (2) his employer was aware that he participated in such activity, (3) he suffered an adverse employment action based upon his activity, and (4) there is a causal connection between the protected activity and the adverse action."

Plaintiff Moyle:

314.   Upon information and belief, the protected activity Plaintiff Moyle engaged in was taking disability leave.  Disability leave is protected under the Family Medical Leave Act and the Americans with disabilities act.

315.   Upon information and belief, Plaintiff Moyle informed UPS management through his direct supervisors Chance Stewart and Leo Cummings. Therefore, they knew he was participating in the protective activity of taking medical leave. Plaintiff Moyle has phone records to support this claim.

316.   Upon information and belief, Plaintiff Moyle suffered an adverse employment action when Leo Cummings and Chance Stewart permanently replaced him with Bran Mactavish; when they informed him that he would be transferred to the Upstate New York location of UPS; and when they denied his accommodation request previously mentioned above.

317.   Upon information and belief, the causal connection is clear. Mr. Moyle exercised his right to take disability leave which is frowned upon within UPS and by Chance Stewart. As a result, he was transferred to a location that was over 100 miles from his home (in violation of UPS policy), had his accommodation request denied, and was permanently replaced in violation of FMLA.

Plaintiff Welsh:

318.   Upon information and belief, the protected activities Plaintiff Welsh engaged in were taking disability leave, filing a complaint concerning homophobia, and requesting religious

observance accommodations. Disability leave is protected under the Family Medical Leave Act and the Americans with disabilities act. Homophobia is protected under Title VII, NYCHRL, and NYSHRL. Religious observance is protected under Title VII, NYCHRL, and NYSHRL.

319.   Upon information and belief, Plaintiff Welsh informed UPS management about his religious observance accommodation, homophobic attack, and need for disability leave through his direct supervisors Lloyd Hall. Therefore, they knew he was participating in the protective activity of taking medical leave, protesting homophobia, and requesting religious observance accommodations. Plaintiff Welsh has phone records to support this claim.

320.   Upon information and belief, Plaintiff Welsh suffered an adverse employment action when Lloyd Hall denied his religious observance accommodation request and deliberately changed his schedule so he would be at work during times that directly conflicted with his religious observance practices. Plaintiff Welsh suffered an adverse employment action when he was punished for reporting a fellow employee for engaging in acts of homophobia. The punishment came in the form of a retaliatory work schedule and denial of religious observance requests. Plaintiff Welsh suffered an adverse employment action when Lloyd Hall informed him that he would be reassigned to Parsippany, New Jersey, upon returning to work. Parsippany is located extremely far from Mr. Welsh's home.

321.   Upon information and belief, the causal connection is clear. Mr. Welsh exercised his right to take disability leave which is frowned upon within UPS and by Lloyd Hall; he went against Lloyd Halls wishes and reported his colleague for being a homophobe, and he requested a religious observance accommodation which Lloyd Hall viewed as being against the needs of the business when in actuality he was retailing against Mr. Welsh for reporting his homophobic colleague. As a result, Mr. Welsh was transferred to a location that was extremely from his home (in violation of UPS policy).

322.   Plaintiff Moyle and Plaintiff Welsh repeat and reallege all paragraphs above as though fully set forth herein.

323.   As their joint employer, defendant corporation, and individual defendants Hall and Stewart engaged in egregious prohibited conduct listed above. This conduct caused Plaintiff Moyle and Plaintiff Welsh to suffer severe depression and anxiety, which led them to resign from their jobs.

324.   Defendants' actions and omissions warrant an award of punitive damages.

## SEVENTH CAUSE OF ACTION

### Unlawful retaliation in violation of NYCHRL (Plaintiff Murray)

325.   Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein.

326.   Upon information and belief, at all relevant times, Plaintiff Murray had been subject to Defendants' standard practices, policies, programs, procedures, protocols, and plans, including willfully engaging in conduct that violates New York City Human Rights Law ("NYCHRL"), Administrative Code of City of New York § 8-107 (7).

327.   Upon information and belief, Plaintiff Murray participated in protected activity by filing a complaint with HR manager Beverly concerning his wage discrimination claims (as listed in Count Four above), the theft of overtime from the delivery package drivers, the insurance fraud by way of accident scene manipulation and accident coverups orchestrated by William Grey.

