UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

FARI MURRAY, CARLOS PALAGUACHI,
WARREN PAYNE, ROY WELSH, DANIEL
MOYLE, AHMED RADWAN, and ROBERT
SANTIAGO, *individually and on behalf of others*
*similarly situated*,

                           Plaintiffs,

                v.

UNITED PARCELS SERVICE, INC., WILLIAM
GREY, CHANCE STEWART, and LLOYD HALL,

                           Defendants.

**MEMORANDUM & ORDER**
20-CV-1427 (MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

     Plaintiffs Fari Murray, Carlos Palaguachi, and Warren Payne commenced the

above-captioned action on March 18, 2020, against Defendant United Parcels Service, Inc.

("UPS") alleging wage and hour violations under federal and state law and civil rights violations

under federal law.  (Compl., Docket Entry No. 1.)  By Second Amended Complaint dated

February 19, 2021 (the "SAC"), Plaintiffs added Roy Welsh, Daniel Moyle, Ahmed Radwan,

and Robert Santiago as Plaintiffs and William Grey, Chance Stewart, and Lloyd Hall as

additional Defendants (collectively "Individual Defendants").  (SAC, Docket Entry No. 43.)

Plaintiffs allege that Defendants committed widespread violations of New York Labor Law §§

190 *et seq*., 215, 650 *et seq*., and 740 ("NYLL"), Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq*. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §

296 ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107

("NYCHRL"), as well as unjust enrichment under common law.  Plaintiffs allege that

Defendants (1) maintained a policy and practice of requiring Palaguachi, Payne, Radwan, Santiago, and other similarly situated employees to work an excess of forty hours a week without providing overtime compensation or appropriate wage notices or statements, (SAC ¶¶ 3–4, 279–90); (2) knowingly and willfully compensated Murray, a Black supervisor, less than his Caucasian counterparts, (SAC ¶¶ 2, 291–301); and (3) constructively discharged Welsh and Moyle, (SAC ¶¶ 302–08).  Plaintiffs also allege that Defendants (1) retaliated against Murray, Welsh, and Moyle, (SAC ¶¶ 309–39); (2) discriminated against Welsh and Moyle on the basis of a disability, (SAC ¶¶ 339–51); (3) were unjustly enriched by the usage of Murray's, Welsh's, and Moyle's vehicles and gas expenses to complete their jobs, (SAC ¶¶ 352–69); (4) Grey, Stewart, and Hall aided and abetted UPS's discriminatory conduct, (SAC ¶¶ 370–97); and (6) retaliated against Murray and Welsh for raising concerns that Defendants engaged in Department of Transportation ("DOT") violations, (SAC ¶¶ 398–401).

Defendants move to dismiss the SAC for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiffs oppose the motions.[1]  For the reasons explained below, the Court grants the motion in part and denies it in part.

---

[1] (UPS Mot. to Dismiss ("UPS Mot."), Docket Entry No. 47; UPS Mem. in Supp. of UPS Mot. to Dismiss ("UPS Mem."), Docket Entry No. 48; Individual Defs.' Mot. to Dismiss ("Individual Defs.' Mot."), Docket Entry No. 53; Individual Defs.' Mem. in Supp. of Individual Defs.' Mot. to Dismiss ("Individual Defs.' Mem."), Docket Entry No. 54; Pls.' Mem. in Opp'n to UPS Mot. to Dismiss ("Pls.' UPS Opp'n"), Docket Entry No. 59; Pls.' Mem. in Opp'n to Individual Defs.' Mot. to Dismiss ("Pls.' Individual Defs. Opp'n'"), Docket Entry No. 60.)

## I.   Background

The Court assumes the truth of the factual allegations in the SAC for the purpose of deciding Defendants' motion.[2]

### a.   Factual background

Plaintiffs are all former UPS employees, employed from a period of time between approximately January 4, 2003 to October 18, 2020.  (SAC ¶¶ 18–24.)

#### 1.   Murray

##### A.   Unpaid overtime

Murray is an African American male from Westchester County, New York who was employed by UPS from January 4, 2003 until October 8, 2018.  (SAC ¶¶ 11, 18; Decl. of Fari Murray ("Murray Decl.") dated July 29, 2021 ¶ 2–3, Docket Entry No. 66-1.)  Murray began his career as a package driver and after five-months was promoted to the role of on-road supervisor.  (SAC ¶¶ 49–51.)  As an on-road supervisor, Murray's duties included identifying customer

---

[2]  All of Plaintiffs' factual allegations, including allegations concerning personal knowledge are pled "upon information and belief."  However, after the parties filed their respective briefs, the Court permitted Plaintiffs to submit documents incorporated by reference or integral to the SAC.  (Order dated Aug. 21, 2021.)  The Court will consider the documents and exhibits that support the allegations referenced in the SAC.  *See United States v. Strock,* 982 F.3d 51, 63 (2d Cir. 2020) ("[T]he district court is normally required to look only to the allegations on the face of the complaint," but "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 23031 (2d Cir. 2016) (holding that courts may consider on a motion to dismiss "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" and other documents "integral" to the complaint (first quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); and then quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010))); *L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir. 2011) ("A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." (alteration in original) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004))).

needs, delivering packages, and performing observations. (*Id*. ¶ 50.) This position did not require discretion or independent judgment. (*Id*. ¶ 60.) Murray contends that he raised concerns of gender and race-based wage discrimination, DOT violations, overtime theft, and other abuses by UPS management to human resources ("HR") manager, Beverly.[3] For example, Murray has evidence of drivers working fifteen to eighteen hour shifts per day, without overtime compensation. (*Id*. ¶¶ 64–65.) Murray was required to go into the company's timekeeping software, Global Timecard System ("GTS"), and change the driver's "punch-in and punch-out times" in order to lower their work hours. (*Id*. ¶ 67; Murray Decl. ¶ 6.) Package delivery drivers reported the manipulation and missing wages to Murray, and Murray would "beg and plead" with his former supervisor, William Grey, to pay the missing wages. (SAC ¶ 67; Murray Decl. ¶ 7.) However, Grey would prevent Murray from immediately paying the drivers for their hours and if the drivers were paid, "they would often be reimbursed for one or two of their straight time hours, but they would never receive all of the hours missed or any of their half time."[4] (SAC ¶ 67; Murray Decl. ¶¶ 7–8.) Murray reduced the earned hours of over one hundred delivery drivers. (Murray Decl. ¶ 9.) Murray and other on-road supervisors were also required to work beyond their allotted DOT hours, however, on-road supervisors are not required to "punch in or punch out," and therefore, their DOT hours are untraceable. (SAC ¶¶ 69–71.) On-road supervisors also often work fifteen to eighteen hour shifts. (*Id*. ¶ 71.)

_____

[3] The SAC refers to the human resources manager as "Beverly, but does not provide a full name or title of the individual. (*See* SAC ¶¶ 61, 80, 82, 297, 327, 329, 334, 402, 403.)

[4] Murray alleges that "countless hours" of DOT hour manipulation occurred while he was employed at UPS, which establishes a pattern and practice of UPS and its management team manipulating the DOT rules and regulations. (SAC ¶ 68.)

### B.   Racial discrimination

Murray earned a base salary of around $80,000.00 as an on-road supervisor, while his Caucasian male counterpart, Patrick Scanlon, earned a base salary of over $90,000.00.  (*Id*. ¶ 73; Murray Decl. ¶¶ 11–12.)  Murray trained Scanlon when he was hired at UPS and was just as qualified as Scanlon, "if not more qualified," for the on-road supervisor position.  (SAC  ¶ 73–74; Murray Decl. ¶ 12–13.)  "When [Scanlon] was promoted to [o]n-[r]oad-[s]upervisor, [Murray] had approximately [fifteen] years of experience working for UPS in many positions, while [Scanlon] had less than a year."  (Murray Decl. ¶ 14.)  In addition, Scanlon committed infractions while on his new hire probationary period, including running his vehicle into Murray's vehicle.[5]  (SAC ¶ 75; Murray Decl. ¶ 16.)  Scanlon was not reprimanded or fired for this infraction and Murray's manager John Reinwald instructed Murray to "not make a big deal about the accident and intimidated him out of contacting his insurance carrier."  (SAC ¶ 75; Murray Decl. ¶ 16.)  In fact, Grey told Murray not to report the accident to Murray's insurance carrier because it would contact UPS and create a "negative hit to the balanced scorecard." Instead, Grey threatened Murray's job and instructed him to "work something out" with Scanlon. (SAC ¶ 75.)  Out of fear of losing his job, Murray did not contact  his insurance carrier or UPS's insurance carrier and Scanlon did not pay for the damages.  (*Id*.)  As a result, Murray was left with thousands of dollars of damage to his vehicle.  (*Id*.; Murray Decl. ¶ 17.)  Scanlon also hit other vehicles during his time at UPS, but none of the accidents were ever reported to UPS's insurance carrier.  (SAC ¶ 76; Murray Decl. ¶ 18.)  Despite these infractions during Scanlon's

---

[5]  According to the UPS's policy, new driver trainees are on probation and must stay accident-free.  (Murray Decl. ¶ 15.)

probatory period, he was promoted by UPS to an on-road supervisor.  In addition to Scanlon, Murray was compensated less than other Caucasian on-road supervisors.[6]  (SAC ¶¶ 78–79.)

### C.   UPS internal investigation

In August through September of 2018, UPS conducted an internal investigation about the vehicle accidents involving Murray and Scanlon.  (*Id.* ¶ 80; Murray Decl. ¶ 10.)  During the investigation, Murray revealed details related to the allegations of unpaid overtime and race-based discrimination to Beverly.  (SAC ¶ 80; Murray Decl. ¶¶ 23–26.)  Murray also provided Beverly with screenshots of text messages concerning the alleged unpaid overtime. (SAC ¶ 80; Murray Decl. ¶ 10.)  Some of the screenshots included: (1) a text message from driver Blackmon to Murray received on August 17, 2017 indicating that Blackmon's timecard reflected that he worked seventy hours for the week, but the GTS system reported that he worked about fifty-seven hours;[7] (2) a text message from driver Pritchard to Murray on November 10, 2017 indicating that Pritchard's timecard for a previous work day was deleted and "showing as a scheduled off;"[8] (3) a text message from driver Harris Solomon to Murray received on October 27, 2017 stating that the GTS System underreported Solomon's work day by two hours;[9] (4) a

---

[6]  UPS also compensated Murray less than other Caucasian on-road supervisors, including Roy Welsh, Carl Lucateli, Joseph Simeone, and Robert "Bob" Walsh, but there was no difference between the job descriptions or duties and Murray trained Simeone.  (Murray Decl. ¶ 19–21.)

[7]  (Text Message from driver Blackmon dated Aug. 17, 2017 ("Blackmon Text Message"), annexed to Murray Decl. as Ex. 1, Docket Entry No. 66-2.)

[8]  (Text Message from driver Pritchard dated Nov. 10, 2017 ("Pritchard Text Message"), annexed to Murray Decl. as Ex. 6, Docket Entry No. 66-3.)

[9]  (Text Message from driver Solomon dated Oct. 27, 2017 ("Solomon Text Message"), annexed to Murray Decl. as Ex. 7, Docket Entry No. 66-3.)

text message from driver Oleg Gezner to Murray received on or about August 24, 2018

indicating that Gezner worked for almost fifty-four hours that week, but was only compensated

for forty hours;[10] (5) several messages from driver Creed to Murray asking Murray to fix his

time card and stating that "someone chang[ed] his timecard;"[11] and (6) text messages from

several drivers asking for Murray to "fix [their time]" to accurately reflect the hours that they

worked.[12]  (*see* Murray Decl. ¶ 10; SAC ¶ 80.)  Grey and other UPS senior management

threatened to terminate the delivery drivers if they complained about overtime theft.  (SAC ¶ 84.)

_____

[10]  (Text Message from driver Gezner dated Aug. 24–25, 2018 ("Gezner Text Messages"), annexed to Murray Decl. as Ex. 8, Docket Entry No. 66-3.)

[11]  ( *See* Text Message from driver Creed dated Dec. 11–13, 2017 ("December Creed Text Messages"), annexed to Murray Decl. as Ex. 3, Docket Entry No. 66-2; Text Message from driver Creed dated Jan. 18–19, 2017 ("January Creed Text Messages"), annexed to Murray Decl. as Ex. 14, Docket Entry No. 66-5; Text Message from driver Creed dated Feb. 19, 2018 ("February Creed Text Message"), annexed to Murray Decl. as Ex.13, Docket Entry No. 66-5; Text Messages from driver Creed dated Aug. 22–24, 2018 ("August Creed Text Messages"), annexed to Murray Decl. as Ex.10, Docket Entry No. 66-4.)