328.   Upon information and belief, after doing so, Plaintiff Murray alleges defendant corporation and William Grey took several adverse employment actions against him, including, among other things, terminating him after he raised claims and provided evidence of the alleged discriminatory acts.

329.   Upon information and belief, the causal connection between the protected activity and the adverse employment actions is evidenced by their temporal proximity. Within a month after filing a complaint with Beverly concerning the matters mentioned and throughout this pleading, Mr. Murray was terminated.

330.   Upon information and belief, as his employer, defendants engaged in egregious prohibited conduct listed above. This caused Plaintiff Murray to suffer from PTSD and Severe Depression.

331.   Defendants' actions and omissions warrant an award of punitive damages.

## EIGHTH CAUSE OF ACTION

### Unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964
### (Plaintiff Murray against UPS)

332.   Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein.

333.   Upon information and belief, at all relevant times, Plaintiff Murray has been subject to Defendants' standard practices, policies, programs, procedures, protocols, and plans, including

willfully engaging in conduct that violates Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e.

334. Upon information and belief, Plaintiff Murray participated in protected activity by making internal complaints to human resource manager Beverly for many claims.

335. Upon information and belief, after doing their due diligence and filing their bona fide legitimate complaints concerning violations of protected activities, Plaintiffs were wrongfully terminated and constructively discharged.

336. Plaintiff Murray alleges the defendant corporation took adverse employment actions against them, including, among other things, being threatened and terminated. Plaintiff Murray blew the whistle and raised concerns of race discrimination, wage theft, DOT violations, insurance fraud, and wage discrimination during an internal investigation and was terminated.

337. Upon information and belief, the causal connection between the protected activity and the adverse employment actions is evidenced by their temporal proximity.

338. Upon information and belief, as their employer, defendant corporation, and individual, Defendant Grey engaged in egregious prohibited conduct listed above. This led to Mr. Murray's retaliatory termination.

339. Defendants' actions and omissions warrant an award of punitive damages.

## NINTH CAUSE OF ACTION

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Brought on behalf of Plaintiff Moyle and Welsh)

340. Upon information and belief, The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., prohibits employers from discriminating against qualified individuals because of a disability "regarding job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

341. Plaintiff Moyle and Plaintiff Welsh repeat and reallege all paragraphs above as though fully set forth herein.

342. Upon information and belief, because depression and severe anxiety substantially limit at least one of Plaintiff Moyle's and Plaintiff Welsh's major life activities, Plaintiff Moyle and Plaintiff Welsh are individuals with a disability under the ADA. The life activities limited by severe depression are:

    a.  Sleeplessness, or excessive sleeping,
    b.  Lack of concentration,
    c.  Lack of focus and articulation,
    d.  Lack of communication,
    e.  Eating disorder,
    f.  The inability to take care of himself, and
    g.  The inability to regulate his emotions and thoughts.

343.    Plaintiff Moyle and Plaintiff Welsh were fully qualified to be a Business Manager and On-Road Supervisor and could perform all the essential functions of the positions. Plaintiff Moyle and Plaintiff Welsh worked for Defendant for over three and seven years before they were diagnosed with depression and severe anxiety and would be demoted, removed, reassigned, and denied their reasonable accommodations while they were out on short-term disability leave.

344.    Plaintiff Moyle and Plaintiff Welsh were both prescribed medications with severe side effects that detrimentally impacted one or more of their major life activities.

345.    As a result of Defendant's actions, Plaintiff Moyle and Plaintiff Welsh have suffered and will continue to suffer economic and non-economic harm.

## <u>TENTH CAUSE OF ACTION</u>

### VIOLATION OF THE NYSHRL and NYC ADMINISTRATIVE CODE
### (Brought on behalf of Plaintiff Moyle Plaintiff Welsh)

346.    To establish a prima facie case of disability disparate treatment, Plaintiff must show that (1) he is an individual with a disability, (2) he is otherwise qualified to perform the essential functions of her job, and (3) he was discriminated against because of his disability.

347.    Plaintiff Moyle and Plaintiff Welsh repeat and reallege all paragraphs above as though fully set forth herein.

348.    Upon information and belief, because depression and severe anxiety substantially limit at least one of Plaintiff Moyle's and Plaintiff Welsh's major life activities, Plaintiff Moyle and Plaintiff Welsh are individuals with a disability under the NYCHRL. The life activities limited by severe depression are:

    a.  Sleeplessness, or excessive sleeping,
    b.  Lack of concentration,
    c.  Lack of focus and articulation,
    d.  Lack of communication,
    e.  Eating disorder,
    f.  The inability to take care of himself, and

      g.   The inability to regulate his emotions and thoughts.