[12]  (*See* Text Message from driver Li dated Nov. 17, 2017 ("Li Text Message"), annexed to Murray Decl. as Ex. 2, Docket Entry No. 66-2; Text Messages from driver Scott dated May 3–4, 2018 ("Scott Text Messages"), annexed to Murray Decl. as Ex. 4, Docket Entry No. 66-2; Text Message from driver Quails Townsend dated May 5, 2018 ("Townsend Text Message"), annexed to Murray Decl. as Ex. 5, Docket Entry No. 66-3; Text Message from driver Jackson dated Sept. 26, 2018 ("Jackson Text Message"), annexed to Murray Decl. as Ex. 9, Docket Entry No. 66-4; Text Messages from driver Rose Sheldon dated Sept. 28, 2017 ("Sheldon Text Message"), annexed to Murray Decl. as Ex. 11, Docket Entry No. 66-4; Text Message from UPS driver dated May 7, 2018, annexed to Murray Decl. as Ex.12, Docket Entry No. 66-4; Text Message from driver Anthony Clarke dated Oct. 23, 2017 ("Clarke Text Message"), annexed to Murray Decl. as Ex. 15, Docket Entry No. 66-5; Text Message from driver Helper Cece dated July 21–13, 2017 ("Cece Text Messages"), annexed to Murray Decl. as Ex. 16, Docket Entry No. 66-5; Text Message from driver Calix dated May 4, 2018 ("Calix Text Message"), annexed to Murray Decl. as Ex. 17, Docket Entry No. 66-6; Text Message from driver McKenzie dated July 27, 2018 ("McKenzie Text Message"), annexed to Murray Decl. as Ex. 18, Docket Entry No. 66-6; Text Message from driver Mchearan dated May 16, 2018 ("Mchearan Text Message"), annexed to Murray Decl. as Ex. 19, Docket Entry No. 66-6; Text Message from driver Lara dated April 4, 2017 ("Lara Text Message"), annexed to Murray Decl. as Ex. 20, Docket Entry No. 66-6; Text Message from driver Emile dated Sept. 11, 2017 ("Emile Text Messages"),

In addition, Murray provided Beverly with details of what he believed were "discriminatory and unfair treatment of Latinx, African American, and Indian delivery drivers compared to the Caucasian drivers." (*Id*. ¶ 80; Murray Decl. ¶¶ 24–26.) For example, according to Murray, UPS terminated an Indian and Latinx driver who got into accidents while delivering packages, while UPS did not reprimand —and in fact promoted — Scanlon, a white delivery driver, after he was involved in an accident during his probationary period. (SAC ¶ 84.) Murray also reported his belief that Latinx and African American on-road supervisors were "redlin[ed] to work in less favorable neighborhoods" by UPS denying their requests to transfer out of predominately low-income or crime-ridden coverage areas that are predominately African American because the employees "[f]it the demographics of the[] . . . coverage area[] [b]etter." (*Id*. ¶ 80.) For example, (1) Orane Sewell, an African American male was denied a transfer request to Pennsylvania but Alex Gorza, a Caucasian male with less experience and qualifications was granted the same transfer request, (Murray Decl. ¶ 27); and (2) Malcom, an African American male was denied a transfer request that was later granted to Brian Pollard, a Caucasian male with less experience, (*id*. ¶ 28). (*See* SAC ¶ 84.) In addition, Murray provided information related to his own treatment. He reported to Beverly that (1) he was paid less than the other on-road supervisors that were Caucasian, (SAC ¶ 84; Murray Decl. ¶ 29); (2) he was required to deliver packages using his personal vehicle, without compensation for gas or

---

annexed to Murray Decl. as Ex. 21, Docket Entry No. 66-7; Text Message from driver Eli Fernandez dated Sept. 20, 2018 ("Fernandez Text Message"), annexed to Murray Decl. as Ex. 22, Docket Entry No. 66-7; Text Message from driver Darling dated May 14, 2018 ("Darling Text Message"), annexed to Murray Decl. as Ex. 23, Docket Entry No. 66-7.)

mileage,[13] (SAC ¶ 84; Murray Decl. ¶¶ 30, 33–39; Images of Murray Vehicle, annexed to Murray Decl. as Ex. 24, Docket Entry No. 66-7); and that (3) some of his Caucasian colleagues "commit[ted] egregious and ethically flawed acts" but were never terminated.  (SAC ¶ 81.)

Murray also provided Beverly with photographs showing that on-road supervisors and drivers were required to deliver packages with their personal vehicles without compensation for gas or mileage and that Grey and other UPS senior management threatened to terminate them if they refused.  (*Id.* ¶¶ 80, 83.)  Plaintiffs allege that the use of on-road supervisors' personal vehicles to deliver packages is a violation of the collective bargaining agreement.  (*Id.* ¶ 83.)  In addition, Grey and other UPS senior management forced drivers to pay out of pocket if their vehicles were involved in accidents to avoid having to report them to UPS's insurance carrier.  (*Id.* ¶ 85.)  If or when an accident was reported, Grey and other UPS senior management manipulated accident scenes to decrease the company's insurance liability.  (*Id.* ¶ 86.)  For example, after one accident, "Grey instructed [] Murray to move [a] UPS vehicle into the middle of the block" from the accident location, because "the insurance carrier charges UPS more for accidents in the intersection than in the middle of the block."  (*Id.*)  After other accidents, Grey has instructed Murray to "work magic," which Plaintiffs allege is code for covering up the details of the accident.  (*Id.*; Murray Decl. ¶ 48.)  Moreover, Murray has evidence of Grey and other senior management officials engaging in workplace intimidation of drivers and workers injured on the job by prohibiting them from visiting doctors or forcing them to visit designated "company medical experts" who misdiagnose the injured employees or downplayed the severity of the injury (SAC ¶¶ 87–89.)  Murray also has evidence of other unfair or unlawful workplace

---

[13]  Murray estimates that, while employed for three years as an on-road supervisor at UPS, he logged about 43,500 of total mileage, (Murray Decl. ¶¶ 41–45), and was uncompensated for $7,200 in gas, (*id.* ¶ 47).

practices, including falsifying delivery records, maintaining a driver release policy that terminates drivers for leaving packages in "high risk areas," and prohibiting or manipulating expense reports submitted by on-road supervisors.  (*Id*. ¶¶ 90–92.)  Defendants terminated Murray one month after he reported his experiences to HR.  (*Id.* ¶¶ 80, 329.)

 In addition, "Murray sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while a[] . . . UPS [employee][,] by his former . . . [s]upervisor, Grey, and UPS senior management."  (SAC ¶ 62.)

## 2.    Welsh

Welsh is a Jewish Caucasian male from New Orleans, Louisiana who was employed by UPS from June 26, 2016 until July 20, 2019.  (SAC ¶¶ 13, 20.)  Welsh began his career as a package delivery driver and after seven months was promoted to the role of on-road supervisor. (SAC ¶¶ 53–54; Decl. of Roy Welsh dated July 29, 2021 ("Welsh Decl.") ¶ 4, Docket Entry No. 66-10.)  Welsh was a whistleblower who raised concerns of "document manipulation, fraudulent reporting of accidents, management readiness exam cheating, DOT hours of service regulation violations, massive overtime theft of the driver's, [and] other abuses by UPS management." (SAC ¶ 174.)  Welsh also raised concerns with HR surrounding the discriminatory and retaliatory actions of his supervisor and another UPS employee, the lack of safety concerning the number of hours on-road- supervisors are required to work, as well as the quick turnaround time for drivers to return to work for meetings.  (*Id*. ¶ 175.)

### A.    Alleged falsifications

On one occasion, Anthony Celano, a UPS senior manager, instructed Welsh and other on-road supervisors to stay in the office to "scrub out all discrepancies" from the delivery records or to log undelivered packages as service failures.  (*Id*. ¶ 180; Welsh Decl. ¶¶ 13–17.)

Celano also instructed Welsh to engage in "creative bookkeeping" in order to "fleece customers out of refunds for packages delivered late." (Welsh Decl. ¶¶ 18–19.) Celano later reprimanded Welsh for not completing the falsification of records quickly enough. (SAC ¶¶ 183–86.) Welsh also observed managers encourage drivers to falsify records for next day air packages and U.S. Post Office deliveries.[14] (*Id*. ¶¶ 187–90.) Celano threatened to transfer employees who did not obey his instructions to falsify records to unfavorable locations and positions. (*Id*. ¶ 191; Welsh Decl. ¶ 21–22.)

Senior managers also instructed Welsh to cover up workplace injuries and accidents. (SAC ¶¶ 192–95.) Welsh understood that manipulating accidents to assign less fault to the driver affected UPS's insurance premiums and saved UPS money and he believed that covering up accidents were "paramount to maintaining job security." (*Id*. ¶¶ 195–96; Welsh Decl. ¶ 30.) On one occasion, Welsh instructed a driver involved in an accident to move his vehicle so that in the pictures taken of the accident it would look like the driver was less at fault than he actually was. (SAC ¶ 196.)

As a manager, Welsh was also required to change the hour of delivery drivers by reducing the number of hours they worked to reduce overtime owed to them. (Welsh Decl. ¶ 7–12.) Welsh went into the GTS System to change timecards to make it appear as though the driver ended their shift or started their shift at an earlier or later time so that UPS would not get a DOT violation. (*Id.*) In other instances of misrepresentation encouraged by senior management,

---

[14] Plaintiffs allege that "[e]very week in the Yonkers Center between 2017 and 2018, drivers were instructed to 'drop the package on the door, and not scan if it's late," and "[a] UPS employee would later input the tracking number on an online system (ETT), ensuring that the delivery time would show as occurring before 10:30 [AM]." (*Id*. ¶ 189.)

Welsh was instructed by Justin LaPorte, a senior manager, to take the Management Readiness examinations for other employees.  (*Id.* ¶¶ 197–99; Welsh Decl. ¶¶ 28, 46–49.)

### B.   Homophobic slurs

Welsh was also subjected to homophobic slurs while employed by UPS.  A few months before Welsh resigned, Hector Fortis, a former UPS service provider and current union representative, called Welsh a "faggot."[15]  (SAC ¶¶ 200–01; Welsh Decl. ¶ 51.)  When Welsh confronted Fortis to condemn the vulgar remark, Fortis "became enraged and approached [] Welsh in a threatening manner . . . and screamed at [] Welsh."  (SAC ¶¶ 201–02.)  Afterwards, Welsh filed a complaint with Hall, his business manager, however, Hall only told him that "it would blow over, and [] Fortis's bark was worse than his bite."  (*Id.* ¶ 203.)  Even after Welsh expressed concerns about his physical safety because Fortis got into his face in a threatening manner, Hall brushed off the issue and warned Welsh against making a "big deal" of the incident and "reminded him that bad things happen to managers and employees who create UPS problems."  (*Id.* ¶ 204.)  Welsh made an internal complaint about Fortis's behavior via UPS's 1800 hotline, (*Id.* ¶ 372), and also reported this incident to HR, but never received a formal response from UPS.  (*Id.* ¶ 205.)

However, after Welsh reported the incident, it became "nearly impossible for Welsh to get time off from work or a flexible work schedule that would allow him to practice his religious faith, Judaism, freely."  (*Id.* ¶ 206.)  Welsh's religious practices required him to be home before sundown, but Hall denied every request that Welsh made to attend Shabbat dinners and was

---

[15]  UPS describes Fortis as Welsh's "former co-worker and current union representative." (UPS Mem. 11.)

required to work all day, with threats of termination if he went home before sundown.[16]  (*Id*. ¶¶ 207–08, 210.)  Welsh also requested to work from home to comply with his religious practices, but Hall refused.  (*Id*. ¶ 209.)  Welsh's work hours also drastically increased after he reported Fortis's misconduct — "Welsh went from work[ing] an average of [forty to fifty] hours a week to work[ing] from 7 [AM] until after 11 [PM]."  (*Id*. ¶ 211.)  On several occasions, Welsh paid a secretary out of pocket to assist him with driver timecards at the end of the day so he could go home at a manageable hour.  (*Id*. ¶ 213.)  "Welsh was the only [o]n-[r]oad [s]upervisor who had to pay out of pocket to have a secretary at his location."  (*Id*.)

The treatment Welsh faced after reporting the incident caused him to develop high blood pressure and also resulted in a diagnosis of depression and severe anxiety.  (*Id*. ¶ 215.)  Welsh was out on medical leave for two months as a result of his diagnosis and experienced side effects from his antidepressant medication.  (*Id*. ¶ 215.)  Welsh spoke with Hall and Lloyd to request reasonable accommodations to facilitate his return to work.[17]  (*Id*. ¶ 216.)  Hall denied Welsh's request and informed him that he would be transferred to the Parsippany New Jersey pre-load location.  (*Id*. ¶ 217.)  As a result, Welsh resigned.  (*Id*.)  Plaintiffs allege that "Welsh sustained substantial psychological and monetary injuries due to the hostile work environment he was

---

[16]  Throughout his career at UPS, Welsh had a set schedule due to his religious observances.  (SAC ¶ 208.)  Welsh would work in the mornings so that he could be home by sundown.  (*Id*.)  After Welsh went against Hall's wishes and reported Fortis's behavior to the 1800 hotline, he was not allowed to go home before sundown.  (*Id*.)

[17]  Welsh requested to (1) "return to the set schedule of 6 [AM]-5 [PM] so he could be home by sundown;" (2) "work from home two days out of the week so he could attend medical appointments;" (3) have "white light in [his] office to reduce headaches and improve concentration;" (4) "remov[e] Hector Fortis from the facility or his work shift;" and (5) "take lunch break free of retribution."  (*Id*. ¶ 216.)

subjected to while a[] . . . UPS [employee][,] by his former manager Stewart, and UPS senior management." (*Id.* ¶ 176.)

### 3. Moyle

Moyle is a Caucasian male from Bronx County, New York who was employed by UPS from July 9, 2012 until August 21, 2019. (SAC ¶¶ 12, 19.) Moyle began his career as a package delivery driver, was promoted to a non-road supervisor, and then was promoted to a business manager. (SAC ¶ 52; Decl. of Daniel Moyle ("Moyle Decl.") dated July 29, 2021 ¶ 2–3, Docket Entry No. 66-12.)