349.     Plaintiff Moyle and Plaintiff Welsh were fully qualified to be a Business Manager and On-Road Supervisor and could perform all the essential functions of the positions. Plaintiff Moyle and Plaintiff Welsh worked for Defendant for over three and seven years before they were diagnosed with depression and severe anxiety and would be demoted, removed, reassigned, and denied their reasonable accommodations while they were out on short-term disability leave.

350.     Plaintiff Moyle and Plaintiff Welsh were both prescribed medications with severe side effects that detrimentally impacted one or more of their major life activities.

351.     As a result of Defendant's actions, Plaintiff Moyle and Plaintiff Welsh have suffered and will continue to suffer economic and non-economic harm.

## ELEVENTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (On behalf of Plaintiff Murray, Plaintiff Welsh, and Plaintiff Moyle)

352.     According to the doctrine of unjust enrichment, the Plaintiff must show "(1) the other party was enriched, (2) at the other party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 567 (S.D.N.Y. 2016).

### 1. UPS WAS UNJUSTLY ENRICHED:

353.     Plaintiff Welsh, Plaintiff Moyle, and Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein. Plaintiff Welsh, Plaintiff Moyle, and Plaintiff Murray were required to consistently utilize their vehicle to benefit Defendant's corporation throughout his employment. Plaintiff Welsh, Plaintiff Moyle, and Plaintiff Murray were required to pay out of pocket for gas to fill the gas tank of the defendant corporation's vehicle and fill the gas tank of their vehicle when and he used his vehicle to the benefit of the defendant corporation. Plaintiff Welsh, Plaintiff Moyle, and Plaintiff Murray were denied their $30.00 monthly payment for his cellphone[17] to conduct the defendant corporation's business use.

---

[17] According to the Defendants corporation's internal policy, supervisors and managers are supposed to be compensated $30.00 per month for using their cellphones to conduct company business.

## 2. UPS WAS ENRICHED AT THE EXPENSE OF
## PLAINTIFFS WELSH, MOYLE, AND MURRAY[18]:

Plaintiff Welsh:

354.    Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein. Plaintiff Welsh drove his vehicle an average of 300 miles per day throughout his employment with Defendant corporation while conducting Defendant corporation's business. Plaintiff Welsh was required to deliver packages while driving his vehicle, visit accident sites while driving his vehicle, conduct observations and reviews while driving his vehicle, as well as moving "off routes.[19]" while driving his vehicle. The defendant corporation required Plaintiff welsh to use his vehicle instead of using a package car because it does not have access to parkways. Personal vehicles were more expedient. There was an average of 50 off routes per day.

355.    Plaintiff Welsh logged approximately 78,300 miles per year on his vehicle. Plaintiff Welsh worked as an on-road supervisor for three years, which brings the approximate total mileage to 234,900.

356.    Plaintiff Welsh was required to use his money to put gas into Defendant corporation's package cars (delivery trucks). This occurred at least three times per month at an estimated cost of $50.00 per occurrence. Plaintiff Welsh was required to pay out of pocket whenever the Defendant corporation failed to procure adequate gas cards. Plaintiff Welsh estimates his uncompensated gas expense for Defendant corporations package cars as $5,400.00 throughout his employment.

357.    Besides paying out-of-pocket costs to fill the corporate Defendant's package cars, he was also required to put gas into his vehicle when he had to conduct off route's deliveries, accident site visits, and inspections. Plaintiff Welsh was required to pay approximately $38.18 per week, which equals $152.72 per month. Plaintiff Welsh estimates his uncompensated gas expense for delivering packages, conducting observations, and visiting accident sites on behalf of Defendant corporation as $5,497.97 and totaling approximately $10,897.97 over the duration of his employment.

---

[18] The estimated out-of-pocket cost does not include the cash payments Plaintiff Murray, Plaintiff Welsh, and Plaintiff Moyle had to pay to cover automobile accidents on the Defendant corporation.
[19] Missorted packages that are placed into the wrong delivery vehicle.

358.   Plaintiff Welsh was denied his $30.00 monthly payment for the use of his cellphone. This occurred throughout the duration of his employment, with an estimated annual cost of $360.00 annually and a total cost of $1,080.00 for his employment duration.