### A. Unpaid overtime

Moyle has "firsthand knowledge" of UPS violating the United States Department of Labor's wage and hour laws, including evidence that many drivers worked fifteen to eighteen hours a day or sixty-five to ninety hours a week, but that the overtime hours were not reflected on their paychecks. (SAC  ¶ 99–100.) For example, Stewart and UPS senior management instructed business managers to "go into the GTS and change the deliver drivers' punch-in and punch-out times" to "reduce the driver's daily and weekly hours worked." (*Id.* ¶¶ 100–02.) Moyle was required to go into the GTS System, and change the delivery drivers' punch-in and punch-out times in order to reduce the earned hours of delivery drivers. (Moyle Decl. ¶ 6–9.) Moyle "was under pressure from his superiors" to manipulate hours and UPS "throughout the organization," promote[d] the falsification of company records to mislead customers, lower insurance premiums, and make their internal balanced scorecards look more favorable." (SAC ¶¶ 104–06.)

### B.   UPS discharges and cover ups

In addition, Moyle has evidence of UPS managers disciplining or discharging employees "arbitrarily and for disguised reasons," (*id.* ¶ 107), and covering up misconduct, (*id.* ¶¶ 110–35). One of Moyle's former supervisors, Tommy Francis, "taught [him] how to cover up crashes by dispatching Moyle to the scene of a crash and asking Moyle to pay for damages with his own money."[18] (*Id.* ¶¶ 110–11; Moyle Decl. ¶¶ 15–19, 22.)  Moyle feared that his career would be damaged if he defied Francis.  (SAC ¶ 111.)  Stewart encouraged Moyle to cover up accident injuries.  For example, in the first quarter of 2019, a driver, Ramadan Abdul-Salaam, was injured after he slipped and fell on the job and Abdul-Salaam's supervisor reported the accident to Moyle.  (*Id.* ¶¶ 130–31.)  Moyle reported the accident to Stewart and Stewart "completely disregarded Abdul-Salaam's doctor's note" and instructed Moyle "to suppress the injury."  (*Id.* ¶¶ 132–33.)  Stewart failed to file reports on accidents reported to him because it would create extra paperwork and harm Stewart's balanced scorecard.  (*Id.* ¶¶ 127–29.)

Plaintiffs also allege that UPS "cheats" customers with its Next Day Air package service across the New Your City area by making customers pay a premium for the service and instructing drivers to scan time-sensitive packages as delivered even though the packages are "miles from the customer's location."  (*Id.* ¶¶ 112–14.)  Plaintiffs further allege that Stewart and Grey encouraged and facilitated this practice and contributed to other cover ups, including

---

[18]  "Tommy Francis kept a little black book where he kept a log of all the injuries and accidents he covered up."  (SAC ¶ 111.)

manipulating tracking for annual safety rides and falsifying reports of service failures at UPS stores.[19]  (*Id.* ¶¶ 115–26.)

## C.   Whistleblowing

Moyle was a "whistleblower" who raised concerns of "document manipulation, fraudulent reporting of accidents, . . . DOT[] hours of service violations, massive overtime theft of the driver and other abuses by UPS management."  (*Id.* ¶ 96.)  After Moyle refused to cover up workplace accidents as instructed by Stewart, Stewart falsely reported that Moyle failed to report Abdul-Salaam's injury on time — resulting in a "lost-time injury"[20] — and requested that that Terri Murphy,[21] the Metro New York Safety Manager, "launch an 'investigation' into . . . Moyle concerning Abdul-Salaam's injury."  (*Id.* ¶¶ 136–37.)  During the investigation, Murphy threated Moyle and Moyle was subjected to "conference call harassment, public ridicule, threats of termination, heightened scrutiny of his work product, excessive [and] unnecessary additional training, and harassment by company security."  (*Id.* ¶¶ 140–41.)  In addition, Stewart and

---

[19]  Plaintiffs allege that UPS must perform day-long performance rides, as well as safety rides on the drivers and that these two rides must be done separately.  (SAC ¶¶ 118–20.) According to Plaintiffs, Stewart instructed managers and supervisors to conduct both rides simultaneously to "trick[] the system."  (*Id.* ¶¶ 120–21.)  In addition, when UPS failed to deliver a package to a commercial address by 5:00 PM as required, Stewart instructed supervisors to note that the customer's business was closed to avoid having to reimburse the customer for a failed delivery.  (*Id.* ¶¶ 123–25.)

[20]  A "lost-time injury" is the highest classification of internal injury at UPS, it negatively impacts UPS's insurance premiums, and managers accused of acquiring them may be terminated. (*Id.* ¶ 138 n.8.)

[21]  Plaintiffs also allege that Murphy was complicit in the accident scene manipulation and insurance fraud carried out by other senior management officials.  (*Id.* ¶¶ 144–49.)  Murphy has directed Moyle and other managers to under-report the severity of vehicle accidents, (*id.* ¶¶ 144–46), manipulate the scenes of vehicle accidents, (*id.* ¶ 146), and mischaracterize vehicle accidents to UPS's insurance company, (*id.* ¶¶ 148–49).

Murphy subjected  Moyle to "constant drilling and fake investigations from UPS company security."  (*Id*. ¶ 157.)  Moyle was also punished by company "grinding" — the act of punishing managers and supervisors by making them work in locations far from their home, for extended hours, and during odd hours — and the number of hours he was required to work increased from forty to forty-five hours per week to sixty to seventy hours per week.  (*Id*. ¶ 143.)

The constant harassment caused Moyle to have a panic attack and caused him to develop depression and severe anxiety.  (*Id*. ¶ 158.)  As a result of his diagnosis, Moyle took medical leave for three and a half months.  (*Id*.)  Moyle experienced grogginess as a side effect of his anxiety and depression medication and a month before he was scheduled to return from leave, he spoke with Stewart and Leo Cummings to request accommodations.  (*Id*. ¶¶ 158, 160.)  UPS denied his requests and he was not offered any alternatives.[22]  (*Id*. ¶¶ 159–60.)  In addition, UPS informed him that his position as the district manager in the Knickerbocker location was given to Brian Mactavish and he would be relocated to a location in Upstate New York upon his return. (*Id*. ¶¶ 159, 162.)  Rather than returning to work, Moyle resigned.  (*Id*. ¶ 162.)  Plaintiffs allege that "Moyle sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while a[] . . . UPS [employee][,] by his former manager Stewart, and UPS senior management."  (*Id.* ¶¶ 97, 150.)

---

[22]  Moyle requested (1) the "[a]bility to audio record conversations to aid with the issues he had concerning memory retention;" (2) "[n]atural lighting in his workspace, or a 'white noise' machine or noise-canceling headphones to aid with his ability to concentrate; and (3) "[a] set schedule so [he] could attend therapy and frequent doctor visits[,] [and] . . . to balance out the groggy effects of the medication [he] was prescribed."  (*Id.* ¶ 160.)

#### 4.     Palaguachi, Payne, Radwan, and Santiago

Palaguachi is a Spanish-speaking Latinx male from Bronx County, New York who was a UPS delivery driver from October of 2017 until May of 2018.  (*Id.* ¶¶ 14, 21, 55.)  Payne is an African American male from Kings County, New York who was a UPS delivery driver from August of 2017 until June of 2018.  (*Id.* ¶¶ 15, 22, 55.)  Radwan is an Arabic-speaking male from Kings County, New York who was as UPS delivery driver from July of 2018 until October 1, 2018.  (*Id.* ¶¶ 17, 23, 55.)  Santiago is a Spanish-speaking male from Kings County, New York who was a UPS delivery driver from April 7, 2014 until October 18, 2020.  (*Id.* ¶¶ 16, 24, 55.)

Throughout their employment, Palaguachi, Payne, Santiago, and Radwan worked Sundays through Fridays for fifty to ninety hours per week and were not compensated for overtime hours.[23]  Defendants maintained a policy and practice of requiring Plaintiffs and all similarly situated employees to work more than forty hours a week without appropriate overtime compensation as required by federal and state laws.  (*Id.* ¶ 266.)  Defendants also did not provide employees with information regarding overtime wages nor did Defendants provide them with an accurate wage statement as required by NYLL § 195.  (*Id.* ¶¶ 224–25, 236–37, 248–49, 260–61.)  In addition, Grey and UPS senior management instructed them to (1) hide automobile accidents; (2) lie about delivery records — including falsely manipulating delivery attempts; (3) and to deliver packages with their personal vehicles without compensation for mileage or gas.  (*Id.* ¶¶ 226–29, 238–41, 250–53, 262–65.)

---

[23]  (*Id.* ¶¶ 219–23, 231–35, 243–47, 255–59; *see* Palaguachi Estimated Hrs. Worked ("Palaguachi Hrs."), annexed to SAC as Ex. A, Docket Entry No. 43-1; Payne Estimated Hrs. Worked ("Payne Hrs."), annexed to SAC. as Ex. A, Docket Entry No. 43-1; Santiago Estimated Hrs. Worked ("Santiago Hrs."), annexed to SAC as Ex. A, Docket Entry No. 43-1; Radwan Estimated Hrs. Worked ("Radwan Hrs."), annexed to SAC as Ex. A, Docket Entry No. 43-1, (collectively "Estimated Work Hours").)

### b. Procedural background

On March 18, 2020 Murray, Palaguachi, and Payne commenced the above-captioned action, alleging wage and hour violation under federal and state law and civil rights violations under federal law. (Compl.) On April 13, 2020, Plaintiffs filed the Amended Complaint adding an additional Plaintiff, Welsh, and the Individual Defendants as parties to the action, as well as additional causes of action for property damage, negligent and intentional emotional distress, discrimination claims pursuant to NYSHRL and NYCHRL, and disability discrimination claims under the Rehabilitation Act and ADA. (Am. Compl., Docket Entry No. 5.) On February 19, 2021, Plaintiffs filed the SAC, (1) adding Radwan and Santiago as Plaintiffs, (2) withdrawing their Fair Labor Standards Act ("FLSA") claim, Rehabilitation Act claim, religious observance discrimination claims, property damage claim, negligent and intentional emotional distress claims, and (3) adding claims under Sections 215 and 740 of the NYLL, and a common law claim for unjust enrichment. (*See* SAC.)

Defendants move to dismiss the SAC for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiffs oppose the motions.[24]

---

[24] In their memorandum of law in opposition to the Individual Defendants' motion to dismiss, Plaintiffs withdraw their NYLL, Title VII, ADA, NYSHRL and NYCHRL disability, and NYSHRL and NYCHRL constructive discharge claims against the Individual Defendants. (Pls.' Individual Defs. Opp'n 4.) In addition, in their memorandum of law in opposition to UPS's motion to dismiss, Plaintiffs specifically withdraw their ADA, NYSHRL and NYCHRL disability, and NYSHRL and NYCHRL constructive discharge claims. (Pls.' UPS Opp'n 2.) In addition, Plaintiffs did not address Defendants' arguments as to the deficiencies of their Title VII and NYSHRL retaliation claims and the Court therefore deems them abandoned and only addresses Plaintiffs' NYCHRL retaliation claims. *See BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. Mar. 31, 2021) ("Plaintiffs' failure to oppose [d]efendants' specific argument in a motion to dismiss is deemed waiver of that issue." (quoting *Kao v. Brit. Airways, PLC*, No. 17-CV-232, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018))); *MYL Litig. Recovery I LLC v. Mylan N.V.*, No. 19-CV-1799, 2020 WL 1503673, at *7 (S.D.N.Y. Mar. 30, 2020) ("[The plaintiff] has failed to respond to this argument in its opposition. Accordingly, any

## II.  Discussion

### a.  Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

---

argument opposing [the defendant's] position here is waived." (citing *Kao*, 2018 WL 501609, at *5)); *Levy v. Maggiore*, 48 F. Supp. 3d 428, 452 (E.D.N.Y. 2014) ("[The p]laintiff does not respond to this argument and the [c]ourt therefore construes [the p]laintiff's failure to respond as an abandonment of this claim."); *see also Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.  Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.").  Therefore, the remaining claims are NYLL wage and hour claims by Palaguachi, Payne, Radwan, and Santiago against UPS; Title VII race discrimination claim by Murray against UPS; NYCHRL retaliation claims by Murray, Welsh and Moyle against UPS, Grey, Stewart, and Hall; and NYLL §§ 214 and 740 retaliation claims by Murray, Welsh, and Moyle against UPS; Plaintiffs' unjust enrichment claim against UPS; Plaintiffs' employer liability claim against UPS; and NYCHRL aiding and abetting claims by Murray, Welsh, and Moyle against the Individual Defendants.

b.   **Pleading upon information and belief is not a basis for dismissal**

As an initial matter, UPS argues that Plaintiffs' claims are implausible and therefore must be dismissed because "virtually all of the SAC's factual allegations are improperly pled upon information and belief." (UPS Mem. 5.)  In support, UPS states that "[w]hile a plaintiff may plead some facts upon information and belief . . . [a] complaint must at least contain enough factual allegations that are *not* made upon information and belief to 'raise a right to relief above the speculative level'" and Plaintiffs have failed to "raise a right to relief above the speculative level" because  "nearly all of Plaintiffs' factual allegations are pled upon information and belief." (*Id*. at 5–7 (quoting *Gilford v. NYS Off. of Mental Health*, No. 17-CV-8033, 2019 WL 1113306, at *5-6 (S.D.N.Y. Mar. 11, 2019)).)

Plaintiffs contend that UPS's argument is factually incorrect and although some of Plaintiffs' arguments are made upon information and belief, this does not render their claims implausible.  (Pl.'s UPS Opp'n 3.)  In support, Plaintiffs argue that their claims are plausible because "each discrete allegation pertains to information that is . . . exclusively within the Defendants' knowledge."  (*Id*. at 5.)  Even though "[a]ll of the claims are things Plaintiffs experienced or witnessed first-hand, [] the corroborating evidence is in the sole possession of [Defendants]."  (*Id*.)