Plaintiff Moyle:

359.   Plaintiff Moyle repeats and realleges all paragraphs above as though fully set forth herein. From 2014 to 2015, Tommy Francis directed Mr. Moyle to make over $5000.00 in out-of-pocket cash payments to car accident victims in order to prevent them from calling the police or filing insurance claims. Mr. Moyle was not compensated for this out-of-pocket expense.

360.   From 2015 to 2017, Anthony Celano directed Mr. Moyle to make over $12,000 in out-of-pocket cash payments to car accident victims in order to prevent them from calling the police or filing insurance claims. Mr. Moyle was not compensated for this out-of-pocket expense.

Plaintiff Murray:

361.   Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein. Plaintiff Murray drove his vehicle an average of 150 miles per day throughout his employment with Defendant corporation while conducting Defendant corporation's business. Plaintiff Murray was required to deliver packages while driving his vehicle, visit accident sites while driving his vehicle, conduct observations and reviews while driving his vehicle, as well as moving off routes while driving his vehicle. Defendant corporation required Plaintiff Murray to use his vehicle, as opposed to using a package car. There was an average of 75 off routes per day.

362.   Plaintiff Murray logged approximately 39,150 miles per year on his vehicle. Plaintiff Welsh worked as an on-road supervisor for three years, which brings the approximate total mileage to 117,450.

363.   Plaintiff Murray was required to use his money to put gas into Defendant corporation's package cars throughout his employment with Defendant corporation. This occurred at least four times per month at an estimated cost of $50.00 per occurrence. Plaintiff Murray was required to pay out of pocket whenever the Defendant corporation failed to procure adequate gas cards. Plaintiff Murray estimates his uncompensated gas expense for Defendant corporations package cars as $7,200.00 throughout his employment.

364.    Additionally, he was also required to put gas into his vehicle when he had to conduct off route's, deliveries, accident site visits, and inspections. Plaintiff Murray was required to pay approximately $40.00 per week, which equals $160.00 per month. Plaintiff Murray estimates his uncompensated gas expense for delivering packages, conducting observations, and visiting accident sites on behalf of Defendant corporation as $5,760.00 and totaling approximately $12,960.00 over the duration of his employment.

365.    Plaintiff Murray was denied his $30.00 monthly payment for the use of his cellphone. This occurred throughout the duration of his employment, with an estimated annual cost of $360.00 annually and a total cost of $1,080.00 for the duration of his employment.

### 3. IT IS AGAINST EQUITY AND GOOD CONSCIENCE TO PERMIT UPS TO RETAIN THE OUT-OF-POCKET EXPENSES OWED TO PLAINTIFF's WELSH, MURRAY, AND MOYLE:

366.    Plaintiff Moyle, Plaintiff Welsh, and Plaintiff Murray have submitted their monthly expense reports throughout the duration of their employment. Lloyd Hall, Chance Stewart, and William Grey failed to reimburse them for the expense report. As previously stated, on one occasion William Grey chastised Plaintiff Murray for placing his expense report request in writing and then informed him that the company did not have the budget to pay the expenses.

367.    UPS's 4th quarter 2020 earnings were 24.9 Billion Dollars, it would be against equity and would be beyond unconscionable to permit UPS to retain Plaintiff Moyle, Plaintiff Welsh, and Plaintiff Welsh's out-of-pocket expenses.

368.    As their employer, Defendant engaged in the egregious prohibited conduct listed above. This caused Plaintiff Welsh, Murray, and Moyle to suffer economic harm.

369.    Defendants' actions and omissions warrant an award of punitive damages.

### TWELFTH CAUSE OF ACTION
### VIOLATION OF NYC ADMINISTRATIVE CODE
### (Brought on behalf of Plaintiff Welsh for
### Aiding and Abetting brought against Lloyd Hall)

370.    According to N.Y.C. Admin. Code § 8-107(6) Aiding and abetting. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or attempt to do so.

371.    Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

372.    Plaintiff Welsh participated in protected activity by making internal complaints via the 1800 hotline, complaining to upper management, and contacting human resources on many claims. After doing so, Plaintiff Welsh allege defendant Lloyd Hall took several adverse employment actions against him, including, among other things, being written-up and subjected to heightened scrutiny of his work product, denying him the secretary he needed to effectively execute his job, making him work egregious hours and shifts, denying his disability accommodations request, prohibiting him from partaking in his religious observances (Shabbat Dinner).