"When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are based on secondhand information that [he] believes to be true."  *Mott v. Cnty. of Monroe*, No. 20-CV-6809, 2021 WL 2042623, at *4 (W.D.N.Y. May 21, 2021) (quoting *Barrett v. Forest Labs., Inc*., 39 F. Supp. 3d 407, 431-32 (S.D.N.Y. 2014)).  "[T]he mere fact that a complaint includes allegations asserted on information and belief is not, in and of itself, a basis for dismissal."  *Latele Television C.A. v. Telemundo Commc'ns Grp., LLC*, Case No. 12-CV-2539,

2013 WL 1296314, at *11 (S.D. Fla. March 27, 2013) (citing *Arista Records, LLC v. Doe* 3, 604

F.3d 110, 120 (2d Cir. 2010)).  Indeed, the Second Circuit has explained that the *Twombly*

plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading

facts alleged upon information and belief in certain circumstances, including where: (1) "the

facts are peculiarly within the possession and control of the [opposing party]" or (2) "the belief is

based on factual information that makes the inference of culpability plausible." *Arista Records

LLC*, 604 F.3d at 120 (citations and quotation marks omitted); *Zeitlin v. Palumbo*, 532 F. Supp.

3d 64, 69 (E.D.N.Y. 2021) (same); *see also Haley v. Teachers Ins. & Annuity Assoc. of Am.*, 377

F. Supp. 3d 250, 269 (S.D.N.Y. 2019).  Some district courts in this Circuit have required that

allegations upon information and belief be accompanied by a statement of the facts upon which

the belief is founded.  *See Mott*, 2021 WL 2042623, at *4 ("[A]lthough a plaintiff may do so

[plead facts upon information and belief] where the facts are peculiarly within the possession and

control of the defendant or where the belief is based on factual information that makes the

inference of culpability plausible, such allegations must be accompanied by a statement of the

facts upon which the belief is founded." (quoting *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp.

2d 514, 527 (S.D.N.Y. 2013))); *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 385

(S.D.N.Y. 2006) ("[A]llegations pled on 'information and belief' are proper if 'accompanied by

a statement of the facts upon which the belief is founded.'" (quoting *Shopping Mall Invs., N.V. v.

E.G. Frances & Co., Inc.*, No. 84-CV-1469, 1985 WL 210 (S.D.N.Y. Jan. 23, 1985))); *see also

United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d

71, 82 (2d Cir. 2017) ("Pleading on information and belief is a desirable and essential expedient

when matters that are necessary to complete the statement of a claim are not within the

knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the

subject."); *Sanders v. Grenadier Realty, Inc.*, 367 F. App'x 173, 175 (2d Cir. 2010) (affirming

dismissal of discrimination claim under Fair Housing Act for failure to state a claim where

plaintiffs alleged racial animus based on facts pled on information and belief and "plaintiffs

allege[d] no basis for the 'information and belief' on which their assertion" was based).

      Plaintiffs have plausibly alleged facts to support their allegations against Defendants.

Although Plaintiffs have styled many of their allegations in the SAC upon "information and

belief" they have provided factual information in the SAC and accompanying exhibits to support

these allegations. *See United States v. Daugerdas*, No. 09-CR-581, 2020 WL 364601, at *3

(S.D.N.Y. Jan. 22, 2020) ("Prefacing allegations with this standard pleading qualification does

not eviscerate the sufficiency of a complaint." (quoting *Lefkowitz v. John Wiley & Sons, Inc.*,

2014 WL 2619815, at *9 (S.D.N.Y. June 2, 2014)); *Installed Bldg. Prod., LLC v. Cottrell*, No.

13-CV-1112, 2014 WL 3729369, at *4 (W.D.N.Y. July 25, 2014) (recognizing that "a complaint

is not inadequate under the *Iqbal/Twombly* standard simply because it contains pleadings made

upon information and belief. Rather, a complaint may contain information and belief pleading

and still be sufficient under *Iqbal/Twombly* when 'the belief is based on factual information that

makes the inference of culpability plausible.'" (quoting *Arista Records, LLC*, 604 F.3d at 120));

*see also Liberty Ins. Corp. v. Brenman*, No. 14-CV-5892, 2016 WL 880170, at *4 (E.D.N.Y.

Mar. 1, 2016) (denying dismissal of the plaintiff's complaint where at least some of the factual

allegations were not pled on information and belief, and when taken as true stated a plausible

claim of misconduct); (*see generally* SAC; Murray Decl.; Welsh Decl.).

      In addition, whether Defendants have engaged in similar misconduct with other UPS

employees is information within Defendants' sole possession and control. Only if an employee

later successfully challenges Defendants' alleged misconduct practices would the details of

Defendants' conduct be available to Plaintiffs. *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff. . . ." (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1224 (3d ed. 2004)).

Because the SAC and relevant exhibits contain factual content that allows the Court to draw the reasonable inference that Defendants may be liable for the misconduct alleged, the Court relies on Plaintiffs' information and belief pleadings in the SAC to determine below whether they have sufficiently stated a claim. *Iqbal*, 556 U.S. at 678; *see Installed Bldg. Prod., LLC*, 2014 WL 3729369, at *8 (W.D.N.Y. July 25, 2014) (drawing a reasonable inference that the defendant engaged in the misconduct alleged in the complaint where most of the allegations were pled upon information and belief).

### c.   Wage and hour claims

Defendants argue that Plaintiffs' wage and hour claims are preempted by section 301 of the LMRA.[25]   (UPS Mem. 7–9; Individual Defs.' Mem. 6.)  UPS claims that Plaintiffs' NYLL overtime claim arises exclusively out of a provision in their Collective Bargaining Agreements ("CBAs") for overtime compensation for each hour worked in excess of eight hours per day and section 301 of the LMRA precludes statutory claims "substantially dependent" on or

---

[25]  Plaintiffs' first, second and third causes of action all address wage related claims and the Court therefore addresses all three claims together.  Specifically, Plaintiffs allege: (1) NYLL unpaid overtime claims on behalf of Palaguachi, Payne, Radwan, Santiago, and all other similarly situated employees against UPS in the first cause of action, (SAC ¶¶ 279–83; Pls.' Individual Defs.' Opp'n 4); (2) NYLL wage notice claims on behalf of Palaguachi, Payne, Radwan, Santiago, and all other similarly situated employees against UPS in the second cause of action, (SAC ¶¶ 284–87; Pls.' Individual Defs.' Opp'n 4); and (3) NYLL wage statement claims on behalf of Palaguachi, Payne, Radwan, Santiago, , and all other similarly situated employees against UPS in the third cause of action, (SAC ¶¶ 288–90; Pls.' Individual Defs.' Opp'n 4).

"inextricably intertwined" with an analysis of a CBA.  (UPS Mem. 7–9 (citing *Whitehurst v. 1199SEIU United Healthcare Workers East*, 928 F.3d 201, 206 (2d Cir. 2019) (per curiam).) The Individual Defendants also claim that Plaintiffs failed to first exhaust their administrative remedies or to satisfy the six month statute of limitations required by section 301 of the LMRA within which a claim of lost wages could have been filed under the governing CBAs.  (Individual Defs.' Mem. 6.)  In addition, Defendants argue that Plaintiffs' remaining wage and hour claims only recite statutory text and are conclusory.  (UPS Mem. 7–9; Individual Defs.' Mem. 4–6.) The Individual Defendants argue that NYLL claims against Grey should be dismissed because there is no plausible pleading of ownership or operational control.  (Individual Defs.' Mem 4.) In support, Defendants argue that Plaintiffs' allegations that Grey "had the power to hire and fire them, controlled the terms and conditions of employment, and determined the rates and methods of payment of any compensation in exchange for Plaintiffs' services" are conclusory and Grey's role as a line-level supervisor is not more controlling than the role of the thousands of other supervisors UPS employs to perform ordinary, service-line responsibilities of a corporate employer.  (*Id*. at 5–6.)

Plaintiffs argue that their NYLL claims are not preempted by Section 301 of the LMRA because the SAC asserts no violation of any purported rights under a CBA and also does not dispute or challenge any provision of a CBA.  (Pls.' UPS Opp'n 7.)  In addition, Plaintiffs argue that the NYLL requires that employees be paid a minimum wage and overtime for all hours worked more than forty hours a week and the policies and practices of UPS's and their

management violated those statutory rights by depriving Plaintiffs and others of wages for time they worked.[26]

### i. Preemption

The LMRA "governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on an analysis of a collective-bargaining agreement." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see also Whitehurst*, 928 F.3d at 206. In relevant part, section 301 of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a); *Whitehurst*, 928 F.3d at 206 (quoting 29 U.S.C. § 185(a)). "Section 301 'governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement.'" *Whitehurst*, 928 F.3d at 206 (quoting *Caterpillar*, 482 U.S. at 394). "Thus, when resolution of a state law claim is 'substantially dependent' upon or 'inextricably intertwined' with analysis of the terms of a CBA, the state law claim 'must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law.'" *Id*. at 206–07 (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 220 (1985)); *see Sullivan v. Am. Airlines, Inc*., 424 F.3d 267, 272 (2d Cir. 2005) ("The Supreme Court has only found three statutes to have the requisite extraordinary preemptive force to support complete preemption[,] [including section] 301 of the [LMRA]."); *see also Lingle v.*

---

[26] As noted above, Plaintiffs withdraw their NYLL claims against the Individual Defendants. (Pls.' Individual Defs. Opp'n 4.)

*Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404 (1988) (recognizing that section 301

preemption serves to "ensure uniform interpretation of collective-bargaining agreements").  In

contrast, preemption does not occur when an individual covered by a CBA "asserts 'legal rights

*independent* of that agreement.'"  *Whitehurst*, 928 F.3d at 207 (quoting *Caterpillar Inc.*, 482

U.S. at 396).  "A state-law claim is 'independent' when resolving it 'does not require construing

the collective-bargaining agreement.'"  *Id.* at 207 (quoting *Lingle*, 486 U.S. at 407).  "In other

words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand,

and state law, on the other, would require addressing precisely the same set of facts, as long as

the state-law claim can be resolved without interpreting the agreement itself, the claim is

'independent' of the agreement for § 301 pre-emption purposes."  *Lingle*, 486 U.S. at 409–10;

*Blast All, Inc. v. Ingelsby*, No. 21-CV-00124, 2021 WL 1318022, at *3 (D. Conn. Apr. 8, 2021)

(same).

        Plaintiffs' NYLL claims are not automatically preempted based on section 301 of the

LMRA.  Plaintiffs claim that Defendants violated the NYLL by (1) failing to pay them and other

similarly situated employees "overtime compensation at rates of one and one-half times the

regular rate of pay for each hour worked more than forty (40) hours in a workweek," (SAC ¶

281); (2) failing to provide them and other similarly situated employees written notice of pay

rates, (*id.* ¶ 285); and (3) failing to provide them and other similarly situated employees with

wage statements, (*id.* ¶ 289).  Although Plaintiffs' CBAs may create parameters and entitlements

for UPS employees related to work hours and wages, the resolution of these claims do not

depend on the meaning of the CBAs and the NYLL supplies a right to compensation that is

entirely independent of any contractual rights afforded to Plaintiffs.  *See Vera v. Saks & Co.*, 335

F.3d 109, 113 (2d Cir. 2003) (per curiam) ("[I]f a state prescribes rules or establishes rights and

obligations that are independent of a labor contract, actions to enforce such independent rules or rights would not be preempted by [section] 301."); *Arroyo v. NYU Langone Hosp.*, No. 19-CV-1624, 2019 WL 5682628, at *3 (S.D.N.Y. Oct. 31, 2019) ("Indeed, '[e]ven if resolving a dispute under a state law claim and the [CBA] "would require addressing the precisely same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes.'" (quoting *Severin v. Project OHR, Inc.*, No. 10-CV-9696, 2011 WL 3902994, at *4 (S.D.N.Y. Sept. 2, 2011)); *Polanco v. Brookdale Hosp. Med. Ctr.*, 819 F. Supp. 2d 129, 134 (E.D.N.Y. 2011) ("Although the CBA may provide additional rights to the employees, it may not override independent statutory rights provided by the NYLL."). Indeed, "[c]ourts have routinely held that the sort of unpaid wage and notice claims under the NYLL alleged here are 'legally independent' of wage-related provisions in a CBA and are therefore not preempted by the LMRA." *Chu v. Chinese-Am. Planning Council Home Attendant Program, Inc.*, 194 F. Supp. 3d 221, 228-29 (S.D.N.Y. 2016) (citing *Severin*, 2011 WL 3902994, at *4; *Kaye*, 975 F. Supp. 2d at 425-26; *see also Berger*, 2019 WL 3526533, at *3 (finding that identical New York state-law claims for wage and overtime compensation could be adjudicated purely under state law, "irrespective of the terms of [the] employment contract"). Thus, Plaintiffs' NYLL claims are not preempted. *See Arroyo*, 2019 WL 5682628, at *3 (S.D.N.Y. Oct. 31, 2019) (determining that section 301 of the LMRA did not preempt the plaintiff's claims where the "[p]laintiff did not so much as mention the CBAs in his [c]omplaint, let alone allege that [the d]efendant had violated any term of the CBAs and [i]nstead, [the p]laintiff alleged that [the d]efendant violated the NYLL and its accompanying regulations by failing to pay wage and overtime compensation for security guards' pre- and post-shift work"); *see also Nakahata v. New York-Presbyterian Healthcare Sys.,*

*Inc.*, 723 F.3d 192, 203 (2d Cir. 2013) (recognizing that "[t]he plaintiff is master of the complaint and may assert state law causes of action that are independent of the CBA" and "a motion addressed to the adequacy of the pleadings is not necessarily the proper place for preemption to be decided").