373.    Lloyd Hall implemented these acts.

374.    Their temporal proximity evidences the causal connection between the protected activity and the adverse employment actions.

375.    As his supervisor and or manager, defendant Lloyd Hall engaged in egregious prohibited conduct listed above. This caused Plaintiff Welsh to suffer from severe depression and anxiety, which led him to resign from his job.

376.    Defendants' actions and omissions warrant an award of punitive damages.


**THIRTEENTH CAUSE OF ACTION**

**VIOLATION OF NYC ADMINISTRATIVE CODE**
**(Brought on behalf of Plaintiff Moyle for**
**Aiding and Abetting brought against Chance Stewart)**

377.    According to N.Y.C. Admin. Code § 8-107(6) Aiding and abetting. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or attempt to do so.

378.    Plaintiff Moyle repeats and realleges all paragraphs above as though fully set forth herein.

379.    Plaintiff Moyle participated in protected activity by making internal complaints by complaining to upper management and contacting human resources on a myriad of claims. After doing so, Plaintiff Moyle alleges defendant Chance Stewart took several adverse employment actions against him, including, among other things, being written-up and subjected to heightened scrutiny of his work product, denying his disability accommodations request, making him work egregious hours and shifts, reassigning him to work in locations that

are egregiously far from his home (in violation of UPS internal policy) and demoting him while he was on short term disability leave.

380.     Chance Stewart implemented these acts.

381.     Their temporal proximity evidences the causal connection between the protected activity and the adverse employment actions.

382.     As his supervisor and or manager, defendant Chance Stewart engaged in egregious prohibited conduct listed above. This caused Plaintiff Moyle to suffer severe depression and anxiety, which led him to resign from his job.

383.     Defendants' actions and omissions warrant an award of punitive damages.

## FOURTEENTH CAUSE OF ACTION
### VIOLATION OF NYC ADMINISTRATIVE CODE
**(Brought on behalf of Plaintiff Murray for**
**Aiding and Abetting brought against William Grey)**

384.     According to N.Y.C. Admin. Code § 8-107(6) Aiding and abetting. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or attempt to do so.

385.     Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein.

386.     Plaintiff Murray participated in protected activity by complaining to upper management and contacting human resources on many claims. After doing so, Plaintiff Murray alleges defendant William Grey took several adverse employment actions against him, including, among other things, being written-up and subjected to heightened scrutiny of his work product, making him work egregious hours and shifts, paying him less than his Caucasian colleagues, denying him repayment for his expenses, accusing him of covering up an accident that William Grey instructed him to cover up, and terminating him after he participated in an internal investigation.

387.     William Grey implemented these acts.

388.     Their temporal proximity evidences the causal connection between the protected activity and the adverse employment actions.

389.     As his supervisor and or manager, defendant William Grey engaged in egregious prohibited conduct listed above. This egregious prohibited conducted lead to a retaliatory investigation and ultimately Plaintiff Murray's termination.

390.    Defendants' actions and omissions warrant an award of punitive damages.

## FIFTEENTH CAUSE OF ACTION

**VIOLATION OF NYC ADMINISTRATIVE CODE**
**(Brought on behalf of Plaintiff Moyle, Plaintiff Murray, and Plaintiff Welsh for**
**Employer liability for discriminatory conduct by an employee, agent or independent**
**contractor brought against Defendant corporation)**

391.    New York City Human Rights Law § 8-107(13)(b), imposes liability on the employer for its employee's conduct in three instances: (1) where the offending employee exercised managerial or supervisory responsibility; (2) where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action'; and (3) where the employer should have known of the offending employee's unlawful discriminatory conduct yet failed to exercise reasonable diligence to prevent it.

392.    Plaintiff Moyle, Plaintiff Murray, and Plaintiff Walsh ("Plaintiffs") repeats and realleges all paragraphs above as fully set forth herein.

393.    There is sufficient evidence from which a reasonable trier of fact could find that Defendant Corporation knew or should have known about William Grey, Chance Stewart, Tommy Francis, Terri Murphy, Anthony Celano, Rhonda Ward, Tim O'Connor, and Howard McLeish's conduct.

394.    Defendants have engaged in egregious acts of discrimination, theft of time, insurance fraud, and cheating. When Plaintiff's complained or went against Defendants unethical and illegal acts, Defendants retaliated.