### ii.    Unpaid overtime claims

The NYLL "mandates that an employee engaged in interstate commerce be compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of forty hours per week." *Nakahata*, 723 F.3d at 200; *Saltos v. GGI Constr. Corp*., No. 21-CV-6459, 2022 WL 3108622, at *4 (E.D.N.Y. July 18, 2022) ("Like federal law, New York law requires employers to provide employees with an overtime premium for all hours worked in excess of 40 hours per week at one and one-half times the regular rate of pay." (first citing NYLL §§ 650 *et seq*.; and then citing 12 NYCRR § 142-2.2.)), *report and recommendation adopted,* 2022 WL 3100559 (E.D.N.Y. Aug. 4, 2022).  To establish an overtime claim under the NYLL, plaintiffs must establish that: (1) the defendant was an "employer" as defined by the statute; (2) they were employees as defined in the statute; and (3) they worked in excess of [forty] hours in a given workweek without receiving overtime compensation.[27]  *See Nakahata*, 723 F.3d at 200 (quoting *Lundy v. Catholic Health Sys. of Long Island, Inc*., 711 F.3d 106, 114 (2d Cir. 2013)); *Saltos*, 2022 WL 3108622, at *4 (E.D.N.Y. July 18, 2022) ("To establish an overtime claim under the NYLL, a plaintiff must establish that: (1) he worked in excess of 40

---

[27]    The NYLL defines "employer" as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service" or "acting as an employer."  N.Y. L. L. §§ 190(3), 651(6): *see Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013).  The definition of "employed" under the NYLL is that a person is "permitted or suffered to work."  *Id*. § 2(7).

hours in a given workweek without receiving overtime compensation; (2) he was an "employee" as defined in the statute; and (3) the defendant was an "employer" as defined by the statute." (citing *Rodriguez v. Ridge Pizza Inc.*, 16-CV-0254, 2018 WL 1335358, at *5 (E.D.N.Y. Mar. 15, 2018), *report and recommendation adopted*, No. 21-CV-6459, 2022 WL 3100559 (E.D.N.Y. Aug. 4, 2022))).

Based on the allegations in the SAC, Plaintiffs have sufficiently alleged UPS's liability under the NYLL for failure to pay overtime. Plaintiffs allege (1) that UPS "constitutes a single employer of Plaintiff[]s and all similarly situated employees" within the meaning of the NYLL because it "controlled the terms and conditions of employment, and determined the rate and method of any compensation in exchange for Plaintiff[]s services," (SAC ¶¶ 47–48); (2) that Plaintiffs Palaguachi, Payne, Radwan, and Santiago are employees within the meaning of the NYLL,[28] (*id.* ¶ 46); and (3) Plaintiffs Palaguachi, Payne, Radwan, and Santiago were employed by UPS from various periods between approximately August of 2017 to October 18, 2020 and were not paid overtime compensation, (*id.* ¶¶ 21–24, 282). Plaintiffs allege that throughout their employment, Palaguachi, Payne, Radwan, and Santiago worked Sunday through Friday for fifty to ninety hours per week and were not compensated for overtime hours.[29] (*See* Estimated Work Hours, attached to SAC as Ex. A, Docket Entry No. 43-1.) Based on these facts, Plaintiffs have

---

[28] Palaguachi, Payne, Radwan, and Santiago, on behalf of themselves and other similarly situated employees, are the only named Plaintiffs that assert NYLL wage and hour violations.

[29] Plaintiffs provide a chart with information on the number of hours worked and the number of overtime owed for each workday. (*See* Estimated Work Hours, attached to SAC as Ex. A, Docket Entry No. 43-1.) The chart assumes an eight hour workday five days a week, which equals a forty-hour work week as required by the NYLL, and includes the number of hours worked over eight hours each day. *See Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013).

adequately alleged claims for unpaid overtime under the NYLL.  *See Cruz v. O & M PIZZA CORP.*, No. 20-CV-5057, 2022 WL 3448661, at *4 (E.D.N.Y. July 22, 2022) (finding that the plaintiff adequately pled a claim for unpaid overtime pursuant to the NYLL where the plaintiff alleged that he was employed by defendants within the meaning of the NYLL and further stated that defendants willfully failed to pay overtime wages as required by the NYLL), *report and recommendation adopted,* 2022 WL 3446332 (E.D.N.Y. Aug. 17, 2022); *Saltos*, 2022 WL 3108622, at *4–5 (finding that the plaintiff sufficiently established the defendant's liability under the NYLL for failure to pay overtime where the plaintiff alleged that he was a construction laborer for the defendant employer and throughout his employment, he consistently worked in excess of forty hours per week).

### iii.   Wage notices and wage statements claims

The NYLL requires employers to provide a wage notice to an employee at the time of hiring. NYLL § 195(1)(a).  *Saltos*, 2022 WL 3108622, at *5; *Carter v. Tuttnaeur U.S.A. Co*., 78 F. Supp. 3d 564, 569 (E.D.N.Y. 2015) ("As of April 9, 2011, an employer must provide an employee with a wage notice within ten business days of the start of employment and then annually every February thereafter." (quoting *Yuquilema v. Manhattan's Hero Corp*., No. 13-CV-461, 2014 WL 4207106, at *10 (S.D.N.Y. Aug. 20, 2014), *report and recommendation adopted*, No. 13-CV-461, 2014 WL 5039428 (S.D.N.Y. Sept. 30, 2014)).  Among other things, this notice must include (1) "the rate or rates of pay and basis thereof"; (2) "whether paid by the hour, shift, day, week, salary, piece, commission, or other"; (3) "the regular pay day designated by the employer"; (4) "the name of the employer"; (5) "any 'doing business as' names used by the employer"; and (6) "such other information as the commissioner deems material and necessary."  N.Y.L.L. § 195(1); *see also Castro v. Hyper Structure Corp*., No. 21-CV-0139,

2022 WL 2467242, at *14 (E.D.N.Y. Mar. 7, 2022) ("Section 195(1)(a) of the NYLL requires

employers to provide employees at the time of hiring with a wage notice containing, among other

things, the rate of pay, the basis thereof, and the pay schedule."); *Mendez v. MCSS Rest. Corp*.,

564 F. Supp. 3d 195, 219 (E.D.N.Y. 2021) (describing the required contents of the wage notice

under § 195(1)).  In addition, notices must be provided in English and the employees' primary

language.  N.Y.L.L. § 195(1); *Hernandez v. Jrpac Inc*., No. 14-CV-4176, 2016 WL 3248493, at

*25 (S.D.N.Y. June 9, 2016) (stating that "an employer shall give each employee written notice

of the employee's regular hourly pay rate, overtime hourly pay rate, the amount of tip credit, if

any, to be taken from the basic minimum hourly rate, and the regular payday . . . [and [t]hese

notices must be provided in English and the workers' primary language).  Under the statute, if a

wage notice under section 195 is not provided "within ten business days of" the employee's

"first day of employment," the employee "may recover in a civil action damages of fifty dollars

for each work week that the violations occurred or continue to occur, but not to exceed a total of

five thousand dollars." N.Y.L.L. § 198(1-b); *see also Carter*, 78 F. Supp. 3d at 570 (citing

N.Y.L.L. § 198(1-b)).

The NYLL also requires employers to give employees a wage statement with each

payment of wages.  *Castro*, 2022 WL 2467242, at *14 (citing NYLL § 195(3)).  Section 195(3)

of the NYLL requires employers to furnish employees with 'a statement with every payment of

wages, listing information about the rate and basis of pay, any allowances and deductions, and

the employer's identity and contact details.'" (quoting *Rojas v. Splendor Landscape Designs*

*Ltd*., 268 F. Supp. 3d 405, 412 (E.D.N.Y. 2017)); *Ying Dai v. ABNS NY Inc*., 490 F. Supp. 3d

645, 660 (E.D.N.Y. Sept. 29, 2020) ("Under Section 195(3), employers must give their

employees accurate wage statements that include the dates and hours worked, the rate of pay and

additional details.").  An employee who is not given these statements may "recover in a civil action damages of two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorney's fees."  N.Y.L.L § 198(1-d).  "Under the NYLL, an employer's 'complete and timely payment of all wages . . . to the employee who was not provided notice' or 'who was not provided statements' serves as an affirmative defense to a wage notice or wage statement claim.  *Mendez*, 564 F. Supp. 3d at 219 (quoting N.Y.L.L. §§ 198(1-b); 198(1-d)).

Plaintiffs allege that Palaguachi, Payne, Radwan, and Santiago never received a wage notice — in Plaintiffs' primary languages — or wage statements from UPS at any point throughout the course of their employment.  (*See* SAC ¶¶ 285, 289.)  Based on these allegations Plaintiffs have adequately alleged wage notice and wage statement claims under the NYLL.  *See Hernandez,* 2016 WL 3248493 at *25; *Cruz*, 2022 WL 3448661, at *4 (finding that the plaintiff adequately pled claims for wage notice and wage statement violations where he alleged that he was not provided proper wage statements or notices as required by the NYLL); *Tambriz v. Taste & Sabor LLC*, 577 F. Supp. 3d 314, 327–28 (S.D.N.Y. 2021), *report and recommendation adopted*, 2022 WL 282918 (S.D.N.Y. Jan. 31, 2022) (finding that the plaintiffs demonstrated that the defendants violated the NYLL wage notice and wage statement requirements with respect to each of them where the plaintiffs assert that throughout their employment with the defendants, they never received either the requisite notice or wage statements required by the NYLL); *see also Saltos*, 2022 WL 3108622, at *5 (granting default judgment in favor of the plaintiff for NYLL wage notice and statement claims where he alleged in his complaint and attested that he never received a wage notice from the defendants at the time he was hired or at any other time, and he never received wage statements with his weekly earnings).

Accordingly the Court denies UPS's motion to dismiss Plaintiffs' NYLL wage and hour claims.

### d.   Murray's Title VII race claim

Defendants argue that Murray's Title VII claim should be dismissed because Plaintiffs fail to plead basic facts to plausibly allege race discrimination.[30]  (UPS Mem. 15.)  In support, UPS argues that Murray's claim "suffers from multiple fatal deficiencies," including Murray's (1) "conclusory" allegation that there is no difference in job responsibilities for on-road supervisors, (2) failure to plead factual allegations that UPS's decision to pay him less occurred under circumstances that give rise to an inference of discrimination besides his "conclusory" allegation that UPS paid him less because of his race and gender, and (3) failure to provide dates with regard to when the alleged discrimination occurred.  (*Id*. at 15–16.)

Plaintiffs argue that Murray pled sufficient facts to allege a plausible race discrimination claim. [31]  (Pls.' UPS Opp'n 19.)  In support, Plaintiffs state that Murray has shown that he is a

---

[30]  Plaintiffs' fourth cause of action is employment discrimination in violation of the Title VII, on behalf of Murray.  (SAC ¶¶ 291–301.)

[31]  In their opposition briefing, Plaintiffs argue for the first time that "Welsh plead[s] basic facts to allege a discrimination claim plausibly" based on his Jewish religion and "close familial ties to the LGBTQ community."  (Pls.' UPS Opp'n 19.)  Defendants argue that these new allegations are improper because there are no claims for discrimination based on religion or sexual orientation alleged in the SAC.  The Court agrees.  Plaintiffs cannot amend the SAC in their opposition papers to add additional causes of action.  *Santana v. City of New York*, No. 15-CV-6715, 2018 WL 1633563, at *4 (S.D.N.Y. Mar. 29, 2018); *see Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (declining to read a new cause of action asserted in opposition papers to a motion to dismiss into Plaintiff's amended complaint); *Logfret, Inc. v. Gerber Fin., Inc.*, 559 F. Supp. 3d 348, 361 (S.D.N.Y. 2021) (declining to address new assertions argued in the plaintiff's opposition papers because "new facts and allegations, first raised in a Plaintiff's opposition papers, may not be considered in deciding a motion to dismiss." (quoting *Universal Trading & Inv. Co. v. Tymoshenko*, No. 11-CV-7877, 2012 WL 6186471, at *1 (S.D.N.Y. Dec. 12, 2012))); *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 753 (S.D.N.Y. 2016) ("The plaintiff cannot amend his complaint 'merely by raising new facts and

protected class member both by race and gender, he was qualified as an on-road supervisor given how long he worked for UPS, and was paid less than his Caucasian coworkers who held the same title and had the same workload.  (*Id.*)  In addition, Murray claims that his Caucasian counterparts moved up the ranks faster than him even though they had less than perfect records regarding accidents.[32]  (*Id.*)

Claims of employment discrimination under Title VII are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Zheng-Smith v. Nassau Health Care Corp.*, No. 20-CV-3544, 2021 WL 4097316, at *1 (2d Cir. Sept. 9, 2021) (applying *McDonnell Douglas* framework to Title VII employment discrimination claim), *cert. denied*, 142 S. Ct. 1675 (2022) (2d Cir. 2013).  To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) "[he] is a member of a protected class; (2) [he] is qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."  *Zheng-Smith*, 2021 WL 4097316, at *1 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015)); *see also Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013).  A plaintiff's burden is "minimal."  *Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008); *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) ("A plaintiff's burden to establish an initial prima facie case is, by design, 'minimal and de

---

theories in [his] opposition papers.'" (quoting *Guo v. IBM 401(k) Plus Plan*, 95 F.Supp.3d 512, 526 (S.D.N.Y. 2015))), *aff'd*, 712 F. App'x 57 (2d Cir. 2017).  Moreover, the specific causes of action that are cited by Plaintiffs in this section of their opposition — counts nine and ten — involved only alleged disability discrimination and were withdrawn by Plaintiffs.  (*See* Pls' UPS Opp'n 2, 19–20.)  Therefore the Court declines to address these claims.