395.    Their temporal proximity evidences the causal connection between the protected activity and the adverse employment actions.

396.    As the employer, Defendant engaged in egregious prohibited conduct listed above. This egregious prohibited conduct caused plaintiffs to suffer from severe depression and anxiety, leading to their termination or resignation.

397.    Defendants' actions and omissions warrant an award of punitive damages.

## SIXTEENTH CAUSE OF ACTION

### VIOLATION OF NEW YORK LABOR LAW § 215 and 740
**(Brought on behalf of Plaintiff Welsh and Plaintiff Murray)**

398.    Plaintiff Welsh, Plaintiff Murray, and Plaintiff Moyle ("Plaintiffs") repeats and realleges all paragraphs above as fully set forth herein.

399.    At all relevant times, Plaintiffs have been subject to Defendants' standard practices, policies, programs, procedures, protocols, and plans, including willfully engaging in conduct that violates NYLL § 215 and 740.

400.    According to NYLL § 215 and 740, this claim is authorized and instituted based upon the dangerous and potentially deadly employment practices of Defendants. Specifically, Plaintiffs complain that Defendant's engaged in DOT violations for both the package delivery drivers and the on-road supervisors.

401.    To recover under N.Y. Lab. Law § 740 claims the Plaintiff must show that he reported or threatened to report the employer's activity, policy or practice, but need not claim that he cited any particular law, rule, or regulation at the time that Plaintiff made a report. Tonra v. Kadmon Holdings, Inc., 405 F. Supp. 3d 576, 579 (S.D.N.Y. 2019).


Plaintiff Murray:

402.    As previously stated, Plaintiff Murray raised concerns with human resource manager Beverly regarding Defendant corporation and Defendant Greys unethical and dangerous practice of forcing on-road supervisors and package delivery drivers to violate DOT hours regulations.

403.    Shortly after Plaintiff Murray raised his concerns to Beverly, Defendant corporation and Defendant Grey retaliated against Plaintiff Murray by terminating his employment. The temper of proximity is so close that an inference of retaliatory intent is undeniable. Plaintiff Murray's termination is a clear violation of NYLL § 740.


Plaintiff Welsh:

404.    As previously stated, Plaintiff Welsh raised concerns with human resources regarding Defendant corporation and Defendant Greys unethical and dangerous practice of forcing on-road supervisors to violate DOT hours regulations.

405.   Shortly after Plaintiff Welsh raised his concerns to human resources, Defendant corporation and Defendant Hall retaliated against Plaintiff Welsh by denying his religious observance request, changing his work schedule so he would be forced to work on the Sabbath, and by denying his ADA accommodations request. These actions by Defendant's resulted in Plaintiff Welsh's constructive discharge from Defendant corporation. The temper of proximity is so close that an inference of retaliatory intent is undeniable. Plaintiff Welsh's constructive discharge is a clear violation of NYLL § 740.

406.   Defendant corporation's act of manipulating the DOT hours for the package delivery drivers and the on-road supervisors is a dangerous practice that presents a substantial and specific danger to the public health or safety.

Plaintiff Moyle:

407.   Plaintiff Moyle raised concerns of DOT violations with safety director Terri Murphy. On multiple occasions, Plaintiff Moyle would personally have DOT violations whenever he worked over his allotted hours. Terri Murphy would call him and chastise him to go into the GTS system and reduce his hours. Plaintiff Moyle would complain about fatigue and stated that the was concerned about driving on little to no sleep and getting into accidents.

408.   Plaintiff Moyle also raised concerns about the number of hours the package delivery drivers were required to drive. Plaintiff Moyle expressed that he feared the auto accidents were a result of the DOT violations, and sleep deprivation of the drivers. Terri Murphy did not care about Plaintiff Moyles concerns. It is Plaintiff Moyles belief that Terri Murphy used these complaints coupled with the filing of the injury mentioned above, to retaliate against him and get him to resign from UPS.

UPS learned nothing from Walmart:

409.   One would think that UPS would learn from the deadly practices of Walmart when their DOT violations nearly cost actor-comedian Tracy Morgan his life in 2014[20]. As is the case here, Walmart knew their package delivery driver drove beyond the allotted DOT-regulated hours. Walmart decided to place profits over people and allowed their driver to drive with only a handful of hours of rest. This deadly decision by Walmart accident cost comedy writer James McNair his life.