[32] Plaintiffs withdraw their federal discrimination claims against individual plaintiffs. (Pls.' Individual Opp'n 2.)

minimis.'" (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005))).  If the

plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a

legitimate, nondiscriminatory reason for its actions.  *Miceli v. Mehr*, 830 F. App'x 63, 65 (2d

Cir. 2020) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).  If the

defendant offers a legitimate, nondiscriminatory explanation for its action, the court must

nevertheless deny summary judgment if the plaintiff can show that the explanation was pretext.

*See Williams v. Mount Sinai Med. Ctr.*, 859 F. Supp. 2d 625, 641 (S.D.N.Y. 2012) (citing

*Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 294 (S.D.N.Y. 2005)).

At the pleading stage, however, a plaintiff need not prove discrimination or even allege

facts establishing every element of the *McDonnell Douglas* prima facie case.  *Littlejohn*, 795

F.3d at 311; *see Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016) (discussing *McDonnell

Douglas* burden at the pleading stage in the context of Title VII cases); *Williams v. N.Y.C. Hous.

Auth.*, 458 F.3d 67, 71 (2d Cir. 2006) ("[T]he requirements for establishing a prima facie case

under *McDonnell Douglas* [do not] apply to the pleading standard that plaintiffs must satisfy in

order to survive a motion to dismiss." (second alteration in original) (quoting *Swierkiewicz v.

Sorema*, 534 U.S. 506, 511 (2002))).  Instead, a plaintiff need only plead facts sufficient to give

"plausible support" to the plaintiff's "minimal" initial burden, which is governed by the statute

under which she brings her claims.  *Vega*, 801 F.3d at 84 (quoting *Littlejohn*, 795 F.3d at 307,

312); *see also Javed v. Medgar Evers Coll. of City Univ. of N.Y.*, 724 F. App'x 73, 74 (2d Cir.

2018) (citation omitted).  The allegations must "put forward 'at least minimal support for the

proposition'" that the adverse employment action was "motivated by [the employer's]

discriminatory intent."  *Javed*, 724 F. App'x at 74 (quoting *Vega*, 801 F.3d at 85); *see also Vega*,

801 F.3d at 87 ("[A] plaintiff must plausibly allege that (1) the employer took adverse action

against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision.").

Murray has adequately pled a Title VII claim of race-based wage discrimination.  First, Murray is African American, a member of a protected class.  (SAC ¶¶ 11, 18; Murray Decl. ¶¶ 2–3.)  Plaintiffs allege that Murray had over fifteen years of experience working at UPS, (SAC ¶¶ 49; Murray Decl. ¶¶ 2–3, 14), trained other UPS employees, (SAC  ¶ 73; Murray Decl. ¶ 13), and when he became an on-road supervisor he had experience identifying customer needs, experience delivering packages, experience performing observations, and knowledge of the GTS and SEAS systems.  (SAC ¶¶ 50–51.)  These allegations are sufficient to support an inference that Murray was qualified for his position.  In addition, Plaintiffs allege that Murray was paid $20,000 less than one of his Caucasian counterparts, even though he had more experience than the employee, trained the employee, and the Caucasian employee was involved in an accident during their probationary trainee period.  (SAC ¶¶ 73–75.)  Plaintiffs also allege that "Mr. Murray was compensated less than Roy Welsh, Carl Lucateli, Joseph Simeone, and Robert "Bob" Walsh, other Caucasian on-road supervisors who "all possessed the same skills and knowledge that Mr. Murray had when he assumed the role as an [o]n-[r]oad [s]upervisor."  (*Id*. ¶ 78); *see Lenzi v. Systemax, Inc*., 944 F.3d 97, 110 (2d Cir. 2019) (recognizing a Title VII discrimination claim may be based on equal work for unequal pay); *Butterfield-Bajinan v. City of New York*, No. 16-CV-5919, 2017 WL 4045175, at *4 (S.D.N.Y. Sept. 11, 2017) (finding allegations of unequal pay sufficient to constitute an adverse action).  These allegations plausibly support an inference that Murray was discriminated against because of his race.  *See Craven v. City of New York*, No. 19-CV-1486, 2020 WL 2765694, at *5 (S.D.N.Y. May 28, 2020) (finding that the plaintiff plausibly alleged sex and race discrimination claims where she alleged a

similarly situated white male colleague was paid more than she was, despite having fewer responsibilities and equal or lesser credentials); *see also Bockus v. Maple Pro, Inc.*, 850 F. App'x 48, 50 (2d Cir. 2021) (recognizing that the pleading state, "need only give plausible support to a minimal inference of discriminatory motivation.").

Accordingly, the Court denies Defendants' motion to dismiss Murray's Title VII claim.

### e.   Murray's, Welsh's, and Moyle's NYCHRL and NYLL Retaliation claims

Defendants claim that Plaintiffs' retaliation claims fail as a matter of law because neither Murray, Welsh, nor Moyle properly allege protected activity. [33]  (UPS Mem. 10–12; Individual Defs.' Mem. 12–15.)  In addition, Defendants question the veracity of Murray's allegation that he raised concerns about race-based wage discrimination, (UPS Mem. 12), and claim that even if Murray made the complaint, he "cannot plausibly plead a causal connection between the protected activity and retaliation because he cannot know whether the retaliation occurred because of the wage discrimination complaint or his other complaints,"  (Individual Defs.' Mem. 15).[34]  Defendants also argue that Plaintiffs' retaliation claims under NYLL §§ 215 and 740 fail as a matter of law.  (UPS Mem. 13.)  In support, Defendants claim that (1) Plaintiffs' section 215 claim is solely based on the allegation that they "raised concerns" about violations of DOT hours

---

[33]  Plaintiffs assert multiple retaliation claims in their sixth and seventh causes of action in the SAC.  Specifically, they assert: (1) NYCHRL retaliation claims on behalf of Welsh and Moyle against UPS, Stewart, and Hall in their sixth cause of action, (SAC ¶¶ 310, 315–16, 320–21); (2) NYCHRL retaliation claim on behalf of Murray against UPS and Grey in their seventh cause of action, (*id.* ¶¶ 326–28); and (3) NYLL §§ 215 and 740 claims on behalf of Murray, Welsh, and Moyle against UPS in their sixteenth cause of action, (*id.* ¶¶ 398–409).

[34]  Defendants also argue that Welsh's and Moyle's "Title VII retaliation claim . . . also fail[] for the independent reason that [they] failed to exhaust their administrative remedies." (UPS. Mem. 13 n.4.)  However, Plaintiffs do not allege a Title VII retaliation claim on behalf of either Welsh or Moyle.  (*See generally* SAC.)

regulations to HR and a safety director, however, DOT hours regulations are not provisions of the NYLL, (*id.* at 13); (2) Plaintiffs fail to allege adverse consequences resulted from these purported violations of DOT hours regulations, (*id.* at 13), and (3) Plaintiffs failed to file their section 740 claim within the requisite limitations period.  (Individual Defs.' Mem. 25).

Plaintiffs argue that Murray's, Welsh's, and Moyle's retaliation claims under the NYCHRL do not fail as a matter of law because they were retaliated against after engaging in protected activities.  (Pls.' UPS Opp'n 14; Pls.' Individual Defs.' Opp'n 5–6.)  In support, Plaintiffs claim that Welsh and Moyle made internal complaints via the 1800 hotline, complained to upper management, and contacted HR on several occasions concerning homophobia and religious observance discrimination and Defendants "took several adverse actions against them, including write-ups, heightened scrutiny, denial of disability requests, egregious hour and shift assignments, and refusal of a right to religious observance" based on their protected activity. (Pls.' Individual Defs.' Opp'n 5–6.)  Plaintiffs contend that (1) Defendants terminated Murray one month after he filed a HR complaint concerning race-based wage discrimination, (*id.* at 5–6; SAC ¶¶ 326–29); (2) Welsh took disability leave, filed a complaint concerning homophobia, and requested religious observance accommodations, Hall knew about his engagement in these activities and changed his schedule to conflict with his religious observance practices and UPS transferred him to a work location extremely far from his home, (SAC ¶¶ 318–21); and (3) Moyle engaged in and was on disability leave, Stewart knew he was utilizing this leave and Defendants permanently replaced him and transferred him to a location in upstate New York because of his accommodation request, (*id.* ¶¶ 314–17).  In addition, Plaintiffs argue that Murray, Welsh and Moyle plausibly allege claims under NYLL §§ 215 and 740 because they were all reprimanded after raising concerns with HR on UPS's alleged violations of DOT

regulations.  (Pls.' UPS Opp'n 14–16.)  Plaintiffs claim that both statues are intended to protect employees and the public, and as a result of Defendants' conduct, delivery drivers have been involved in multiple automobile accidents.  (*Id.*)

> ### i.   NYCHRL retaliation claims

NYCHRL provides that "[i]t shall be an unlawful discriminatory practice . . . to retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter."  N.Y.C. Admin. Code § 8-107(7).  "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that [they] took an action opposing [their] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  *Leroy v. Delta Air Lines, Inc*., 36 F.4th 469, 474 (2d Cir. 2022) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715 F.3d 102, 112 (2d Cir. 2013)).  "To survive a motion to dismiss, a plaintiff claiming retaliation under the NYCHRL must allege that she engaged in protected activity."  *Id*. (citing *Albunio v. City of New York*, 16 N.Y.3d 472, 479 (2011)).  The plaintiff "need not prove that her underlying complaint of discrimination had merit but only that it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  If the underlying employment practice was unlawful, however, that establishes the reasonableness of her belief.  *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001) (noting that a plaintiff "could reasonably have believed that [the defendant]'s conduct violated Title VII" because "the facts she alleges support a hostile work environment claim of sex discrimination").  "The NYCHRL require[s] a causal connection between an adverse act and a protected activity to prove a retaliation claim."  *Antoine v. Brooklyn Maids 26, Inc*., 489 F. Supp. 3d 68, 87 (E.D.N.Y. 2020); *Alexander v. Possible Prods.,*

*Inc.*, 336 F. Supp. 3d 187, 196 (S.D.N.Y. 2018) ("Plaintiff must show a 'causal link' between the protected activity and the retaliatory act" to bring a retaliation claim under NYCHRL (citing *Kumaga v. N.Y.C. School Const. Auth.*, 910 N.Y.S.2d 405 (Sup. Ct. 2010))).

### 1.   Murray's NYCHRL claim

Plaintiffs have provided sufficient allegations to support Murray's NYCHRL retaliation claim.  Murray engaged in a protected activity by reporting details related to the allegations of race-based discrimination to Beverly.  (SAC ¶ 80, 84; Murray Decl. ¶¶ 23–26); *see Kwan*, 737 F.3d at 844 (recognizing a company complaint as protected activity for a federal retaliation claim); *Santana v. Latino Express Restaurants, Inc.*, 198 F. Supp. 3d 285, 296 (S.D.N.Y. 2016) ("An employee's informal complaint to a supervisor about discrimination is sufficient to constitute a protected activity under the NYCHRL"); *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) ("[I]nformal complaints to supervisors about purportedly discriminatory activity are also protected activity"); *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012).  Although Defendants dispute these factual allegations, the Court construes them in favor of Plaintiffs.  Thus, Plaintiffs have plausibly alleged that HR manager Beverly knew of the protected activity based on Murray's race based complaints to HR.  *See Kwan*, 737 F.3d at 844 (finding that a complaint to a company's officer is sufficient to impute to the company's knowledge of the protected activity under federal law).  UPS also engaged in conduct that would likely deter a person from reporting discrimination by termination Murray.  *See Mihalik*, 715 F.3d at 102 (recognizing that termination is reasonably likely to deter a person from engaging in action opposing employer's discrimination); *Farmer v. Shake Shack Enters.*, LLC, 473 F. Supp. 3d 309, 334 (S.D.N.Y. 2020) (recognizing that "termination [is] undisputedly an adverse employment action").  Furthermore, Plaintiffs have

plausibly alleged a causal link between Murray's complaints and his termination, based on temporal proximity because he was terminated a month after he made the complaints to Beverly. (SAC ¶ 329); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110–11 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship." (citation omitted)); *Craven*, 2020 WL 2765694, at *6 (finding that the plaintiff's allegations that she received unequal pay and an excessive workload in retaliation for her participation in an interview with her employer's equal employment office were sufficient to state a claim for retaliation where the adverse employment occurred five months after her interview and there was consistent antagonism prior); *Bloomberg*, 967 F. Supp. 2d at 862 (finding that the "broader standard" of the NYCHRL "does not absolve [the plaintiff] from putting forth evidence tending to show a causal connection between her action opposing . . . alleged discrimination and the alleged adverse actions"); *see, e.g.*, *Kwan*, 737 F.3d at 845 (determining that a three-week period between complaint and termination was sufficient to show causal connection); *Malena*, 886 F. Supp. 2d at 364 (inferring causal relationship after the plaintiff was terminated approximately three weeks after making a complaint to HR).