---

[20] https://www.washingtonpost.com/news/morning-mix/wp/2015/08/12/shocking-images-of-tracy-morgan-crash-in-report-blaming-driver-of-wal-mart-truck/

410.   In reporting the DOT hours violations of Defendant corporation to human resources, Plaintiffs Murray and Welsh were attempting to protect the public from potentially suffering another Walmart tragedy.

411.   Defendant's treatment of Plaintiff Welsh and Plaintiff Murray was done out of retaliation and their disdain for individuals who dare to blow the whistle concerning Defendant's DOT practices, in violation of NYLL § 740.

412.   Plaintiff Welsh and Murray were damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff's respectfully requests that this Court enter judgment against Defendants by:

a) Designating this action as a collective action and authorizing prompt issuance of a notice according to N.Y. CLS CPLR § 901 to all putative class members apprising them of the pendency of this action and permitting them to promptly file consents to be Plaintiffs in the NYLL claims in this action;

b) Declaring that Defendants violated the minimum wage provisions of, and rules and orders promulgated under, the NYLL as to Plaintiff's and all similarly situated employees;

c) Declaring that Defendants violated the overtime wage provisions of, and rules and orders promulgated under, the NYLL as to Plaintiff's and all similarly situated employees;

d) Declaring that Defendants violated the timely payment provisions of, and rules and orders promulgated under, the NYLL as to Plaintiff's and all similarly situated employees;

e) Declaring that Defendants violated the notice and recordkeeping requirements of the NYLL concerning Plaintiff's and all similarly situated employee's compensation, hours, wages, and any deductions or credits taken against wages;

f) Declaring that Defendants violated the federal Equal Pay Act of 1963 concerning Plaintiff Murray and all similarly situated employees, compensation, hours, wages, and any deductions or credits taken against wages;

g) Declaring that Defendants' violations of the federal Equal Pay Act of 1963 were willful as to Plaintiff Murray and all similarly situated employees;

h) Declaring that Defendants violated Title VII of the Civil Rights Act of 1964 concerning Plaintiff's and all similarly situated employee's compensation, hours, wages, and any deductions or credits taken against wages;

i) Declaring that Defendants' violations of Title VII of the Civil Rights Act of 1964 were willful as to Plaintiff's and all similarly situated employees;

j) Awarding Plaintiff's and all similarly situated employees' damages for the amount of unpaid minimum wage and overtime compensation, and any improper deductions or credits taken against wages, as well as awarding spread hours pay under the NYLL as applicable;

k) Awarding Plaintiff's and all similarly situated employees' damages for Defendants' violation of the NYLL notice and recordkeeping provisions, according to NYLL §§ 198(1-b), 198(1-d);

l) Awarding Plaintiff's liquidated damages in an amount equal to one hundred percent (100%) of the total amount of minimum wage, overtime compensation, and spread of hours pay

shown to be owed according to NYLL § 663 as applicable; and liquidated damages according to NYLL § 198(3);

m) Award Plaintiff Murray and all others similarly situated employees the value of all compensation and benefits lost and that they will lose in the future as a result of Defendants' unlawful conduct that violated the federal and state Equal Pay laws;

n) Award Plaintiff's and all others similarly situated compensatory and punitive damages that stem from Defendants' violation of federal and state Equal Pay laws;

o) Award Plaintiff Murray and all others similarly situated employees the value of all compensation and benefits lost and that they will lose in the future as a result of Defendants' unlawful conduct that violated Title VII of the Civil Rights Act of 1964;

p) Award Plaintiff Murray and all others similarly situated compensatory and punitive damages that stem from Defendants' violation of Title VII of the Civil Rights Act of 1964;

q) Award Plaintiffs and all others similarly situated pre-judgment interest and attorneys' fees, costs, and disbursements, as provided by law;

r) Providing that if any amounts remain unpaid upon the expiration of ninety (90) days following issuance of the judgment or ninety (90) days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen (15%) percent, as required by NYLL § 198(4); and

s) All such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs and all similarly situated employees demand a jury trial on all issues triable by a jury.

Dated: Brooklyn, New York
February 19, 2021

By:  Tyrone A. Blackburn, Esq.

_____/s/ Tyrone Blackburn_____
Tyrone A. Blackburn, Esq.
Attorney for Plaintiff's
1242 E. 80th Street, 3rd Floor
Brooklyn, New York 11236
Telephone: (347) 342-7432