### 2. Welsh's NYCHRL claim

Drawing all inferences in Plaintiffs' favor, Welsh has alleged a plausible claim of retaliation under the NYCHRL.  First, Welsh's report of Fortis's homophobic attack may constitute action opposing UPS's discrimination.  Fortis called Welsh a homophonic slur, approached him in a threatening manner, and screamed at him while at work.  (SAC ¶¶ 201–02); *see Mihalik*, 715 F.3d at 113 (recognizing that "even a single comment may be actionable in the

proper context under the NYCHRL); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 851 (S.D.N.Y. 2013) (recognizing that a public verbal reprimand can constitute adverse action for a NYCHRL retaliation claim); *see also Leroy*, 36 F.4th at 474 (recognizing that "[t]he plaintiff 'need not prove that [his] underlying complaint of discrimination had merit but only that it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful.'"(quoting *Kwan*, 737 F.3d at 843)).  Welsh made an internal complaint about Fortis's behavior via UPS's 1800 hotline, (*id.* ¶ 372), and also reported this incident to HR, but never received a formal response from UPS.  (*Id.* ¶ 205); *see Santana v. Latino Express Rests., Inc.*, 198 F. Supp. 3d 285, 296 (S.D.N.Y. 2016) ("An employee's informal complaint to a supervisor about discrimination is sufficient to constitute a protected activity under the NYCHRL"); *Nieblas-Love*, 165 F. Supp. 3d at 70 ("[I]nformal complaints to supervisors about purportedly discriminatory activity are also protected activity."); *Malena*, 886 F. Supp. 2d at 363 (same).  A request of a religious accommodation may also be a protected activity.  *Privler v. CSX Transp. Inc.*, No. 18-CV-1020, 2021 WL 3603334, at *19 (N.D.N.Y. Aug. 13, 2021) ("While the Second Circuit has not expressly determined whether a request for a religious accommodation constitutes 'protected activity' for purposes of a Title VII retaliation claim, [d]istrict [c]ourts in this Circuit have held that it does." (citing *Levy v. Legal Aid Soc*., 408 F. Supp. 3d 209, 216-17 (E.D.N.Y. 2019)); *see also Chavis v. Wal-Mart Stores, Inc*., 265 F. Supp. 3d 391, 407 n.6 (S.D.N.Y. 2017) ("Courts in this District have held that a request for a religious accommodation itself constitutes protected activity for purposes of a Title VII retaliation claim).  Second, Defendants knew of the allegedly discriminatory acts because Welsh reported them to his direct supervisor, Hall, and Hall told him that "it would blow over, and [] Fortis's bark was worse than his bite."  (*Id.* ¶ 203.) Third, Defendants' denial of time off for religious observances and schedule manipulation may

deter another individual from reporting discriminatory attacks to their supervisor.  Throughout his career at UPS, Welsh had a set schedule due to his religious observances.  (SAC ¶ 208.)  Welsh would work in the mornings so he could be home by sundown.  (*Id*.)  After Welsh went against Hall's wishes and reported Fortis's behavior to the 1800 hotline, he was not allowed to go home before sundown.  (*Id*.)  The manipulation of Welsh's previous schedule — including denial of requests to work from home — so that he could no longer attend his religious activities would likely deter a person from complaining as Welsh did.  *See Bermudez v. City of New York*, 783 F. Supp. 2d 560, 588 (S.D.N.Y. 2011) (finding under NYCHRL that denial of benefits, including requests for time off, after reporting discriminatory behavior would likely deter a person from engaging in protected activity); *see also Mihalik*, 715 F.3d at 114 (recognizing that "NYCHRL does not require materially adverse employment actions" for conduct to be actionable (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 34, 37–39 (App. Div. 2009)); *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 325–26 (E.D.N.Y. 2014) (finding that "requiring [the plaintiff to use unpaid leave, rather than compensatory time, to attend Friday prayers does have a material impact on [the p]laintiff and that [a] reasonable employee could well be dissuaded from complaining about discrimination if he were required to give up enjoyment of the use of compensatory time and forego pay in order to attend weekly prayer"); *Syeed*, 568 F. Supp. 3d at 321 ("The NYCHRL must be construed 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" (quoting *Nguedi v. Fed. Rsrv. Bank of N.Y.*, No. 16-CV-636, 2019 WL 1083966, at *10 (S.D.N.Y. Mar. 7, 2019))).  Finally, a causal connection can be inferred from temporal proximity.  *See Kwan*, 737 F.3d at 845 ("[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse

[employment] action."); *Kraiem v. JonesTrading Institutional Servs. LLC*, 571 F. Supp. 3d 53,

60 (S.D.N.Y. 2021) ("When considering causation, courts apply the same temporal-proximity

analysis to NYCHRL . . . retaliation claims as they do to Title VII claims.").  Welsh alleges that

he experienced the interaction with Fortis, a few months before his departure from UPS.  (SAC ¶

201.)  "Even after Welsh expressed concerns about his physical safety because Fortis got into his

face in a threatening manner, Hall brushed off the issue and warned Welsh against making a "big

deal" of the incident and "reminded him that bad things happen to managers and employees who

create UPS problems."  (*Id*. ¶ 204.)  Welsh ignored Hall's suggestion to disregard the attack and

reported the interaction to an 1800 hotline, and soon after, Hall began denying Welsh's religious

accommodation requests and manipulating his schedule.  (*Id*. ¶¶ 206–08.)  The "few months"

between Welsh's engagement in a protected activity and Hall's retaliatory conduct is sufficient

to give rise to an inference of causation.  *See Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011)

(citation omitted) ("While we have not 'drawn a bright line' defining the maximum time period

that can give rise to an inference of causation, six weeks fits comfortably within any line we

might draw."); *Gorzynski*, 596 F.3d at 110 ("Though this Court has not drawn a bright line

defining, for the purposes of a prima facie case, the outer limits beyond which a temporal

relationship is too attenuated to establish causation, we have previously held that five months is

not too long to find the causal relationship.").

### 3.   Moyle's NYCHRL claim

Moyle's retaliation claim against Defendants fails because Plaintiffs fail to allege that he

participated in a protected activity.  Plaintiffs allege in the SAC that "the protected activity that

Plaintiff Moyle engaged in was taking disability leave[, which is] protected under the Family

Medical Leave Act ['FMLA']."  (SAC ¶ 314.)  However taking disability leave pursuant to the

FMLA is not a protected activity under NYCHRL.  *See, e.g., Fasanello v. United Nations Int'l Sch.*, No. 19-CV-5281, 2022 WL 861555, at *15 (S.D.N.Y. Mar. 23, 2022) ("Because FMLA leave is protected by federal law, not by the NYCHRL, [the d]efendant is correct that taking FMLA leave is not a 'protected activity' under the NYCHRL."); *Amley v. Sumitomo Mitsui Banking Corp.*, No. 19-CV-3777, 2021 WL 4429784, at *18 (S.D.N.Y. Sept. 27, 2021) ("Taking FMLA leave on its own does not constitute 'opposition' to an unlawful employment practice." (citing *Corrado v. N.Y. Unified Court Sys.*, 163 F. Supp. 3d 1, 26 (E.D.N.Y. 2016))); *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 367 (S.D.N.Y. 2016) ("Taking FMLA leave is not a protected activity within the meaning of the NYCHRL."); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012) ("While [the plaintiff] alleges that she was retaliated against for taking FMLA leave, this is not a 'protected activity' under  . . . NYCHRL"), *aff'd*, 713 F.3d 163 (2d Cir. 2013).

Accordingly, the Court denies Defendants' motion to dismiss Murray's and Welsh's NYCHRL retaliation claims, but grants Defendants' motion to dismiss Moyle's NYCHRL retaliation claim.

### ii.   NYLL §§ 215 and 740 claims

"Section 215 prohibits an employer from in any manner discriminating or retaliating against 'any employee . . . because such employee has made a complaint to his or her employer . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter.'"  *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 582 (2d Cir. 2020) (quoting NYLL § 215(a)(1)).  The Supreme Court has held that this anti-retaliation provision "includes oral as well as written complaints."  *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 109 (2d Cir. 2015).  "To establish a prima facie case, the plaintiff must show '(1) participation in protected activity known to the defendant, like the filing of a [NYLL]

lawsuit; (2) adverse employment action [a]ffecting the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Cortese v. Skanska Koch, Inc.*, 544 F. Supp. 3d 456, 470 (S.D.N.Y. 2021) (quoting *Mullins v. City of N.Y.*, 626 F.3d 47, 53 (2d Cir. 2010)).

Section 740 of the NYLL, provides in relevant part that '[a]n employer shall not take any retaliatory personnel action against an employee because such employee . . . discloses . . . to a supervisor . . . an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety." *Id.*; N.Y. Lab. L. § 740(2)(a).  "The plain language of section 740 requires that, in order to state a cause of action, 'a plaintiff must allege facts supporting the conclusion that (1) he was subject to a retaliatory personnel action after (2) disclosing to a supervisor (3) a practice of the employer that is in violation of a law, rule, or regulation (4) that creates and presents a substantial and specific danger to the public health or safety.'" *Arazi v. Cohen Bros. Realty Corp.*, No. 20-CV-8837, 2022 WL 912940, at *10 (S.D.N.Y. Mar. 28, 2022) (quoting *Klein v. Brookhaven Health Care Facility*, No. 17-CV-4841, 2019 WL 1459258, at *9 (E.D.N.Y. Mar. 11, 2019), *report and recommendation adopted*, No. 17-CV-4841, 2019 WL 1458219 (E.D.N.Y. Mar. 31, 2019).

### 1.   Section 215 claims

Plaintiffs have failed to state a claim for retaliation under section 215 because their section 215 claim is based solely on the allegation that they "raised concerns" about DOT violations, not any provision of the NYLL.  (*See* SAC ¶¶ 398–412); *see HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 100 (S.D.N.Y. 2020) (dismissing a Section 215 claim where the plaintiff did not "allege that [the defendant] made a complaint about a violation of the New York Labor Laws

or an order of the Commissioner of Labor."); *Copantitla v. Fiskardo Estiatorio Inc.*, 788 F.

Supp. 2d 253, 302 (S.D.N.Y. 2011) (recognizing that to state a claim for retaliation under NYLL

§ 215, a plaintiff must allege that "while employed by the defendant, [he] made a complaint

about the employer's violation of [NYLL] and, as a result, was terminated or otherwise

penalized, discriminated against, or subjected to an adverse employment action"); *Kassman v.

KPMG LLP*, 925 F. Supp.2d 453, 472 (S.D.N.Y. 2013) (dismissing a claim under section 215

because the alleged complaints did not "ris[e] to the level of specificity to state a retaliation

claim under . . . the New York Labor Law").

### 2.   Section 740 claims

#### A.   Murray's section 740 claim is time-barred

UPS terminated Murray in 2018, thus his section 740 claim is barred by the applicable

one-year statute of limitations because Plaintiffs commenced this action in March of 2020, five

months after the limitations period ended.  (SAC ¶18; *see* Compl.); *see* N.Y. Lab. L. §

740(4)(a)(2019); *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 132 (2d Cir. 2007)

("The statute of limitations applicable to a claim brought under section 740 is one year from the

time of the alleged unlawful employment action." (citing N.Y. Lab. L. § 740(4)(a))).

#### B.   Welsh's and Moyle's section 740 claims

Drawing all reasonable inferences in Plaintiffs' favor and assuming that Welsh and

Moyle's last report of DOT violations occurred at the end of their employment, their section 740

claims are not time-barred.  (*See* SAC ¶¶ 19–20 (stating that Welsh worked at UPS until July of

2019 and Moyle worked at UPS until August of 2019)); *Reddington*, 511 F.3d at 132.

Welsh and Moyle also have sufficiently plead section 740 claims.  Plaintiffs allege that

Welsh and Moyle complained to HR and the UPS safety director about UPS's violations of DOT

hours regulations.  (SAC ¶¶ 402–03, 407–08.)  UPS's violations of DOT hours regulations creates a specific danger to public safety by putting over-worked and tired delivery drivers on the road that may cause accidents.  (*See id.* ¶¶ 82, 409–12.)  After disclosing these alleged violations, Welsh's religious accommodations requests were denied and his work schedule changed, which led to his resignation, and Moyle was subjected to frivolous investigations and company "grinding" that led to his resignation.  (*Id.* ¶¶ 136–37, 140–43, 157); *see Jones v. CareandWear II, Inc.*, 166 N.Y.S.3d 513 (N.Y. Sup. Ct. 2022) (finding that the plaintiff stated a claim under section 740, where she raised concerns about conduct that posed a substantial danger to public health and safety, and shortly after she raised her concerns, she was barred from work communications and later terminated); *see also Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 586 (S.D.N.Y. 2019) ("'[I]n order to recover under a section 740 claim, [the] plaintiff must show that [he] reported or threatened to report the employer's activity, policy or practice, but need not claim that [he] cited any particular law, rule or regulation at [the] time' that the plaintiff made a report." (quoting *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 23 N.Y.3d 448 (2014))).

Thus Plaintiffs have alleged sufficient facts to support a claim under section 740 as to Welsh and Moyle, but Murray's claims is untimely.

Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs section 215 claims and section 740 claim as to Murray, but denies the motion as to Welsh's and Moyle's section 740 claims.

### f.   Unjust enrichment claims

Defendants argue that Plaintiffs' unjust enrichment claims are deficient because Plaintiffs do not plead that their wages fell below minimum wage as a result of the out of pocket expense

paid by drivers and "under New York law, employers do not have to reimburse employees for business expenses, including 'tools of the trade,' so long as not doing so does not reduce the employee's wage below the minimum wage." [35] (UPS Mem. 21 (quoting *Oram v. SoulCycle LLC*, 979 F. Supp. 2d 498, 507 (S.D.N.Y. 2013).)

Plaintiffs argue that the expenses of "paying out of pocket to cover up auto accidents, gas payments for UPS's delivery trucks, and reneging paying the supervisor's work cellphone bills are not necessary 'tools of the trade' for Plaintiffs to perform their jobs." (Pls.' UPS Opp'n 17.)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Myun-Uk Choi v. Tower Res. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018); *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc*., 448 F.3d 573, 586 (2d Cir. 2006) (same) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).

Plaintiffs have adequately alleged a claim for unjust enrichment. Plaintiffs allege that UPS benefitted by (1) not compensating Murray and Welsh for traveling off route to make cash payouts to cover up auto accidents, (2) not compensating drivers for gas payments for UPS's delivery trucks, and (3) reneging on paying the supervisor's work cellphone bills, (SAC ¶¶ 354–58, 361–65), and not paying for the use of their personal cell phone, (SAC ¶¶ 358, 365). UPS also benefitted by not compensating Moyle for making out-of-pocket cash payments to car accident victims in order to prevent them from calling the police or filing insurance claims. (*Id*. ¶¶ 359–60). Plaintiffs also allege that it is against equity and good conscience to permit UPS to not reimburse Plaintiffs for out-of-pocket expenses because Murray, Welsh, and Moyle

---

[35] Plaintiffs allege unjust enrichment claims on behalf of Murray, Welsh, and Payne against UPS in their eleventh cause of action. (SAC ¶¶ 352–69.)

submitted expense reports to their supervisors with the expectation that they would be compensated for these expenses and UPS made billions of dollars in earnings in 2020.  (*Id*. ¶¶ 366–67.)  Drawing all reasonable inferences in Plaintiffs' favor, the Court cannot conclude that gas expenses for off-route deliveries, cash payments to car accident victims, or cell phone payments constitutes "tools of the trade."[36]  Moreover, even if these items are characterized as "tools of the trade," because Defendants also failed to pay Plaintiffs their required wages, the failure to pay the costs of (1) cash payouts to cover up auto accidents, (2) gas payments for UPS's delivery trucks, and (3) the supervisor's work cellphone bills will likely further support Plaintiffs' wage theft claims under New York law.  *See Galvez v. 800 Ginza Sushi Inc*., No. 19-CV-8549, 2022 WL 748286, at *15 (S.D.N.Y. Mar. 11, 2022) (denying motion to dismiss delivery workers' claim for reimbursement for purchase of delivery bicycles, as well as for maintenance and repairs because "[the d]efendants also failed to pay [the p]laintiffs the required wages").

---

[36] An employer is not required to reimburse expenses for "tools of the trade . . . so long as not doing so does not reduce the employee's wage below the minimum wage" *Oram*, 979 F. Supp. 2d at 507.  This exclusion has primarily been utilized to bar NYLL and FLSA claims. Defendants have not identified a case barring an unjust enrichment claim based on expenses designated as "tools of the trade."  *See* 29 C.F.R. § 531.35 ("[I]f it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the [FLSA] in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the [FLSA].");  *Galvez v. 800 Ginza Sushi Inc*., No. 19-CV-8549, 2022 WL 748286, at *15 (S.D.N.Y. Mar. 11, 2022) ("Under the regulations implementing both the FLSA and the NYLL, "an employer may not shift the cost of purchasing 'tools of the trade' to an employee if the cost of such tools cuts into the minimum or overtime wages required to be paid him." (quoting *Gamero v. Koodo* Sushi Corp., 272 F. Supp. 3d 481, 511 (S.D.N.Y. 2017)); *Guan Ming Lin v. Benihana Nat'l Corp*., 755 F. Supp. 2d 504, 511–12 (S.D.N.Y. 2010) (finding that employers can require employees to bear the costs of tools of the trade as long as it does not reduce their wages below minimum wage).

Accordingly, the Court denies Defendants motion to dismiss Plaintiffs' unjust enrichment claims.

### g.    Employer liability as to Plaintiffs' NYCHRL claims

Defendants argue that Plaintiffs' employer liability claim fails because they failed to state a NYCHRL claim against UPS.  (UPS Mem. 20.)

Plaintiffs argue that Murray and Welsh both reported misconduct to UPS's HR department, yet UPS failed to do anything to prevent or remedy the offensive conduct, which eventually led to Welsh's and Murray's resignation and termination.  (Pls.' UPS Opp'n 18–19.)

"The NYCHRL's employer liability provision is not a substantive cause of action that creates a distinct form of liability for employers, but instead describes the circumstances in which '[a]n employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or an agent which is in violation of' the NYCHRL's substantive employment provisions." *Rossbach v. Montefiore Med. Ctr.*, No. 19-CV-5758, 2021 WL 930710, at *9 (S.D.N.Y. Mar. 11, 2021) (quoting N.Y.C. Admin. Code § 8-107(13)(b)).  "An aiding and abetting claim against an individual employee depends on employer liability, however, and '[w]here no violation of the [NYCHRL] by another party has been established, . . . individuals cannot be held liable . . . for aiding and abetting their own violations of the Human Rights Law.'" *Miloscia v. B.R. Guest Holdings LLC*, 928 N.Y.S.2d 905, 917 (Sup. Ct. 2011), *aff'd in part, modified in part*, 942 N.Y.S.2d 484 (2012) (quoting *Strauss v. N.Y. State Dept. of Educ.*, 805 N.Y.S.2d 704 (Sup. Ct. 2005)).

As discussed above, Plaintiffs have adequately stated NYCHRL retaliation claims against UPS on behalf of Murray and Welsh.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' employer liability claim.

### h. Aiding and Abetting

Individual Defendants argue that the NYCHRL aiding and abetting claims by Plaintiffs Murray, Welsh, and Moyle, fail since Plaintiffs fail to allege any underlying discrimination or retaliation claims and fail to meet the additional elements of employer liability or set forth any non-conclusory fact establishing shared intent or purpose between UPS and the Individual Defendants.[37]  (Individual Defs.' Mem. 19–20.)  Defendants argue that no aiding and abetting claim lies against Stewart or Hall because Plaintiffs Welsh and Moyle fail to sufficiently plead the elements of an underlying NYCHRL claim.  (*Id*. at 20.)  In addition, Defendants argue that Plaintiff Welsh does not plead a separate claim for religious discrimination against any Defendant because no underlying religious discrimination claim is pleaded.  (*Id*. at 21.)

Plaintiffs argue that Murray, Welsh, and Moyle, have met the NYCHRL standard for aiding and abetting claims because each Plaintiff provides facts claiming that the Defendants implemented adverse work conditions following their protected activity.  (Pls.' Individual Defs.' Opp'n 6.)  In support, Plaintiffs argue that Murray was terminated from his position and Welsh and Moyle suffered severe depression and anxiety, causing their resignations.  (*Id*.)

---

[37] Plaintiffs assert NYCHRL aiding and abetting claims against Hall, Stewart, and Grey in their twelfth, thirteen, and fourteenth causes of action, respectively.  Specifically, Plaintiffs allege a NYCHRL aiding and abetting claim against Hall on behalf of Welsh in their twelfth cause of action, (SAC ¶¶ 370–76); a NYCHRL aiding and abetting claim against Stewart on behalf of Moyle in their thirteenth cause of action, (SAC ¶¶ 377–83);  a NYCHRL aiding and abetting claim against Grey on behalf of Murray in their fourteenth cause of action.  (SAC ¶¶ 384–90.)

NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so." N.Y.C. Admin. Code § 8-107(6); *Sanchez v. L'Oreal USA, Inc*., No. 21-CV-3229, 2022 WL 1556402, at *5 (S.D.N.Y. May 17, 2022).

"A precondition to a valid aiding and abetting claim under the . . . NYCHRL is a demonstration of a valid primary claim for discrimination or retaliation." *Rossbach*, 2021 WL 930710, at *7, *see also Farmer*, 473 F. Supp. 3d at 338 (where plaintiff "does not state a claim for . . . discrimination or a hostile work environment on the part of . . . defendant, there is no predicate for aiding and abetting liability with respect to these claims"). To state a claim for aiding and abetting, a plaintiff must allege that the defendant "actually participate[d] in the conduct giving rise to [the] discrimination claim." *Feingold*, 366 F.3d at 157 (citation omitted); *see also, e.g., Farmer*, 473 F. Supp. 3d at 337; *Mauro v. N.Y.C. Dep't of Educ*., 2020 WL 5899522, at *8 (S.D.N.Y. Apr. 29, 2020); *Malena*, 886 F. Supp. 2d at 367–68.

Plaintiffs' have sufficiently pled claims for aiding and abetting on behalf of Murray and Welsh because Plaintiffs allege that Grey and Hall separately engaged in conduct contributing to violations of the NYCHRL. Plaintiffs claim that Grey took several adverse employment actions against Murray after he reported wage and hour violations and discriminatory employment actions, including, "being written-up and subjected to heightened scrutiny of his work product, making him work egregious hours and shifts, paying him less than his Caucasian colleagues, denying him repayment for his expenses, . . . and terminating him. (SAC ¶ 386); *see Feingold*, 366 F.3d at 158 ("[A] co-worker who actually participates in the conduct giving rise to a discrimination claim [can] be held liable under the [NYCHRL] even though that co-worker lacked the authority to either hire or fire the plaintiff."). Similarly, Plaintiffs claim that after

Welsh reported a homophobic attack to an 1800 hotline, Hall "took several adverse employment actions against him," including, denying his disability accommodations request and prohibiting him from being able to participate in his religious observances.  (SAC ¶¶ 372–73); *see Murtha v. N.Y. State Gaming Comm'n*, No. 17-CV-10040, 2019 WL 4450687, at *19 (S.D.N.Y. Sept. 17, 2019) (finding that the plaintiff sufficiently pled a claim for aiding and abetting where his supervisor retaliated against him for his reasonable accommodations request).  Because Plaintiffs have stated viable NYCHRL retaliation claims involving the conduct of Hall and Grey, they have sufficiently stated aiding and abetting claims against them.

Plaintiffs' claim for aiding and abetting against Stewart on behalf of Moyle fails because they have not demonstrated a valid primary claim for discrimination or retaliation.  *Rossbach*, 2021 WL 930710, at *7.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' aiding and abetting claims against Hall and Grey and grants Defendants' motion to dismiss Plaintiffs' aiding and abetting claim against Stewart.

### a.   Leave to amend

The Court grants Plaintiffs thirty days from the date of this Memorandum and Order to file a third amended complaint.

Rule 15 of the Federal Rules of Civil Procedure provides that "[l]eave to amend should be 'freely give[n] . . . when justice so requires,' but 'should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party[.]'"  *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (second and third alterations in original) (first quoting Fed. R. Civ. P. 15(a)(2); and then quoting *Burch v. Pioneer Credit*

*Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008)); *see also Grasso*, 2022 WL 728839, at *2

("[Second Circuit] precedent favor[s] that 'leave [to amend] . . . be freely given when justice so

requires'" (quoting *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990))); *Kainz v.*

*Bernstein*, 841 F. App'x 249, 253 (2d Cir. 2020) (noting that leave to amend should be freely

given).  "Futility is a determination, as a matter of law, that proposed amendments would fail to

cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil

Procedure."  *Jang v. Trs. of St. Johnsbury Acad.*, 771 F. App'x 86, 88 (2d Cir. 2019) (quoting

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)); *see also*

*Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) ("[An] [a]mendment is futile if it fails 'to

cure prior deficiencies.'" (quoting *Panther Partners Inc.*, 681 F.3d at 119)).  "Thus, the standard

for denying leave to amend based on futility is the same as the standard for granting a motion to

dismiss."  *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot.*

*Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  "If the problems with a claim are 'substantive'

rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to

replead would be 'futile' and 'should be denied.'"  *Jordan v. Chase Manhattan Bank*, 91 F.

Supp. 3d 491, 510 (S.D.N.Y. 2005) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.

2000)).

    The Court grants Plaintiffs leave to file a third amended complaint as to their dismissed

claims — Moyle's NYCHRL retaliation claims, Plaintiffs' NYLL § 215 claims, and Moyle's

NYCHRL aiding and abetting claim.  *See Woo Hee Cho v. Oquendo*, No. 16-CV-4811, 2018 WL

9945701, at *12 (E.D.N.Y. Aug. 25, 2018) ("When a motion to dismiss is granted, the usual

practice is to grant leave to amend the complaint." (quoting *Hayden v. County of Nassau*, 180

F.3d 42, 53 (2d Cir. 1999))); *Caren v. Collins*, 696 F. App'x 19, 22 (2d Cir. 2017) ("[D]ismissal

for insufficient pleadings are ordinarily with leave to replead." (quotation omitted)); *see also Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 264 (S.D.N.Y. 2020) (sua sponte granting leave to file a second amended complaint where plaintiff could provide missing facts necessary to support its claims).

If Plaintiffs decide to file a third amended complaint, Plaintiffs must do so within thirty days of the date of this Memorandum and Order.  A third amended complaint will completely replace the SAC and must stand on its own without reference to the SAC and must contain all of the claims Plaintiffs seek to pursue.  The third amended complaint must be captioned "Third Amended Complaint" and bear the same docket number as this Memorandum and Order.  If Plaintiff elects not to file a third amended complaint or fails to file a third amended complaint within thirty days of this Memorandum and Order, the Court will dismiss Moyle's NYCHRL retaliation claim, Plaintiffs' NYLL § 215 claims, and Moyle's NYCHRL aiding and abetting claim, and all of Plaintiffs' other claims will proceed.

### III.   Conclusion

For the foregoing reasons, the Court denies Defendants' motion to dismiss Plaintiffs' NYLL wage and hour claims, Murray's Title VII race discrimination claim, Murray's and Welsh's NYCHRL retaliation claims, Welsh's and Moyle's NYLL § 740 claims, Plaintiffs' unjust enrichment claim, Plaintiffs' employer liability claims, and Murray's and Welsh's NYCHRL aiding and abetting claims.  The Court grants Defendants' motion to dismiss Moyle's NYCHRL retaliation claim, Murray's, Welsh's, and Moyle's NYLL § 215 claims, Murray's NYLL § 740 claim, and Moyle's NYCHRL aiding and abetting claim.  The Court also grants Plaintiffs leave to amend the SAC within thirty days of the date this Memorandum and Order.

Dated:  September 25, 2022
        Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge